1
2
3
4
5

AUER LAW FIRM PLLC
Colleen Auer (014637)
11445 E. Via Linda, STE 2-529
Scottsdale, Arizona 85259
Telephone: (602) 370-7965
cauernd14@gmail.com

*Attorney for Plaintiff*

6
7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

8
9
10
11
12
13
14
15
16
17

| | |
|---|---|
| Brooke Schneider, | No. |
| Plaintiff, | VERIFIED CIVIL COMPLAINT FOR TITLE VII AND STATE-LAW RETALIATION; SECTION 1983 DEPRIVATION OF DUE PROCESS RIGHTS; AND, CONSTRUCTIVE DISCHARGE |
| v. | |
| Scottsdale Unified School District No. 48 of Maricopa County, Arizona, | |
| Defendant. | JURY TRIAL DEMANDED |

18
19
20
21
22
23
24
25
26
27
28

Brooke Schneider ("Plaintiff"), for her complaint against Scottsdale Unified School District No. 48 of Maricopa County, Arizona ("Defendant"), alleges the following, based upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, including the investigation conducted by and through her attorney:

# Table of Contents

INTRODUCTION ...........................................................................................2

JURISDICTION AND VENUE ....................................................................2

PARTIES ......................................................................................................2

    I.      PLAINTIFF ...................................................................2

    II.     DEFENDANT ................................................................3

DIRECT AND CONCERTED ACTION UNDER COLOR OF LAW ..........3

    I.      DIRECT ACTION BY DEFENDANT ........................3

         A.     Defendant's Governing Board ..........................3

         B.     Defendant's Designated Policymakers .............3

    II.     CONCERTED ACTION BY DEFENDANT ...............5

         A.     Private Party in Concert with Designated Policymakers ..................................................................5

         B.     Employees in Concert with Designated Policymakers....5

PLAINTIFF'S COMPLIANCE WITH PROCEDURAL PREREQUISITES ...................................................................................................6

    I.      ADMINISTRATIVE REMEDIES ............................6

         A.     Retaliation Ended April 15, 2020 ....................6

         B.     Plaintiff Commenced Administrative Remedies Sept. 8, 2020 ....................................................6

         C.     Plaintiff Exhausted Administrative Remedies August 16, 2021 ..............................................6

         D.     Filing Deadline in A.R.S. §12-821 Tolled Until August 16, 2021 ..................................................7

         E.     Plaintiff Filed This Lawsuit Within Statutory Deadlines ..................................................................7

    II.     NOTICE OF CLAIM ................................................8

         A.     First Notice of Claim Delivered March 9, 2020 ..............8

         B.     First Notice of Claim Rejected March 10, 2020 ..............8

         C.     Second Notice of Claim Served June 23, 2021 ................9

         D.     Second Notice of Claim Expired August 23, 2021 ..........9

**E.**     **Plaintiff Filed Suit After the Second Notice of Claim Expired** ............................................. **9**

**FACTS COMMON TO ALL CLAIMS** ................................................. **9**

**I.**     **HOW DEFENDANT CREATED A CULTURE OF FEAR AND INTIMIDATION, RIPE FOR DISCRIMINATION.** ........ **9**

    **A.**     **Full-Scale Delegation of Enforcement Powers Over Staff** ............................................................. **9**

    **B.**     **Deliberate Indifference to Compliance with its Staff Policies** .............................................................. **9**

    **C.**     **Failure to Stop Abuse of its Enforcement Powers Over Staff** ................................................................. **10**

**II.**     **HOW THAT CULTURE MADE DISCRIMINATION INEVITABLE** ......................................................... **11**

    **A.**     **Staff Deferred to Supervisors** ........................... **11**

    **B.**     **Supervisors Devalued Staff** .............................. **11**

    **C.**     **Staff Had No Safety Net** .................................... **11**

**III.**     **HOW PLAINTIFF'S ABUSE WAS A PRODUCT OF THAT CULTURE** ......................................................... **12**

    **A.**     **An Entitled, Empowered Supervisor** ................. **12**

    **B.**     **A Vulnerable Female Subordinate** .................... **12**

    **C.**     **A Non-Submissive Act of Defiance** ................... **13**

    **D.**     **The Supervisor's Sexist Response** .................... **15**

    **E.**     **Supervisor is Aided and Abetted in His Discriminatory Response** .............................................................. **18**

**CLAIMS FOR RELIEF** ...................................................................... **25**

**COUNT 1 Retaliation in Violation of Title VII, 42 U.S.C. §2000E-3(a)** ................................................................................ **25**

**COUNT 2 Retaliation in Violation of ACRA, A.R.S. §§41-1401 *et seq.*** ................................................................................ **33**

**COUNT 3 Constructive Discharge Under AEPA, §23-1501 *et. seq.*, in violation of ACRA, A.R.S. §§41-1401 *et seq.*** ....................... **40**

**COUNT 4 Violation of the Fourteenth Amendment Right to Due Process of Law, 42 U.S.C. §1983** ..................................... **44**

## INTRODUCTION

1.     Plaintiff brings this civil action to remedy workplace retaliation by the Defendant against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. ("Title VII"), and the Arizona Civil Rights Act, A.R.S. §41-1401 *et seq.* ("ACRA"), culminating in Plaintiff's constructive discharge under the Arizona Employment Protection Act, A.R.S. §23-1501 *et seq.* ("AEPA"), in violation of ACRA.

2.     Plaintiff also brings this civil action, pursuant to 42 U.S.C. §1983, to remedy Defendant's actions, under color of state law, which deprived Plaintiff of a protected property right in her continued employment with the District under her 2019/2020 teaching contract, without the requisite due process, in violation of well-established law and her Fourteenth Amendment rights.

## JURISDICTION AND VENUE

3.     This Court has federal question jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3)(4), because Plaintiff sues for violations under Title VII and 42 U.S.C. §1983, respectively.  Further, this Court has pendent jurisdiction over the closely-related, non-federal claims pled, under 28 U.S.C. §1367(a).

4.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391(b) because: (i) Defendant resides in this judicial district, and (ii) all of the events, acts, and omissions giving rise to Plaintiff's claims took place in this judicial district.

## PARTIES

### I.     PLAINTIFF

5.     Plaintiff is an educator certified in Elementary and Early Childhood Education and Structured English Immersion, K-12; a 2016 graduate of Northern Arizona University with a Bachelor of Science Degree in Elementary Education; a 2020 graduate, *Summa Cum Laude*, of Arizona State University ("ASU") with a Master of Education Degree in Curriculum and Instruction with an emphasis in Early Childhood Education; and, a current Doctoral student at ASU pursuing a Doctor of Education Degree in Leadership and Innovation.

6. At all relevant times, Plaintiff was an "employee" of the Defendant covered by Title VII (42 U.S.C. §2000e(f)) and ACRA (A.R.S. §41-1461(5)(a)).

7. Plaintiff was employed by Defendant as an elementary school teacher under two (2), consecutive, teaching contracts from June 12, 2018 until her constructive discharge by the Defendant on March 16, 2020.

## II. DEFENDANT

8. Defendant is a school district organized and existing under the laws of the state of Arizona, located in Maricopa County, governed by the Scottsdale Unified School District Governing Board (the "Governing Board"), with the capacity to sue and be sued.

9. Defendant employs 3,000 people, including about 1,500 teachers, and serves students in Phoenix, Paradise Valley, Fountain Hills, Tempe, and Scottsdale across 29 physical campuses and 1 online high school.

10. Defendant is, and at all relevant times was, an "employer" covered by Title VII (42 U.S.C. §2000e(b)) and ACRA (A.R.S. §41-1461(6)(a)). Defendant is also a "person" under Title VII (42 U.S.C. §2000e(a)).

## DIRECT AND CONCERTED ACTION UNDER COLOR OF LAW

## I. DIRECT ACTION BY DEFENDANT

### A. Defendant's Governing Board

11. The Governing Board is the policymaking entity for Defendant whose official actions represent the decisions of Defendant.

12. All of the wrongful conduct alleged herein was ratified by Defendant, by and through its Governing Board, which was acting in its official capacity, within the scope of its authority, and under color of state law, at all relevant times.

### B. Defendant's Designated Policymakers

13. Among other things, the Governing Board is responsible for:

a. prescribing and enforcing policies and procedures for the governance of Defendant's schools which are consistent with the law and rules prescribed by the Arizona State Board of Education (A.R.S. §15-341(1),(21)-(22)); and,

3

b.      establishing a system by which a "qualified evaluator" can evaluate the performance of Defendant's certificated teachers which is consistent with state law (A.R.S. §§15-537(A), 15-501(8)).

14.      Per state law, the Governing Board may delegate its authority, as follows:

a.      to impose discipline that is not cause for dismissal or revocation of the teacher's/administrator's certificate to a "person or persons" of its choosing (A.R.S. §15-341(21)-(22));

b.      to "prescribe procedures that are consistent with the [G]overning [B]oard's policies" to a "superintendent, principal or head teacher" (A.R.S. §15-341(F)); and,

c.      to evaluate Defendant's certificated teachers to a school principal or other person trained to evaluate certificated teachers (A.R.S. §15-501(8)).

15.      During the relevant period, the Governing Board delegated the following authority to Plaintiff's supervisor, Principal Charles Rantala ("Rantala"):

a.      the authority to evaluate Plaintiff, a certificated teacher; and

b.      the authority to impose discipline, short of dismissal or revocation of a teacher's certificate, on Plaintiff.

[*See* Defendant's policies "*GCQF Discipline, Suspension, and Dismissal of Professional Staff Members*" at 2, and "*GCO-RA Evaluation of Professional Staff Members*" at 2, true and correct copies of which are attached hereto as Exhibits 1 and 2, respectively.]

16.      As a result, Rantala had final policymaking authority for Defendant in these two areas, such that Rantala's evaluation and disciplinary decisions as to Plaintiff represented decisions by Defendant itself, and Rantala's deliberate choice to follow a course of action with respect to the evaluation or discipline of Plaintiff represented the official policy of Defendant.

17.      During the relevant period, the Governing Board also delegated its authority to enforce its anti-discrimination policies to a Compliance Officer, and authorized the Superintendent to appoint that Compliance Officer.  [*See* Defendant's policy "*GBA-R Equal Employment Opportunity*" at 1, a true and correct copy of which

is attached hereto as Exhibit 3.] The Superintendent appointed Defendant's then General Counsel, Michelle Marshall ("Marshall"), to serve in this role.

18. As a result, Marshall had final policymaking authority for Defendant in this area such that Marshall's actions in response to Plaintiff's complaints of (i) unequal pay/sex-based wage discrimination by Rantala, and (ii) discriminatory harassment and retaliation by Rantala represented decisions by Defendant itself, and Marshall's deliberate choice to follow a course of action in response to Plaintiff's discrimination complaints represented the official policy of Defendant.

19. Rantala and Marshall (collectively, the "Designated Policymakers") were each acting in their official capacity, within the course and scope of his/her employment, and under color of state law, at all relevant times.

## II. CONCERTED ACTION BY DEFENDANT

### A. Private Party in Concert with Designated Policymakers

20. In doing the things alleged herein, the Designated Policymakers acted jointly and in concert with each other, and with a private party – namely, Defendant's outside counsel, Jennifer MacLennan ("MacLennan").

21. At all relevant times, MacLennan was acting under the direction of Marshall, and in concert with said official, under color of state law.

### B. Employees in Concert with Designated Policymakers

22. In doing the things alleged herein, the Designated Policymakers acted jointly and in concert with each other, and with the following employees of Defendant:

a. Defendant's then Human Resources ("HR") Director, Amy Eveleth ("Eveleth");

b. Defendant's HR Representative, Teresa Belmonte ("Belmonte");

c. Defendant's Secretarial Assistant to Rantala, Judy Edmonson ("Edmonson");

d. Defendant's Director of Payroll and Benefits, Lindie Evans ("Evans").

The above-listed employees, together with MacLennan, are collectively referred to herein as the "Confederates."

23.    In doing the things alleged herein, each of the Confederates was acting: (i) jointly and in concert with the Designated Policymakers; (ii) at the direction of, with the authorization of, or with the ratification and/or consent of the Designated Policymakers; (iii) in the course and scope of his/her employment; and, (iv) under color of state law.

**PLAINTIFF'S COMPLIANCE WITH PROCEDURAL PREREQUISITES**

**I.    ADMINISTRATIVE REMEDIES**

**A.    Retaliation Ended April 15, 2020**

24.    Defendant's unlawful retaliation against Plaintiff commenced on December 13, 2019 and continued through and including April 15, 2020.  [*See* Plaintiff's Charging Statement against Defendant, attached hereto as Exhibit 4.]

**B.    Plaintiff Commenced Administrative Remedies Sept. 8, 2020**

25.    Plaintiff dual-filed her Charging Statement against the Defendant (the "Charge") with the EEOC (35A-2020-00626C) and the CRD (CRD-2020-0826) on September 8, 2020, and the EEOC assumed responsibility for processing the Charge.

26.    The Charge was dual-filed with the CRD and the EEOC within 300 days after the unlawful retaliation occurred on April 15, 2020, rendering the Charge timely filed under Title VII (42 U.S.C. §2000e-5(e)(1)).

27.    The Charge was dual-filed with the CRD and the EEOC within 180 days after the unlawful retaliation occurred on April 15, 2020, rendering the Charge timely filed under the ACRA (A.R.S. §41-1481(A)).

**C.    Plaintiff Exhausted Administrative Remedies August 16, 2021**

28.    Plaintiff and Defendant tried to informally resolve the Charge through EEOC mediation on March 9, 2021, but no settlement was reached.  So, the Charge was referred to the EEOC's investigative unit for further processing.

29.     Because the EEOC had already exceeded the 180 days allotted to the agency to resolve the Charge (29 C.F.R. 1601.28(a)(1)), and its investigative process was unlikely to run its course in time for Plaintiff to meet various filing deadlines in this case, Plaintiff requested a Notice of Right to Sue letter from the EEOC on May 20, 2021.

30.     The EEOC acknowledged that request on June 15, 2021, and advised Plaintiff to expect to receive a Notice of Right to Sue letter directly from the United States Department of Justice ("DOJ").

31.     Plaintiff received the Notice of Right to Sue letter from the DOJ on August 16, 2021.

**D.      Filing Deadline in A.R.S. §12-821 Tolled Until August 16, 2021**

32.     Per A.R.S. §41-1481(A), exhaustion of administrative remedies is a prerequisite to Plaintiff's suit for unlawful retaliation in violation of A.R.S. §41-1464(A).

33.     Per A.R.S. §41-1481(A), exhaustion of administrative remedies is a prerequisite to Plaintiff's suit for constructive discharge in violation of A.R.S. §23-1502, based on the wrongful termination of Plaintiff's employment in violation of A.R.S. §41-1464(A).

34.     Therefore, the one-year deadline to file state-law claims against Defendant did not commence running until after Plaintiff exhausted her administrative remedies on those claims on August 16, 2021, per A.R.S. §12-821.01(C).

**E.      Plaintiff Filed This Lawsuit Within Statutory Deadlines**

35.     Plaintiff filed this lawsuit within ninety (90) days of receipt of the Notice of Right to Sue letter from the DOJ on August 16, 2021, rendering this lawsuit timely filed under Title VII (29 C.F.R. §1601.28(e)(1)).

36.     Plaintiff filed this lawsuit within one (1) year of the date the Charge was dual-filed with the CRD and the EEOC on September 8, 2020, rendering this lawsuit timely filed under ACRA (A.R.S. §41-1481(D)) and the AEPA (A.R.S. §§12-541(4),(5); 12-821.01(C)).

37.     Plaintiff filed this lawsuit within one (1) year of the date the state-law claims accrued, upon exhaustion of Plaintiff's administrative remedies on August 16, 2021, rendering this lawsuit timely under A.R.S. §12-821, per A.R.S. §12-821.01(C).

38.     Plaintiff filed this lawsuit within two (2) years of the date when Plaintiff was deprived of her protected property interest in her continued, contractual employment with Defendant without due process on March 16, 2020, rendering this lawsuit timely under 42 U.S.C. §1983.

## II.     NOTICE OF CLAIM

### A.     First Notice of Claim Delivered March 9, 2020

39.     Defendant has been on notice of Plaintiff's claims in this case since February 14, 2020 – i.e., long before Plaintiff commenced, much less exhausted, the administrative remedies prerequisite to this lawsuit.

40.     Indeed, Plaintiff, with the assistance of counsel, spent almost every day for a month, from February 14, 2020 until March 9, 2020, outlining Defendant's transgressions to Marshall and MacLennan (collectively, "District Counsel") trying, in vain, to halt and remedy those transgressions without the need for formal proceedings.

41.     Those efforts culminated in Plaintiff's first notice of claim under A.R.S. §12-821.01, consisting of a proposed settlement agreement delivered to MacLennan on March 9, 2020, as the authorized agent for service of a notice of claim on the Defendant at that time (the "First Notice of Claim").

### B.     First Notice of Claim Rejected March 10, 2020

42.     Defendant, by and through Marshall and MacLennan, rejected the First Notice of Claim in writing on March 10, 2020.

43.     Plaintiff and her counsel continued to correspond with Marshall and MacLennan in yet a further attempt to halt Defendant's ongoing transgressions against Plaintiff, which regrettably continued unabated through and including April 15, 2020, as detailed below.

### C. Second Notice of Claim Served June 23, 2021

44. After the EEOC had exceeded its allotted 180-days to resolve the Charge (29 C.F.R. 1601.28(a)(1)) and confirmed that a Notice of Right to Sue letter from the DOJ was imminent, Plaintiff prepared a second notice of claim under A.R.S. §12-821.01, consisting of a 14-page letter detailing Plaintiff's claims against Defendant, and her settlement demand (the "Second Notice of Claim.") On June 23, 2021, the Second Notice of Claim was served on the Governing Board's Secretary, as the authorized agent for service of a notice of claim on the Defendant at that time. [A true and correct copy of the Second Notice of Claim is attached hereto as Exhibit 5.]

### D. Second Notice of Claim Expired August 23, 2021

45. The Second Notice of Claim expired without a response from Defendant sixty (60) days after it was served (A.R.S. §12-821.01(E)), or as of August 23, 2021.

### E. Plaintiff Filed Suit After the Second Notice of Claim Expired

46. Plaintiff filed this lawsuit after the Second Notice of Claim expired without response on August 23, 2021 and was deemed denied per A.R.S. §12-821.01(E).

## FACTS COMMON TO ALL CLAIMS

### I. HOW DEFENDANT CREATED A CULTURE OF FEAR AND INTIMIDATION, RIPE FOR DISCRIMINATION.

### A. Full-Scale Delegation of Enforcement Powers Over Staff

47. Defendant, by and through its Governing Board, placed its enforcement powers over staff – i.e., evaluations, discipline, anti-discrimination – entirely in the hands of its Designated Policymakers and their Confederates.

48. Consequently, whether, when, and how the Governing Board's disciplinary, evaluation, and anti-discrimination policies (the "Staff Policies") were enforced was determined entirely by its Designated Policymakers and their Confederates.

### B. Deliberate Indifference to Compliance with its Staff Policies

49. Further, the Governing Board delegated these sweeping powers over its staffs' employment and civil rights to its Designated Policymakers and their

Confederates, without making any provision for them to be: 1) fully and regularly trained on the requirements and lawful application and enforcement of its Staff Policies; or 2) supervised and audited on their actual application and enforcement of its Staff Policies.

50.     Even as they knew that the Designated Policymakers and their Confederates had a history of breaching Staff Policies, and thus violating the employment and civil rights of staff, the Governing Board refused to intercede in any manner to halt those abuses, and with deliberate indifference allowed those violations to continue unabated.

51.     Worse, the Governing Board facilitated those violations by allowing its Designated Policymakers and their Confederates to commit them behind the scenes, out of the public eye, and outside the Governing Board's direct involvement.  Hence, by design, the Designated Policymakers' and their Confederates' enforcement of Staff Policies was only ever presented to the Governing Board as a *fait accompli*, in the form of a serial listing of affected staff members' names and enforcement outcomes on the Governing Board's consent agenda for swift ratification by the Governing Board in a single action and without individual consideration and public discussion of the propriety of those enforcement outcomes.

### C.     Failure to Stop Abuse of its Enforcement Powers Over Staff

52.     The Governing Board's deliberate indifference to the illegitimate enforcement of its Staff Policies by its Designated Policymakers and their Confederates enabled the latter to abuse those powers to exact desired outcomes – namely, individualized retribution spawning generalized intimidation and deterrence of employee dissension and complaints of workplace misconduct, including EEOC violations.

53.     The result was a culture of fear and intimidation, ripe for discrimination.

////

////

////

## II.  HOW THAT CULTURE MADE DISCRIMINATION INEVITABLE

### A.  Staff Deferred to Supervisors

54.  In this environment, staff did everything possible to avoid winding up in the Designated Policymakers' and their Confederates' enforcement crosshairs, which meant remaining in their respective supervisors' good graces, as this is where any evaluative and/or disciplinary process would originate.

55.  This gave supervisors tremendous power over staff which they could easily abuse with little fear of complaint or repercussions.

### B.  Supervisors Devalued Staff

56.  It also led supervisors to devalue the rights and interests of their subordinates, who were wholly dependent on them for their continued good standing and employment with Defendant.

### C.  Staff Had No Safety Net

57.  This was the inevitable result of the disparities in power between the two groups and the fact that there was no safety net for staff members who engendered the enmity of their supervisors by challenging the appropriateness of their conduct, as Plaintiff did in this case.

58.  Indeed, the teachers' union for the Scottsdale Unified School District ("District"), dubbed the Scottsdale Education Association ("SEA"), held no sway over the outcomes of adverse personnel actions involving its members, despite the SEA's claims to the contrary.

59.  And, the Designated Policymakers and their Confederates invariably backed the supervisors in such circumstances, leaving the staff member to fight for his/her employment and/or civil rights alone.

////

////

////

////

## III.  HOW PLAINTIFF'S ABUSE WAS A PRODUCT OF THAT CULTURE

### A.  An Entitled, Empowered Supervisor

60.     Plaintiff's supervisor, Rantala, was part of Defendant's administration and had been for thirteen (13) years by the time he assumed supervision over Plaintiff and her peers teaching at Defendant's Yavapai Elementary School in 2019.

61.     Rantala had risen up the ranks to principal after twelve (12) years of teaching in the District, and the acquisition of a master's degree in education.

62.     Rantala was therefore firmly entrenched in Defendant's administration when he crossed paths with Plaintiff, who was just beginning her second year of teaching in the District under a 2019/2020 teaching contract with Defendant.

### B.  A Vulnerable Female Subordinate

63.     Plaintiff, a non-tenured, probationary employee, was especially vulnerable to pressure from Rantala to conform to his expectations for his female staff so as to avoid risking her continued employment with Defendant.

64.     From Rantala's perspective, this meant that Plaintiff had to behave in accordance with his gender stereotypes for women as subservient, obedient, deferential, diplomatic, and submissive.  Rantala was the decisionmaker, and he expected Plaintiff to accept his decisions and to comply with them without question or complaint.

65.     This included Rantala's decision to pay Plaintiff less than her male counterpart, Scott Harvey, for doing the same work teaching an after-hours Robotics class.  Rantala informed Plaintiff that if she wanted to teach the Robotics class, she would teach it for free, as a volunteer, until Rantala arranged to set up the E-par code that Plaintiff needed to begin billing her time for teaching that class to Defendant (the "Billing Code").

////

////

////

## C. A Non-Submissive Act of Defiance

66.     This was not an arrangement to which Plaintiff would have otherwise agreed, but Rantala was intimidating and Plaintiff felt compelled to accept Rantala's payment terms in order to be able to teach the Robotics class and placate Rantala.

67.     Plaintiff was very aware of Rantala's gender stereotypes for women, and of the consequences of not submitting to his decisions, and she was keen to avoid those consequences, which included:

> ▷     devaluing the victim's input and professional opinions;

> ▷     micro-managing and excessively monitoring and evaluating the victim's behavior and workplace performance;

> ▷     manipulating and manufacturing information to undermine and humiliate the victim, and to set her up for failure;

> ▷     passing the victim over for suitable work assignments and educational opportunities;

> ▷     applying a heightened standard of performance and behavioral expectations to the victim, as compared to her male counterparts;

> ▷     mis-attributing administrative and professional shortcomings and errors to the victim;

> ▷     impugning the victim's credibility, character, and competence; and,

> ▷     issuing damaging performance evaluations and/or discipline.

68.     For these reasons, Plaintiff capitulated to Rantala's requirement that she teach the Robotics class for "free" as a "volunteer" until the Billing Code was available. However, when the number of "free" Robotics classes went from three (3) to six (6) classes with no end in sight, Plaintiff became concerned and decided to follow up on the status of the Billing Code.

69.     Earlier, Rantala had told Plaintiff that his secretary, Edmonson, initiated set up of the Billing Code the morning of October 29, 2019, which was the the day after Plaintiff began teaching the Robotics class, but that it could "take up to 10 business days

13

[for the Billing Code] to route." [*See* 10/31/19 Rantala email to Plaintiff, a true and correct copy of which is attached hereto as Exhibit 6.]

70. Yet, when Plaintiff checked with Edmonson some two (2) weeks later, Edmonson knew nothing about the Billing Code.

71. So, the Billing Code was not set up until November 20, 2019, and Edmonson informed Plaintiff that the Robotics hours she worked *before* that date could not be paid. [*See* 11/22/19 Edmonson email to Plaintiff, a true and correct copy of which is attached hereto as Exhibit 7.]

72. The fact that Rantala expected Plaintiff to keep teaching the Robotics class for "free" until such time as he got around to setting up the Billing Code, while Harvey was being paid for every hour that he spent doing the same work, was too much for Plaintiff to passively accept.

73. So, Plaintiff contacted HR Representative, Belmonte, and reported that she: 1) had eight (8) hours of unpaid teaching time for the Robotics class for which she was seeking backpay; 2) had been told by Edmonson that she could not be paid for those pre-Billing Code hours; and, 3) was seeking clarification on Defendant's payment policy (the "Pay-Disparity Report"). [*See* 12/9-10/19 email correspondence between Plaintiff and Belmonte (the Pay-Disparity Report), true and correct copies of which are attached hereto as Exhibit 8.]

74. In response to the Pay-Disparity Report, Belmonte told Plaintiff that she would "get this corrected for [Plaintiff]" and planned to "reach out to the school to change the effective date [of the Billing Code] to cover the dates [Plaintiff] worked." [*Id.*]

75. The next day, on December 10, 2019, Belmonte sent the following email to Edmonson, which Edmonson immediately forwarded to Rantala:

> I was going to call you but I didn't know if you're at a new number. Brooke is stating that she worked prior to 11/20/19. We have to pay her for time worked. Please submit a Pay Change epar to change the effective date to

the first day she worked this supplemental. If there's an issue with her working prior to the start date you indicated, have Chuck handle it.

[*See* 12/10/19 Belmonte email to Edmonson, a true and correct copy of which is attached hereto as Exhibit 9.]

### D. The Supervisor's Sexist Response

76. That single, non-submissive act of defiance by Plaintiff – i.e., the Pay-Disparity Report – set Rantala off, and launched his discriminatory response to a female subordinate who refused to simply submit to his decisions and demonstrate the obeisance, compliance, and other stereotypical gender traits he expected of his female subordinates.

### 1. Unequal Pay for Equal Work

77. Rantala's discriminatory retaliation began with the sex-based, pay disparity for the Robotics class. Even with Belmonte's intervention, Plaintiff *was never paid for all of the hours she worked teaching Robotics*, like her male counterpart was, because Rantala required Plaintiff to agree to teach up to three (3) "free" Robotics classes as a "volunteer" until the Billing Code was available, as a condition to approving her request to teach the Robotics class with Harvey. And, Plaintiff feared the repercussions from Rantala if she were to seek backpay for these three (3) hours of work as well.

### 2. Discipline for Challenging the Pay Disparity

78. Within three (3) days of learning of the Pay-Disparity Report, Rantala summoned Plaintiff to his office "to follow up on some items," and shocked her with a Certified Corrective Action Memorandum (the "Letter of Direction") charging Plaintiff with *insubordination for "beg[inning] work with FLL Robotics prior to her ePar clearing Human Resources"* and two (2) other student-related infractions. [*See* the Letter of Direction, a true and correct copy of which is attached hereto as Exhibit 10 (emphasis supplied).]

79. Before the Pay-Disparity Report, Rantala had never said a word to Plaintiff about being dissatisfied with her behavior or performance in any regard. And, the

infractions he cited Plaintiff for in the Letter of Direction were completely baseless. So, once again, in lieu of submissive acceptance, Plaintiff fought back.

80. Plaintiff swiftly responded to Rantala's Letter of Direction with a comprehensive written memorandum (and supporting documents) that refuted each and every infraction Rantala had laid at her door. Most significantly, Plaintiff conclusively demonstrated that Rantala had expressly authorized her to "beg[in] work with FLL Robotics" on October 28, 2019, which was "prior to her ePar clearing Human Resources." [*See* Plaintiff's Response to the Letter of Direction, a true and correct copy of which is attached hereto as Exhibit 11.]

81. Rantala reacted to her challenge by first rebuffing Plaintiff's attempts to meet to discuss her response to the Letter of Direction, and when pressed finally capitulating to a brief meeting with Plaintiff where he accepted her rebuttal information without comment, and then did nothing with it. Specifically, Rantala did not withdraw or amend the Letter of Direction. Nor did he note that the issues raised in the Letter of Direction had been addressed and resolved by Plaintiff. Instead, Rantala left the Letter of Direction in place against Plaintiff "as is," with full knowledge that it was entirely unfounded.

### 3. Unlawful Performance Evaluations

82. One week later, Rantala performed the first of two (2), successive performance evaluations of Plaintiff (the "Evaluations"). The first was completed on December 20, 2019, and the second was completed on January 27, 2020, which was well ahead of the sixty (60) calendar days between evaluations mandated by state law (A.R.S. §15-537(F)(1)) and Staff Policies (Ex. 2 at 2).

83. The previous year, Rantala's predecessor, Principal Carlos Ardón, rated Plaintiff as a "Highly Effective" teacher and, together with his Assistant Principal, nominated Plaintiff for the Educator of the Year award for the District. At the time, Plaintiff was the youngest teacher in the District to receive that award.

84.     A mere six and one-half months later, however, Rantala rated Plaintiff's performance so low in the Evaluations that Plaintiff was instantly demoted to a "Developing" teacher, which triggered the issuance of a Preliminary Notice of Inadequacy and Remediation Plan ("Pre-Terminative Discipline") to Plaintiff, subjecting her to immediate dismissal if she failed to satisfy the Remediation Plan within forty-five (45) days of receipt.

85.     But those Evaluations were fatally flawed in that they purported to relay an accurate assessment of Plaintiff's performance as a teacher, without incorporating or relying on any of the data actually evidencing her level of performance.  In particular, the Evaluations omitted Plaintiff's student benchmark test data for the 2019-2020 school year ("Test Data"), in breach of Staff Policies (Ex. 12 at 2) and the requirements of state law (A.R.S. §15-537).  [*See* Defendant's Staff Policy "*GCO Evaluation of Professional Staff Members,*" a true and correct copy of which is attached hereto as Exhibit 12.]

86.     Had Rantala included the Test Data, the Evaluation outcomes would have been altogether different, and far more favorable to Plaintiff, because Plaintiff's Test Data exceeded both the campus average, and the District average, as noted below:

**Assessment: 19-20 #1 Math Gr 01 Formative Benchmark**

Campus Average      ►     73.6%

Defendant Average     ►     77.46%

Claimant's Average     ►     80.00%

**Assessment: 19-20 #2 Math Gr 01 Formative Benchmark**

Campus Average      ►     66.67%

Defendant Average     ►     66.15%

Claimant's Average     ►     77.63%

**Assessment: First Grade MOY ELA 2019-20**

Campus Average      ►     75.28%

Defendant Average     ►     82.39%

Claimant's Average     ►     85.91%

17

87.     Thus, Rantala's Evaluations were invalid.

#### 4.      Unfounded Pre-Terminative Discipline

88.     Nevertheless, Rantala stood by the Evaluations and actively pursued issuance of the Pre-Terminative Discipline against Plaintiff, even though he knew that the Pre-Terminative Discipline was undeserved, and the Evaluations on which it was founded were invalid.

### E.      Supervisor is Aided and Abetted in His Discriminatory Response

89.     Once again, Plaintiff was blindsided by Rantala when he informed her, on February 7, 2020, that she should expect to receive Pre-Terminative Discipline because she received low ratings on Rantala's Evaluations.

90.     Prior to Plaintiff's Pay-Disparity Report in December 2019, Rantala had never taken an interest in Plaintiff's work in the classroom, much less expressed any issues or concerns about Plaintiff's teaching methods or results.  In fact, the interactions between the two had largely been by email and related to routine administrative matters or authorization requests.

91.     Accordingly, Rantala's concentrated attention on Plaintiff personally, and her classroom activities generally, was entirely new and began only after the Pay-Disparity Report.  Then it became instant, excessive, and intimidating.  For example, Rantala suddenly wanted Plaintiff to account for details like: a particular student's movements from her classroom to another teacher's classroom; the purpose and objectives of a particular learning video she used with her students; and, the time-of-day she taught a certain subject to her class.

92.     Plaintiff felt under pressure and under a microscope from Rantala after she made the Pay-Disparity Report, and that animosity only grew after Plaintiff refused to passively accept Rantala's unfounded Letter of Direction which she thoroughly gutted in her comprehensive response.

93.     Now, with the shockingly-low ratings in Rantala's Evaluations, which themselves were spurious attacks on Plaintiff's skills lacking any basis in the data

evidencing her level of performance, Rantala had eviscerated Plaintiff's teaching record and was threatening her continued employment with Defendant. That was the last straw for Plaintiff in what had been weeks of retaliatory conduct by Rantala following her Pay-Disparity Report.

94. At this point, Plaintiff was beyond traumatized and desperate for help from her employer, the Defendant. But Defendant's Designated Policymakers and their Confederates would not come to Plaintiff's aid. They would, instead, aid and abet Rantala's discriminatory retaliation against Plaintiff, and commence their own discriminatory retaliation against Plaintiff, in order to spawn generalized intimidation and deterrence of employee dissension and complaints of workplace misconduct, including EEO violations.

### 1. Plaintiff's EEO Complaint is Ignored

95. Thus, when Plaintiff wrote HR Director, Eveleth, on February 8, 2020 to report that she was concerned for her "safety and well-being at [her] work site," and "in desperate need of assistance" because she was "being retaliated against and threatened by a school administrator" (the "EEO Complaint"), Eveleth did not forward the EEO Complaint to Marshall for processing or otherwise commence an investigation of the EEO Complaint. [*See* 2/8/2020 Plaintiff email to Eveleth (the EEO Complaint), a true and correct copy of which is attached hereto as Exhibit 13.]

96. Instead, Eveleth sent Plaintiff an email in response to the EEO Complaint in which she extolled Rantala's virtues and impugned Plaintiff's credibility. In that responsive email dated February 11, 2020, Eveleth emphasized: 1) the intrinsic reliability of Rantala's planned Pre-Terminative Discipline against Plaintiff; 2) Rantala's eminent qualifications to determine the necessity of that Pre-Terminative Discipline; 3) the need to swiftly schedule that Pre-Terminative Discipline; and, 4) the dubious nature of Plaintiff's claims against Rantala in the EEO Complaint. [*See* 2/11/2020 Eveleth email to Plaintiff in response to the EEO Complaint, a true and correct copy of which is attached hereto as Exhibit 14.]

97. Although District Counsel learned of the EEO Complaint at or near the time of its filing by Plaintiff, they likewise took no interest in it, or in Plaintiff's concerns for her safety and well-being in the workplace.

98. Indeed, no one interviewed Plaintiff about the EEO Complaint or her concerns for her safety and well-being in the workplace, ever.

99. And, no one investigated the EEO Complaint, ever.

### 2. Plaintiff's Personal Safety and Health is Sacrificed

100. Further, no one took *any action* – at the time Eveleth received the EEO Complaint, or thereafter – to remove Rantala from the workplace; to separate Rantala and Plaintiff from one another in the workplace; or, to otherwise attempt to allay Plaintiff's fears about her safety and security in the workplace.

101. Instead, Eveleth, in concert with District Counsel, told Plaintiff to confront Rantala directly about her objections to his threatened Pre-Terminative Discipline, about which she had complained, and despite Plaintiff's express concerns about her safety and well-being in Rantala's presence.

102. Then, Eveleth, in concert with District Counsel, proceeded with the implementation of the Pre-Terminative Discipline against Plaintiff, irrespective of the EEO Complaint, and without any consideration or investigation of same.

103. They jointly set a date and time of February 18, 2020 at 9:45 a.m. for Plaintiff to meet with Rantala and Eveleth in Rantala's office to accept delivery of the Pre-Terminative Discipline.

### 3. Plaintiff is Forced Out of the Workplace without Pay

104. However, by February 14, 2020, Plaintiff's stress and anxiety from the unrelenting discriminatory retaliation – which had continued unabated after her EEO Complaint – took its toll on Plaintiff's health, and she was forced out of the workplace with a serious medical condition.

105. District Counsel responded to Plaintiff's departure from the workplace by requiring Plaintiff to: 1) use up her paid sick leave and thereafter seek approval of unpaid

FMLA leave to cover the rest of her absence; 2) provide advance notice for each day that she would be absent from the workplace, until such time as her unpaid FMLA leave was approved; and, 3) enter grades for her students by the March 16, 2020 deadline, on threat of otherwise being found to have abandoned her contract, which is an "unprofessional act" under state law (A.R.S. §15-545) that subjects the Plaintiff to severe discipline by the ASBE.

### 4. Pre-Terminative Discipline is Imposed on Plaintiff

106.    While Plaintiff was absent from the workplace for medical reasons, Eveleth, in concert with District Counsel: 1) delivered the Pre-Terminative Discipline to Plaintiff by email on February 18, 2020 – in violation of the service requirements of state-law (A.R.S. §15-539(E)) and Staff Policies (Ex. 1 at 2) – and without affording Plaintiff the due process required by Staff Policies (*Id.* at 3-4); and, 2) notified the Governing Board of the issuance of the Pre-Terminative Discipline to Plaintiff.

107.    Staff Policies (*Id.*) entitled Plaintiff to the following due process in connection with the Pre-Terminative Discipline:

1)    *a disciplinary hearing* within ten (10) working days of her receipt of the Pre-Terminative Discipline, in which Rantala informs Plaintiff of her "conduct that warrants disciplinary action" and provides Plaintiff with "any appropriate evidence" and "relevant documentation not previously provided" (*Id.* at 4.);

2)    *a written disciplinary decision* within ten (10) working days of the disciplinary hearing in which Rantala informs Plaintiff whether he will proceed with the discipline and, if so, encloses written notice of: (i) the discipline to be imposed; and, (ii) the date the discipline will be imposed and become a part of the Plaintiff's personnel file, absent a written request for appeal by Plaintiff within five (5) working days of receipt of the decision (*Id.*); <u>and</u>,

3)    *the right to an appeal of that decision* to the next organizational level (i.e., the assistant superintendent or Superintendent) on any one or more of the following

grounds which may result in the discipline being upheld, modified or referred back for rehearing:

**A.** Determination was founded upon error of construction or application of any pertinent regulations or policies.

**B.** Determination was unsupported by any evidence as disclosed by the entire record.

**C.** Determination was materially affected by unlawful procedure.

**D.** Determination was based on violation of any statutory or constitutional right.

**E.** Determination was arbitrary and capricious.

**F.** The penalty was excessive.

(*Id.*)

108. Plaintiff did not receive any of the above-alleged due process rights in connection with the Pre-Terminative Discipline, to which she was entitled under Staff Policies (*Id.*).

### 5. Plaintiff is Personally Investigated

109. Further, despite their actual knowledge that the Pre-Terminative Discipline was unenforceable for lack of due process, and due to the fatally-flawed, underlying Evaluations, Eveleth, in concert with District Counsel, nevertheless imposed the Pre-Terminative Discipline upon Plaintiff, and then sought to challenge the validity of the Test Data erroneously omitted from the underlying Evaluations.

110. Specifically, in or about March 4, 2020, District Counsel advised Plaintiff that they had begun an investigation into the validity of the Test Data, which had been entered months earlier, based on "verbal concerns" expressed by unidentified members of the First Grade Team to Rantala (the "Test Data Investigation").

111. District Counsel then threatened Plaintiff with possible discipline if she communicated with anyone in the District about the Test Data Investigation.

22

## 6.     Plaintiff is Denied Basic Employment Rights

112.    Around that same time, District Counsel locked Plaintiff out of the Defendant's computer system and from all access to her employee files and information, so that Plaintiff could not do her work for the Defendant, even though she was still employed with the Defendant.

113.    Ultimately, the Test Data Investigation went nowhere.

114.    No one interviewed Plaintiff in connection with the Test Data Investigation, ever.

115.    Plaintiff was never given the opportunity to confront any of the witnesses involved in the Test Data Investigation or to see any of the so-called evidence at the center of the Test Data Investigation.

116.    And, the Test Data Investigation was never completed.

117.    Nor was any action ever taken to withdraw, modify, invalidate or otherwise alter the Test Data, which remains in place in the District to this day.

118.    Meanwhile, District Counsel continued to impose the Pre-Terminative Discipline on Plaintiff founded on the fatally-flawed Evaluations which unlawfully omit the Test Data.

## 7.     Plaintiff is Forced to Resign to Avoid Further Losses

119.    After a month of Plaintiff's absence and frustrated negotiations to end it and the unrelenting discriminatory retaliation against Plaintiff, the entrenched District Counsel proved unwilling to do either and, instead, gave Plaintiff the following ultimatum: *Without benefit of a hearing or any form of due process and in order to avoid a finding of contract abandonment and the resulting stigma and professional consequences of that decree, Plaintiff must either*:

*1) immediately return to the un-remediated hostile work environment;*

*2) establish approved grounds for indefinite, unpaid FMLA leave, through the end of her 2019/2020 teaching contract with Defendant, thereby forfeiting her right to work and to receive the compensation and benefits promised her under that contract; or*

*3) resign effective March 16, 2020, and pay $2,000 in liquidated damages to Defendant, in order to be released from her 2019/2020 teaching contract with.*

120.   The District Counsel were unmoving in this demand, which left Plaintiff with no choice but to resign effective March 16, 2020, and to pay the Defendant $2,000 in liquidated damages, as the other alternatives were infeasible for Plaintiff, as the District Counsel well knew.

121.   Specifically, District Counsel knew that Plaintiff could not, for health reasons, return to the un-remediated hostile work environment.  They also knew, or should have known, that Plaintiff could not afford to go on indefinite, unpaid FMLA leave, in lieu of working and receiving the compensation and benefits promised her under her teaching contract with the Defendant.  Nevertheless, District Counsel rejected all attempts by Plaintiff to reach an accord that would preserve her job, and the compensation and benefits of same, under her teaching contract with the Defendant.

### 8.   Plaintiff is Forced to Pay Defendant Liquidated Damages

122.   Thus, Plaintiff became yet another staff member whose name was serially listed with an enforcement outcome – i.e., "Resignation" – on the Governing Board's consent agenda for swift approval by the Governing Board in a single action, and without individual consideration and public discussion on the propriety of that enforcement outcome.

123.   The Governing Board then ratified Plaintiff's constructive discharge as part of its April 7, 2020 consent agenda which violated Staff Policies and applicable law, as alleged above.  [*See* the Governing Board's April 7, 2020 special meeting agenda, a true and correct copy of which is attached hereto as Exhibit 15.]

124.   The other staff members at Yavapai Elementary School witnessed the discriminatory retaliation that Plaintiff suffered as a result of standing up for her employment and civil rights in this case and were duly dissuaded, intimidated and deterred from standing up for their own employment and civil rights, lest they suffer the same fate.

### 9. Plaintiff is Untimely Paid, and Underpaid

125. While District Counsel repeatedly assured Plaintiff that she would be paid in full through March 26, 2020 of the 2019/2020 school year, the Payroll Director, Evans, deducted 9.715 days from Plaintiff's final paycheck for that period; and, failed to pay Plaintiff the .857 days (or $204.96) of earned leave to which she was entitled. Those monies were not paid to Plaintiff when due, and have yet to be paid to Plaintiff.

126. Further, without cause or justification, Evans did not pay Plaintiff $3,643.28 in gross wages that District Counsel admit were due and payable to Plaintiff on April 14, 2020. Indeed, that payment was not made to Plaintiff until *after* Plaintiff disputed the sufficiency of her final paycheck from the Defendant.

### 10. Plaintiff is Stripped of her Job, Rank, and Reputation

127. Despite actual knowledge that the Pre-Terminative Discipline was based on fatally-flawed Evaluations, and imposed without the requisite due process guaranteed by Staff Policies (Ex. 1 at 3-4), one or more of the Designated Policymakers and their Confederates informed the Governing Board of Plaintiff's Pre-Terminative Discipline, and placed a copy of that Pre-Terminative Discipline in Plaintiff's official personnel file, where it remains to this day.

128. As a result of that Pre-Terminative Discipline being wrongfully imposed on Plaintiff, 1) Plaintiff is no longer eligible for employment by any school in the District, 2) the Defendant is a negative employment reference for Plaintiff; and, 3) the Defendant has officially lowered Plaintiff's teaching classification in the District from "Highly Effective" to "Developing."

## CLAIMS FOR RELIEF

### COUNT 1
### RETALIATION IN VIOLATION
### OF TITLE VII, 42 U.S.C. §2000E-3(a)

129. Plaintiff realleges and incorporates the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

*Protected Activity*

130.    Plaintiff engaged in protected activity on December 9, 2019 when she reported to HR Representative, Belmonte, that her supervisor, Rantala, was denying her pay for performing the same teaching work as a paid male counterpart, which Rantala required Plaintiff to perform for free, as an unpaid "volunteer" – i.e., the Pay-Disparity Report.

131.    Plaintiff also engaged in protected activity on February 8, 2020 when she reported to HR Director, Eveleth, that she was concerned for her "safety and well-being at [her] work site," and "in desperate need of assistance" because she was "being retaliated against and threatened by" her supervisor, Rantala – i.e., the EEO Complaint.

*Adverse Employment Actions*

132.    The Defendant, by and through its Designated Policymaker, Rantala, subjected Plaintiff to the following adverse employment actions:

a.    Letter of Direction issued December 13, 2019;

b.    Two (2) poor Evaluations issued December 20, 2019 and January 27, 2020; and,

c.    Pre-Terminative Discipline issued February 18, 2020.

133.    The Defendant, by and through its Designated Policymakers and their Confederates – i.e., Rantala, Eveleth, Marshall, MacLennan, and Evans – subjected Plaintiff to the following adverse employment actions:

a.    Defendant rejected Plaintiff's EEO Complaint against Rantala and took no steps to halt the discriminatory retaliation or to remediate the hostile work environment of which she complained;

b.    Defendant forced Plaintiff out of the un-remediated hostile work environment with a stress-and-anxiety-induced, serious medical condition on February 14, 2020, without pay; provided, however, that through negotiations between Plaintiff's counsel and District Counsel, Defendant eventually agreed that Plaintiff would be paid in full through March 26, 2020 following her constructive discharge;

c. Defendant imposed unfounded, Pre-Terminative Discipline on Plaintiff, *in absentia*, by email on February 18, 2020, in violation of the service requirements under state law (A.R.S. §15-539(E)) and Staff Policies (Ex. 1 at 2), and without affording Plaintiff the due process required by Staff Policies (*Id*. at 3-4);

d. Defendant placed the unfounded, Pre-Terminative Discipline in Plaintiff's official personnel file for the District on or about February 18, 2020, rendering Plaintiff ineligible for employment by any school in the District, making the District a negative employment reference for Plaintiff, and lowering Plaintiff's teaching classification in the District from "Highly Effective" to "Developing."

e. Defendant commenced a belated, unfounded investigation into the validity of Plaintiff's Test Data, on or about March 4, 2020, in which Plaintiff was not allowed to participate or see the evidence or confront the witnesses against her, and which Defendant never completed, leaving the Test Data unaltered and in place in the District to this day;

f. Defendant barred Plaintiff's access to its computer system and to all of her employee files and information required to do her job, on or about March 4, 2020, while Plaintiff was still employed with Defendant;

g. Defendant forced Plaintiff to resign on March 16, 2020, in the midst of her 2019/2020 teaching contract with the Defendant, without pre-termination notice and due process, in order to avoid the other infeasible alternatives Defendant posed of: (i) returning to the un-remediated workplace; (ii) seeking indefinite, unpaid FMLA leave, through the end of her 2019/2020 teaching contract and thereby sacrificing all remaining compensation and benefits thereunder; or (iii) being found to have abandoned her contract with the resulting stigma and serious disciplinary consequences of that decree from the ASBE;

h. Defendant forced Plaintiff to pay $2,000 in liquidated damages to Defendant on March 16, 2020, in order to avoid a finding of contract abandonment and

the resulting stigma and serious disciplinary consequences of that decree from the ASBE; and,

i.    Defendant denied Plaintiff timely and complete payment of her full wages and benefits through the promised period of March 26, 2020.

*"But For" Causation; Rantala's Adverse Employment Actions in Response to Plaintiff's Pay-Disparity Report*

134.    Plaintiff's protected activity on December 9, 2019 was a substantial and motivating factor in Rantala's adverse employment actions against Plaintiff which would not have occurred in the absence of Plaintiff reporting to HR Representative, Belmonte, what she reasonably and in good faith believed to be unequal pay/sex-based, wage discrimination by Rantala in violation of the Equal Pay Act of 1963 ("EPA") and/or Title VII.  This is evidenced by the following facts:

a.    *There is a direct link between the Pay-Disparity Report and Rantala's adverse employment actions against Plaintiff.*  Indeed, the chief allegation Rantala makes in the Letter of Direction against Plaintiff involves Plaintiff's allegations in the Pay-Disparity Report.  Specifically, Defendant blames the pay disparity Plaintiff reported to Belmonte for the Robotics class on Plaintiff's "insubordination" in beginning to teach the Robotics class before Rantala authorized her to do so when the Billing Code was available for her to bill her work for that class.

b.    *All of Rantala's adverse employment actions against Plaintiff occurred on the heels of Plaintiff's Pay-Disparity Report, and in close proximity to that protected activity.*  The Letter of Direction, which centered on Plaintiff's protected activity, was issued a mere three (3) days after Rantala learned of the Pay-Disparity Report.  A week later, Defendant issued two (2), poor Evaluations for Plaintiff in quick succession on December 20, 2019 and January 27, 2020, which was well ahead of the sixty (60) calendar days between evaluations mandated by state law (A.R.S. §15-537(F)(1)) and Staff Policies (Ex. 2 at 2), which instantly demoted Plaintiff from a "Highly Effective"

28

to a "Developing" teacher and triggered the issuance of Pre-Terminative Discipline against Plaintiff.

c. *All of Rantala's adverse employment actions against Plaintiff breached Staff Policies, which means that they were not motivated by policy enforcement, but rather by Plaintiff's Pay-Disparity Report.* For example, the Letter of Direction, which centers on the Pay-Disparity Report, contravenes Staff Policies which prohibit administrators from engaging in any form of harassment or discrimination against staff members. [*See* Defendant's Staff Policies "*ACA General Harassment*" at 1, and "*AC Non-Discrimination/Equal Opportunity*" at 1, true and correct copies of which are attached hereto as Exhibits 16 and 17, respectively.] Rantala's poor Evaluations of Plaintiff contravene both the procedural and substantive requirements for staff performance evaluations outlined in Staff Policies. [*See* Ex. 12 at 2; Ex. 2 at 2-4.] And, Rantala's invalid Evaluations of Plaintiff do not support Pre-Terminative Discipline against Plaintiff under Staff Policies (Ex. 12 at 1-3; Ex. 2 at 2-4) or state law (A.R.S. §15-537).

135.    Rantala's adverse employment actions against Plaintiff in response to her protected activity would have dissuaded a reasonable employee from reporting unequal pay/sex-based wage discrimination to Defendant.

*"But For" Causation; the Designated Policymakers' and their Confederates' Adverse Employment Actions in Response to Plaintiff's EEO Complaint*

136.    Plaintiff's protected activity on February 8, 2020 was a substantial and motivating factor in the Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff which would not have occurred in the absence of Plaintiff's complaint of discriminatory harassment and retaliation by Rantala in violation of Title VII. This is evidenced by the following facts:

a. *There is a direct link between the EEO Complaint and the Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff.* Indeed, the Designated Policymakers' and their Confederates' adverse employment

actions against Plaintiff began with, and centered on, the EEO Complaint. Specifically, in breach of Staff Policies (Ex. 3 at 1), Eveleth and District Counsel: 1) *chose not to* investigate Plaintiff's EEO Complaint at the time it was received or anytime thereafter; 2) *chose not to* take any steps to ensure Plaintiff's safety and security in the workplace in response to her express concerns about same in the EEO Complaint; and, 3) *chose, instead, to* immediately proceed with Rantala's Pre-Terminative Discipline against Plaintiff, about which she had complained, without first considering, much less investigating, her EEO Complaint. [*Id*.]

b. *All of the Designated Policymakers' and their Confederates' adverse employment actions occurred on the heels of Plaintiff's EEO Complaint, and in close proximity to that protected activity.* For example, three (3) days after the EEO Complaint was filed, Eveleth questioned its validity, and Eveleth and the District Counsel chose not to investigate it, or to take any steps to address Plaintiff's concerns about her safety and well-being in the workplace. A mere six (6) days after Plaintiff filed the EEO Complaint, Eveleth and the District Counsel forced her out of the un-remediated hostile work environment with a stress-induced, serious medical condition. And, from there, District Counsel continued the discriminatory retaliation against Plaintiff with a rapid series of progressively more adverse employment actions against Plaintiff, culminating in Plaintiff's constructive discharge and payment of liquidated damages to the Defendant a mere thirty (30) days later, followed by a battle over the timing and amount of Plaintiff's final paycheck.

c. *All of the Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff breached Staff Policies*, *indicating that they were not motivated by policy enforcement, but rather by Plaintiff's EEO Complaint.* For example, the decision by Eveleth and District Counsel not to investigate the EEO Complaint violated Staff Policies, which require the investigation of every complaint of discrimination received by Defendant (Ex. 3 at 1). Likewise, the decision by Eveleth and District Counsel not to take steps to remediate Plaintiff's hostile work environment

violated Staff Policies that preclude harassment which subjects an individual to "treatment or a school environment that is hostile or intimidating" because of gender, among other reasons (Ex. 16 at 1). Further, the decision by Eveleth and District Counsel to proceed with enforcement of the Pre-Terminative Discipline against Plaintiff, about which Plaintiff had complained, without first investigating the EEO Complaint, violated Staff Policies that: prohibit any form of harassment or discrimination against staff members (*Id*.; Ex. 17 at 1); and, require legitimate performance evaluations as a basis for Pre-Terminative Discipline (Ex. 12 at 1-3; Ex. 2 at 2-4).

137.    The Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff in response to her protected activity would have dissuaded a reasonable employee from reporting EEO violations, including discriminatory harassment and retaliation, to the Defendant.

*Damages*

138.    As a direct and proximate result of the Designated Policymakers' and their Confederates' misconduct alleged above, Plaintiff has suffered damages including, but not limited to:

a.    emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

b.    unpaid and underpaid wages and benefits in relation to: her 2019/20 teaching contract with the Defendant; the Robotics class; and, other before/after school classes she would have taught;

c.    reductions and/or loss of medical and life insurance benefits;

d.    larger co-pays and medical deductibles;

e.    job-search expenses;

f.    $2,000 in liquidated damages paid to the Defendant;

g.    a reduction in her salary; and,

h.    attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A.     Enjoin the Defendant from engaging in any form of unequal pay/sex-based wage discrimination and discriminatory harassment and retaliation;

B.     Order Defendant to:

(i)     cease and desist from paying men and women working in the same school system different salaries for similar work;

(ii)     require the Governing Board to establish a procedure that ensures that wages which are reliant on the set-up of a Billing Code for billing and payment are, nevertheless, paid timely by the Defendant, in accordance with the requirements of state law;

(iii)     require the Governing Board to authorize the creation of a hotline for use by any District employee or agent to report, officially or anonymously, a violation of Staff Policies or any other unlawful and unethical behavior observed in the workplace to the Governing Board or its designee;

(iv)     require the Governing Board to make provisions for all of Defendant's employees and/or agents to receive regular and recurring training on, the lawful application and enforcement of Staff Policies including, but not limited to, the procedures for: 1) filing a complaint of discrimination with Defendant; 2) investigating a complaint of discrimination received by Defendant; and, 3) remedying any discrimination found;

(v)     require the Governing Board, for every complaint of discrimination received by Defendant in whatever form (i.e., verbal or written) to: 1) receive written notice of the complaint; 2) appoint a person or persons to investigate the complaint; and, 3) be apprized quarterly of the investigative findings and resolution of every complaint of unequal pay or discrimination in any form received by Defendant during that period.

(vi)     require the Governing Board to establish a procedure for disciplining District administrators who misapply or unlawfully enforce Staff Policies against subordinates;

(vii)    require the Governing Board to establish a procedure whereby the Superintendent has the authority to place an employee(s) on paid leave pending the outcome of an investigation of a complaint of unequal pay or discrimination in any form; and,

(viii)   require the Governing Board to authorize and direct the Superintendent to oversee, audit, and enforce the Defendant's non-discriminatory compensation policy.

C.     Award back pay and benefits to which Plaintiff would have been entitled but for the Defendant's unlawful retaliation;

D.     Award appropriate equitable relief and front pay in an amount to be determined at trial to make Plaintiff whole and to compensate her for the monetary losses she has suffered and continues to suffer because of the unlawful retaliation alleged in this Complaint;

E.     Award compensatory damages to Plaintiff to fully compensate her for the (i) injuries, pain and suffering and other non-pecuniary losses sustained, (ii) liquidated damages paid, and (iii) out-of-pocket expenses incurred as a consequence of the Defendant's unlawful retaliation, pursuant to, and within the statutory limitations of 42 U.S.C. §1981(a);

F.     Award reasonable attorneys' fees and costs incurred in this action;

G.     Award pre-judgment and post-judgment interest; and,

H.     Award such other relief as the court deems just and proper.

## COUNT 2
### RETALIATION IN VIOLATION
### OF ACRA, A.R.S. §§41-1401 *et seq.*

139.   Plaintiff realleges and incorporates the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

33

140.    The ACRA provides a private right of action for an employee aggrieved by an employer's unlawful employment practice under Title 41, Chapter 9, Article 4; provided, however, that the employee must have satisfied the procedural prerequisites to suit.  A.R.S. §41-1481(D).

141.    At all times material hereto, Plaintiff was an "employee" within the meaning of the ACRA.  A.R.S. §41-1461(5)(a).

142.    At all times material hereto, Defendant was an "employer" within the meaning of the ACRA.  A.R.S. §41-1461(6)(a).

143.    Plaintiff satisfied the procedural prerequisites to this lawsuit, as alleged above (see paragraphs 24 to 46).

*Protected Activity*

144.    Plaintiff opposed, in good faith, the following unlawful employment practices by Defendant per Title 41, Chapter 9, Article 4 of the ACRA:

a.    unequal pay/sex-based wage discrimination, which is prohibited by A.R.S. §41-1463(B)(1), and

b.    discriminatory harassment and retaliation in response to protected activity, which is prohibited by A.R.S. §§41-1463(B)(1), 41-1464(A).

*Adverse Employment Actions*

145.    Rantala subjected Plaintiff to prohibited discriminatory harassment and retaliation under A.R.S. §41-1464(A) for opposing, in good faith, unequal pay/sex-based wage discrimination prohibited by A.R.S. §41-1463(B)(1), by taking the following adverse employment actions against Plaintiff,

a.    *In response to Plaintiff's good faith report of what she reasonably believed to be unequal pay/sex-based wage discrimination by Rantala in violation of the EPA, Title VII and ACRA,* Rantala issued to Plaintiff, in swift succession, a Letter of Direction centered on her Pay-Disparity Report, two (2) poor Evaluations that did not comply with the requirements of Staff Policies or state law, and pre-Terminative Discipline founded entirely on the invalid Evaluations;

34

b. *In response to Plaintiff's good faith report of what she reasonably believed to be discriminatory harassment and retaliation by Rantala in violation of Title VII and ACRA*, the Designated Policymakers and their Confederates rejected Plaintiff's EEO Complaint, forced Plaintiff out of an un-remediated hostile work environment with a stress-induced, serious medical condition, and imposed a rapid series of progressively more adverse employment actions against Plaintiff, culminating in Plaintiff's constructive discharge and payment of liquidated damages to Defendant, and ending with a battle over Plaintiff's final paycheck from Defendant.

*"But For" Causation; Rantala's Adverse Employment Actions in Response to Plaintiff's Pay-Disparity Report*

146. Plaintiff's protected activity on December 9, 2019 was a substantial and motivating factor in Rantala's adverse employment actions against Plaintiff which would not have occurred in the absence of Plaintiff reporting to HR Representative, Belmonte, what she reasonably and in good faith believed to be unequal pay/sex-based wage discrimination by Rantala in violation of the Equal Pay Act of 1963 ("EPA") and/or Title VII. This is evidenced by the following facts:

a. *There is a direct link between the Pay-Disparity Report and Rantala's adverse employment actions against Plaintiff.* Indeed, the chief allegation Rantala makes in the Letter of Direction against Plaintiff involves Plaintiff's allegations in the Pay-Disparity Report. Specifically, Defendant blames the pay disparity Plaintiff reported to Belmonte for the Robotics class on Plaintiff's "insubordination" in beginning to teach the Robotics class before Rantala authorized her to do so when the Billing Code was available for her to bill her work for that class.

b. *All of Rantala's adverse employment actions against Plaintiff occurred on the heels of Plaintiff's Pay-Disparity Report, and in close proximity to that protected activity.* The Letter of Direction, which centered on Plaintiff's protected activity, was issued a mere three (3) days after Rantala learned of the Pay-Disparity Report. A week later, Defendant issued two (2), poor Evaluations for Plaintiff in quick succession on

December 20, 2019 and January 27, 2020, which was well ahead of the sixty (60) calendar days between evaluations mandated by state law (A.R.S. §15-537(F)(1)) and Staff Policies (Ex. 2 at 2), which instantly demoted Plaintiff from a "Highly Effective" to a "Developing" teacher and triggered the issuance of Pre-Terminative Discipline against Plaintiff.

c.   *All of Rantala's adverse employment actions against Plaintiff breached Staff Policies*, *which means that they were not motivated by policy enforcement, but rather by Plaintiff's Pay-Disparity Report*.  For example, the Letter of Direction, which centers on the Pay-Disparity Report, contravenes Staff Policies which prohibit administrators from engaging in any form of harassment or discrimination against staff members.  [*See* Ex. 16 at 1; Ex. 17 at 1.]  Rantala's poor Evaluations of Plaintiff contravene both the procedural and substantive requirements for staff performance evaluations outlined in Staff Policies.  [*See* Ex. 12 at 2; Ex. 2 at 2-4.]  And, Rantala's invalid Evaluations of Plaintiff do not support Pre-Terminative Discipline against Plaintiff under Staff Policies (Ex. 12 at 1-3; Ex. 2 at 2-4) or state law (A.R.S. §15-537).

147.   Rantala's adverse employment actions against Plaintiff in response to her protected activity would have dissuaded a reasonable employee from reporting unequal pay/sex-based wage discrimination to Defendant.

*"But For" Causation; the Designated Policymakers' and their Confederates' Adverse Employment Actions in Response to Plaintiff's EEO Complaint*

148.   Plaintiff's protected activity on February 8, 2020 was a substantial and motivating factor in the Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff which would not have occurred in the absence of Plaintiff's complaint of discriminatory harassment and retaliation by Rantala in violation of Title VII.  This is evidenced by the following facts:

a.   *There is a direct link between the EEO Complaint and the Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff.*  Indeed, the Designated Policymakers' and their Confederates' adverse employment

actions against Plaintiff began with, and centered on, the EEO Complaint. Specifically, in breach of Staff Policies (Ex. 3 at 1), Eveleth and District Counsel: 1) *chose not to* investigate Plaintiff's EEO Complaint at the time it was received or anytime thereafter; 2) *chose not to* take any steps to ensure Plaintiff's safety and security in the workplace in response to her express concerns about same in the EEO Complaint; and, 3) *chose, instead, to* immediately proceed with Rantala's Pre-Terminative Discipline against Plaintiff, about which she had complained, without first considering, much less investigating, her EEO Complaint. [*Id.*]

b. *All of the Designated Policymakers' and their Confederates' adverse employment actions occurred on the heels of Plaintiff's EEO Complaint, and in close proximity to that protected activity.* For example, three (3) days after the EEO Complaint was filed, Eveleth questioned its validity, and Eveleth and the District Counsel chose not to investigate it, or to take any steps to address Plaintiff's concerns about her safety and well-being in the workplace. A mere six (6) days after Plaintiff filed the EEO Complaint, Eveleth and the District Counsel forced her out of the un-remediated hostile work environment with a stress-induced, serious medical condition. And, from there, District Counsel continued the discriminatory retaliation against Plaintiff with a rapid series of progressively more adverse employment actions against Plaintiff, culminating in Plaintiff's constructive discharge and payment of liquidated damages to the Defendant a mere thirty (30) days later, followed by a battle over the timing and amount of Plaintiff's final paycheck.

c. *All of the Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff breached Staff Policies*, *indicating that they were not motivated by policy enforcement, but rather by Plaintiff's EEO Complaint.* For example, the decision by Eveleth and District Counsel not to investigate the EEO Complaint violated Staff Policies, which require the investigation of every complaint of discrimination received by Defendant (Ex. 3 at 1). Likewise, the decision by Eveleth and District Counsel not to take steps to remediate Plaintiff's hostile work environment

violated Staff Policies that preclude harassment which subjects an individual to "treatment or a school environment that is hostile or intimidating" because of gender, among other reasons (Ex. 16 at 1). Further, the decision by Eveleth and District Counsel to proceed with enforcement of the Pre-Terminative Discipline against Plaintiff, about which Plaintiff had complained, without first investigating the EEO Complaint, violated Staff Policies that: prohibit any form of harassment or discrimination against staff members (*Id.*; Ex. 17 at 1); and, require legitimate performance evaluations as a basis for Pre-Terminative Discipline (Ex. 12 at 1-3; Ex. 2 at 2-4).

149. The Designated Policymakers' and their Confederates' adverse employment actions against Plaintiff in response to her protected activity would have dissuaded a reasonable employee from reporting EEO violations, including discriminatory harassment and retaliation, to the Defendant.

*Damages*

150. As a direct and proximate result of the Designated Policymakers' and their Confederates' misconduct alleged above, Plaintiff has suffered damages including, but not limited to:

a. emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

b. unpaid and underpaid wages and benefits in relation to: her 2019/20 employment contract with the Defendant; the Robotics class; and, other before/after school classes she would have taught;

c. reductions and/or loss of medical and life insurance benefits;

d. larger co-pays and medical deductibles;

e. job-search expenses;

f. $2,000 in liquidated damages paid to the Defendant;

g. a reduction in her salary;

h. attorney's fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A.    Enjoin the Defendant from engaging in any form of unequal pay/sex-based wage discrimination and discriminatory harassment and retaliation;

B.    Order Defendant to:

(i)    cease and desist from paying men and women working in the same school system different salaries for similar work;

(ii)    require the Governing Board to establish a procedure that ensures that wages which are reliant on the set-up of a Billing Code for billing and payment are, nevertheless, paid timely by the Defendant, in accordance with the requirements of state law;

(iii)    require the Governing Board to authorize the creation of a hotline for use by any District employee or agent to report, officially or anonymously, a violation of Staff Policies or any other unlawful and unethical behavior observed in the workplace to the Governing Board or its designee;

(iv)    require the Governing Board to make provisions for all of Defendant's employees and/or agents to receive regular and recurring training on, the lawful application and enforcement of Staff Policies including, but not limited to, the procedures for: 1) filing a complaint of discrimination with Defendant; 2) investigating a complaint of discrimination received by Defendant; and, 3) remedying any discrimination found;

(v)    require the Governing Board, for every complaint of discrimination received by Defendant in whatever form (i.e., verbal or written) to: 1) receive written notice of the complaint; 2) appoint a person or persons to investigate the complaint; and, 3) be apprized quarterly of the investigative findings and resolution of every complaint of unequal pay or discrimination in any form received by Defendant during that period.

(vi)     require the Governing Board to establish a procedure for disciplining District administrators who misapply or unlawfully enforce Staff Policies against subordinates;

(vii)    require the Governing Board to establish a procedure whereby the Superintendent has the authority to place an employee(s) on paid leave pending the outcome of an investigation of a complaint of unequal pay or discrimination in any form; and,

(viii)   require the Governing Board to authorize and direct the Superintendent to oversee, audit, and enforce the Defendant's non-discriminatory compensation policy.

C.       Award back pay and benefits to which Plaintiff would have been entitled but for the Defendant's unlawful retaliation;

D.       Award appropriate equitable relief and front pay in an amount to be determined at trial to make Plaintiff whole and to compensate her for the monetary losses she has suffered and continues to suffer because of the unlawful retaliation alleged in this Complaint;

E.       Award compensatory damages to Plaintiff to fully compensate her for the (i) injuries, pain and suffering and other non-pecuniary losses sustained, (ii) liquidated damages paid, and (iii) out-of-pocket expenses incurred as a consequence of the Defendant's unlawful retaliation, pursuant to, and within the statutory limitations of 42 U.S.C. §1981(a);

F.       Award reasonable attorneys' fees and costs incurred in this action;

G.       Award pre-judgment and post-judgment interest; and,

H.       Award such other relief as the court deems just and proper.

## COUNT 3
### CONSTRUCTIVE DISCHARGE UNDER AEPA, §23-1501 *et. seq.*
### IN VIOLATION OF ACRA, A.R.S. §§41-1401 *et seq.*

151.    Plaintiff realleges and incorporates the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

*Existing Employment Contract*

152.    Plaintiff had a written teaching contract with the Defendant for the period July 27, 2019 through May 27, 2020.  [A true and correct copy of Plaintiff's 2019/2020 teaching contract with Defendant is attached hereto as Exhibit 18.]

*Discharge Under AEPA*

153.    On February 8, 2020, Plaintiff notified Eveleth, in writing, that a working condition exists that Plaintiff believes threatens her "safety and well-being at [her] work site," and she is "in desperate need of assistance" because she is "being retaliated against and threatened by a school administrator."  [*See* Ex. 13.]

154.    Eveleth was authorized by the Governing Board to accept Plaintiff's EEO Complaint and to refer those claims to Marshall for investigation and appropriate action.

155.    At the time she filed the EEO Complaint with Eveleth, Plaintiff had been the victim of a rapid series of progressively more adverse employment actions by Rantala following her good faith Pay-Disparity Report.  Plaintiff explained to Eveleth that she was in desperate need of assistance to alleviate her hostile work environment and to ensure her safety and well-being in the workplace.  [*Id.*]

156.    During the relevant period, Plaintiff's work environment was so objectively difficult and unpleasant that a reasonable employee would have felt compelled to resign had he/she found himself/herself in similar circumstances.

157.    Accordingly, Defendant was on written notice of Plaintiff's "objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign" for more than thirty (30) days before Plaintiff resigned on March 16, 2020, during which time the Designated Policymakers and their Confederates did nothing to remediate her work environment or to end the discriminatory harassment and retaliation against Plaintiff.

158.    To the contrary, the Designated Policymakers and their Confederates compounded the discriminatory harassment and retaliation with their additional, rapid and progressively more adverse employment actions against Plaintiff culminating in

Plaintiff's constructive discharge on March 16, 2020 and payment of $2,000 in liquidated damages to Defendant to avoid the other infeasible alternatives posed by District Counsel in a final ultimatum. Those alternatives were: return to an un-remediated hostile work environment; establish approved grounds for indefinite, unpaid FMLA leave, through the end of her 2019/2020 teaching contract, thereby forfeiting her right to work and to receive the compensation and benefits promised her under that contract; or be found to have abandoned her teaching contract and suffer the resulting stigma and serious disciplinary consequences from the ASBE.

*Wrongful Discharge in Violation of ACRA*

159. Plaintiff was constructively discharged by the Defendant, before the end of her teaching contract, in retaliation for engaging in protected activity under the EPA, Title VII and the ACRA as alleged in paragraphs 130 to 138 and 144 to 150 above, which is a violation of the ACRA. A.R.S. §23-1501(A)(3)(b)(i).

160. Plaintiff timely exhausted her administrative remedies under ACRA, as alleged in paragraphs 24 to 46 above.

*Damages*

161. As a direct and proximate result of the Designated Policyholders' and their Confederates' misconduct alleged above, Plaintiff has suffered damages including, but not limited to:

    a.    emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

    b.    unpaid and underpaid wages and benefits in relation to: her 2019/20 employment contract with the Defendant; the Robotics class; and, other before/after school classes she would have taught;

    c.    reductions and/or loss of medical and life insurance benefits;

    d.    larger co-pays and medical deductibles;

    e.    job-search expenses;

    f.    $2,000 in liquidated damages paid to the Defendant;

    g.    a reduction in her salary;

    h.    attorney's fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A.     Enjoin the Defendant from engaging in any form of unequal pay/sex-based wage discrimination and discriminatory harassment and retaliation;

B.     Order Defendant to:

(i)     cease and desist from paying men and women working in the same school system different salaries for similar work;

(ii)     require the Governing Board to establish a procedure that ensures that wages which are reliant on the set-up of a Billing Code for billing and payment are, nevertheless, paid timely by the Defendant, in accordance with the requirements of state law;

(iii)     require the Governing Board to authorize the creation of a hotline for use by any District employee or agent to report, officially or anonymously, a violation of Staff Policies or any other unlawful and unethical behavior observed in the workplace to the Governing Board or its designee;

(iv)     require the Governing Board to make provisions for all of Defendant's employees and/or agents to receive regular and recurring training on, the lawful application and enforcement of Staff Policies including, but not limited to, the procedures for: 1) filing a complaint of discrimination with Defendant; 2) investigating a complaint of discrimination received by Defendant; and, 3) remedying any discrimination found;

(v)     require the Governing Board, for every complaint of discrimination received by Defendant in whatever form (i.e., verbal or written) to: 1) receive written notice of the complaint; 2) appoint a person or persons to investigate the complaint; and, 3) be apprized quarterly of the investigative findings and resolution of every complaint of unequal pay or discrimination in any form received by Defendant during that period.

(vi)    require the Governing Board to establish a procedure for disciplining District administrators who misapply or unlawfully enforce Staff Policies against subordinates;

(vii)    require the Governing Board to establish a procedure whereby the Superintendent has the authority to place an employee(s) on paid leave pending the outcome of an investigation of a complaint of unequal pay or discrimination in any form; and,

(viii)  require the Governing Board to authorize and direct the Superintendent to oversee, audit, and enforce the Defendant's non-discriminatory compensation policy.

C.    Award back pay and benefits to which Plaintiff would have been entitled but for the Defendant's unlawful retaliation;

D.    Award appropriate equitable relief and front pay in an amount to be determined at trial to make Plaintiff whole and to compensate her for the monetary losses she has suffered and continues to suffer because of the unlawful retaliation alleged in this Complaint;

E.    Award compensatory damages to Plaintiff to fully compensate her for the (i) injuries, pain and suffering and other non-pecuniary losses sustained, (ii) liquidated damages paid, and (iii) out-of-pocket expenses incurred as a consequence of the Defendant's unlawful retaliation, pursuant to, and within the statutory limitations of 42 U.S.C. §1981(a);

F.    Award reasonable attorneys' fees and costs incurred in this action;

G.    Award pre-judgment and post-judgment interest; and,

H.    Award such other relief as the court deems just and proper.

## COUNT 4
### VIOLATION OF THE FOURTEENTH AMENDMENT
### RIGHT TO DUE PROCESS OF LAW, 42 U.S.C. §1983

162.    Plaintiff realleges and incorporates the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

*Constitutionally-Protected Property Right*

163.    At all times material to this action, Plaintiff had a constitutionally-protected property right in her continued employment with the Defendant under the terms of her 2019/2020 teaching contract with the Defendant.

164.    State statutes, A.R.S. §§15-536, 15-539, expressly protect certificated, probationary Plaintiffs who have an unexpired teaching contract with the Defendant from termination without cause.

*Deprivation of Protected Property Right without Due Process*

165.    As a public employee with a constitutionally-protected right in her continued employment, Plaintiff was entitled to some form of process prior to being constructively discharged from her employment.

166.    Generally, due process requires that an employee facing termination receive "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present [her] side of the story." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

167.    Here, Pre-Terminative Discipline was delivered to Plaintiff by email, in violation of the service requirements of state-law (A.R.S. §15-539(E)) and Staff Policies (Ex. 1 at 2), and without affording Plaintiff an opportunity to present her side of the story, in accordance with her due process rights under Staff Policies (*Id*. at 3-4).

168.    Then Plaintiff was constructively discharged on March 16, 2020, in the midst of her 2019/2020 teaching contract with the Defendant, without notice or a pretermination hearing.

169.    In the public employment context, "[t]he need for some form of pretermination hearing…is evident from a balancing of the competing interests at stake." *Loudermill*, 470 U.S. at 542.  The employee has a significant interest in retaining employment, the government has an interest in expeditiously removing unsatisfactory employees and avoiding administrative burdens, and both have an interest in preventing an erroneous termination.  *Id*. at 542-43.  "[S]ome opportunity for the employee to

present [her] side of the case is recurringly of obvious value in reaching an accurate decision." *Id.* at 543.

170. Plaintiff was not afforded those due process rights before she was constructively discharged by the Defendant.

*Acting Under Color of State Law and with Deliberate Indifference*

171. Defendant, was acting jointly and in concert with its Designated Policymakers and their Confederates, and under color of state law, when it deprived Plaintiff of her constitutionally-protected property right in her continued employment with the Defendant without due process, in violation of the Fourteenth Amendment.

172. These violations were the consequence of Defendant's decisions, made by and through its Designated Policymakers and their Confederates acting at the direction of, and with the authorization, ratification, and consent of, the Governing Board and within the course and scope of their employment.

173. These violations were also the consequence of the Governing Board's policies of inadequate training and supervision of its Designated Policymakers and their Confederates in the lawful application and enforcement of its Staff Policies.

174. The Governing Board knew that the Staff Policies were crafted to, among other things, define, protect, and preserve the due process and civil rights of District staff.

175. The Governing Board also knew from past history that those Staff Policies had been misapplied and unlawfully enforced by the Designated Policymakers and their Confederates in a manner that denied staff members' their due process rights.

176. Therefore, the Governing Board's failure to make provisions for its Designated Policymakers and their Confederates to be adequately, regularly, and recurringly trained and supervised in the lawful application and enforcement of its Staff Policies amounted to deliberate indifference to the likelihood that its staff members' due process rights would be violated by its Designated Policymakers' and their Confederates' unlawful application and enforcement of those Staff Policies.

*Causation*

177.     As a result of the Designated Policymakers' and their Confederates' unlawful application and enforcement of Staff Policies, Plaintiff has been deprived of her property right in her 2019/2020 teaching contract with Defendant without due process of law, in violation of the Fourteenth Amendment.

178.     As a result of the Governing Board's policies of inadequate training and supervision of its Designated Policymakers and their Confederates in the lawful application and enforcement of Staff Policies, Plaintiff has been deprived of her property rights in her 2019/2020 teaching contract with Defendant without due process of law, in violation of the Fourteenth Amendment.

*Damages*

179.     As a direct and proximate result of the misconduct of the Governing Board and its Designated Policymakers and their Confederates alleged above, Plaintiff has suffered damages including, the loss of wages and benefits under her 2019/2020 teaching contract, for which she is entitled to compensatory damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A.     Declare that Plaintiff was entitled to notice and a pre-termination hearing prior to her constructive discharge on March 16, 2020, in the midst of her 2019/2020 teaching contract with Defendant;

B.     Enjoin Defendant from imposing the Pre-Terminative Discipline on Plaintiff, which was issued without affording Plaintiff the due process required by Staff Policies;

C.     Order Defendant to: 1) remove the Pre-Terminative Discipline from Plaintiff's official personnel file for the District; and, 2) return Plaintiff's classifications in the District back to what they were before the Pre-Terminative Discipline was improperly imposed on Plaintiff, as follows:

1  (i) return Plaintiff's teaching classification from "Developing" back to
2  "Highly Effective;"

3  (ii) return Plaintiff's re-hire eligibility from "not eligible" for rehire by the
4  District to "eligible" for rehire by the District; and,

5  (iii) return Plaintiff's employment reference for the District from "negative" to
6  "positive."

7  D. Award compensatory damages for lost wages and benefits, in an amount
8  to be determined according to proof;

9  E. Award compensatory damages for embarrassment, humiliation, and
10  emotional distress in an amount to be determined according to proof;

11  F. Award reasonable attorney's fees and costs incurred in the action pursuant
12  to 42 U.S.C. §1988;

13  G. Award pre-judgment and post-judgment interest; and,

14  H. Award such other and further relief as this Court deems just and proper.

15  **JURY DEMAND**

16  Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the
17  Federal Rules of Civil Procedure.

18
19  Dated: September 7th, 2021
20
21
22  _____
        Colleen M. Auer
23      *Attorney for Plaintiff*
24
25
26
27
28

48

## VERIFICATION

I, Brooke Schneider, do state and swear under penalty of perjury, and as permitted by 28 U.S.C. §1746, as follows:

I am the Plaintiff in this action. I have read the foregoing Verified Civil Complaint for Title VII and State-Law Retaliation; Section 1983 Deprivation of Due Process Rights; and, Constructive Discharge, and to the best of my knowledge, information and belief, the facts set forth in the pleading are true and accurate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___9/3/2021___.

By: _____

Brooke Schneider

49

# EXHIBIT 1

## GCQF
## DISCIPLINE, SUSPENSION, AND
## DISMISSAL OF
## PROFESSIONAL STAFF MEMBERS

### Categories of Misconduct

Certificated staff members may be disciplined for infractions that include, but are not limited to, the following categories:

A.  Engaging in unprofessional conduct.

B.  Committing fraud in securing appointment.

C.  Exhibiting incompetency in their work.

D.  Exhibiting inefficiency in their work.

E.  Exhibiting improper attitudes.

F.  Neglecting their duties.

G.  Engaging in acts of insubordination.

H.  Engaging in acts of child abuse or child molestation.

I.  Engaging in acts of dishonesty.

J.  Being under the influence of alcohol while on duty.

K.  Engaging in the illicit use of narcotics or habit-forming drugs.

L.  Being absent without authorized leave.

M. Engaging in discourteous treatment of the public.

N.  Engaging in improper political activity.

O.  Engaging in willful disobedience.

P.  Being involved in misuse or unauthorized use of school property.

Q.  Being involved in excessive absenteeism.

R.  Carrying or possessing a weapon on school grounds unless they are peace officers or have obtained specific authorization from the appropriate school administrator.

### Statutory Requirements

Certificated staff members disciplined under A.R.S. 15-341, A.R.S. 15-539, or other applicable statutes:

A.  May not be suspended with or without pay for a period exceeding ten (10) school days under A.R.S. 15-341.

B.  May be suspended without pay for a period of time greater than ten (10) school days or dismissed under A.R.S. 15-539.

C.  Shall be disciplined under procedures that provide for notice, hearing, and appeal, subject to the requirements of A.R.S. 15-341 or A.R.S. 15-539, whichever is appropriate.

D.  Shall, if disciplined under A.R.S. 15-539 or other applicable statutes, excluding A.R.S. 15-341, receive notice in writing served upon the certificated staff member personally or by United States registered or certified mail addressed to the employee's last-known address.  A copy of charges specifying instances of behavior and the acts of omissions constituting the charge(s), together with a copy of all applicable statutes, shall be attached to the notice.

E.  Shall have the right to a hearing in accordance with the following:

   1.  *Suspension under A.R.S. 15-341*.  The supervising administrator will schedule a meeting not less than two (2) days nor more than ten (10) days after the date the certificated staff member receives the notice.

   2.  *Dismissal or dismissal with suspension included under A.R.S. 15-539*.  A certificated staff member's written request for a hearing shall be filed with the Board within ten (10) days after service of notice.  The filing of a timely request shall suspend the imposition of a suspension without pay or a dismissal pending completion of the hearing.

**General Provisions for Discipline
Under A.R.S. 15-341**

General provisions for discipline are as follows:

A.  *Informal consultation*.  Nothing contained herein will limit a supervising administrator's prerogative to engage in informal consultation with a certificated employee to discuss matters of concern related to the employee's performance, conduct, et cetera; however, when it is apparent that disciplinary action toward a certificated employee is likely to become a part of the certificated staff member's personnel record as permitted by A.R.S. 15-341, the procedures outlined herein shall be followed.

B.  *Persons authorized to impose discipline*.  Any supervising administrator who is the immediate or primary supervisor of a certificated staff member is authorized to impose a penalty or penalties, short of dismissal.  Only the Board may dismiss a certificated staff member.

C.  *Notice*.  Any person who is required by this policy to give written notice to any other person affected by this policy may do so by any means reasonably calculated to give the recipient actual knowledge of the notice within a reasonable amount of time.  When time is calculated from the date a notice is received, the notice is deemed to be received on the date it is hand delivered or three (3) calendar days after it is placed in the mail.

D.  *Administrative discretion*.  In adopting these policies and procedures, it is the intention of the District that they be interpreted and applied in a reasonable fashion.  The policies

and regulations are not intended to restrict or eliminate the discretion traditionally afforded to supervising administrators to determine whether discipline is appropriate. Supervising administrators are therefore directed to continue to use reasonable discretion in determining whether a particular alleged violation merits discipline.

E. *Right not to impose discipline.* The District reserves the right not to discipline a certificated staff member for conduct that violates this policy.

F. *Definition of work days.* For the purposes of this policy, a work day is any day that the District's central administrative office is open for business.

G. *Additional reasons for discipline.* A certificated staff member may be disciplined for conduct that has occurred but that, at or near the time of misconduct, was not the subject of or identified as a reason for a specific proceeding under this policy.

## Procedure for Discipline
## Under A.R.S. 15-341

The following procedures will be used to impose any discipline that 1) shall become a part of the certificated staff member's personnel record and 2) is permitted under A.R.S. 15-341:

### Step 1 - Notice:

A. Upon the supervising administrator's determination of the existence of cause to impose discipline, the supervising administrator shall notify the certificated staff member of intent to impose discipline. The notice shall be in writing and shall be delivered in person or by first-class mail. The notice shall include the following:

1. The conduct or omission on the part of the certificated staff member that constitutes the reason for discipline.

2. A scheduled meeting time between the supervising administrator and the certificated staff member. Such meeting shall be scheduled not more than ten (10) working days after the date the certificated staff member receives the notice.

3. A statement of the disciplinary action the supervising administrator intends to impose, including, if applicable, the number of days of suspension with or without pay.

4. Copies of any available relevant documentation, at the discretion of the supervising administrator.

### Step 2 - Discipline Hearing:

A. At the hearing, the supervising administrator shall discuss with the certificated staff member the conduct that warrants disciplinary action and shall provide the certificated staff member with any appropriate evidence and a copy of relevant documentation if not previously provided.

B. The supervising administrator shall conduct the hearing in an informal manner, without adherence to the rules of evidence and procedure required in judicial proceedings.

***Step 3 - Decision (in writing):***

At the hearing, or within ten (10) working days following the hearing, the supervising administrator shall, in writing, inform the certificated staff member of the decision. If the decision is to impose discipline, written notice of the discipline shall be enclosed. The written notice of the decision shall state that a copy of the notice, decision, and a record of the disciplinary action shall be placed in the certificated staff member's personnel file and shall specify the date the discipline shall be imposed unless the certificated staff member files a written request for appeal within five (5) working days after the decision is delivered to the certificated staff member. If the certificated staff member requests an appeal of the decision, the imposition of any discipline shall be suspended pending the outcome of the appeal.

***Step 4 - Appeal:***

Discipline imposed may be appealed at the next organizational level, in writing, to the appropriate assistant superintendent or the Superintendent. Only when the discipline is determined by the Superintendent shall the appeal be to the Board, which, at its discretion, may appoint a hearing officer. The appeal shall contain a brief statement of the reasons why the certificated staff member believes the administrator's decision is incorrect. Appeal is limited to one (1) organizational level above the level of the supervising administrator who imposed the discipline.

The appeal shall specifically describe the part of the determination with which the certificated staff member disagrees:

A. Determination was founded upon error of construction or application of any pertinent regulations or policies.

B. Determination was unsupported by any evidence as disclosed by the entire record.

C. Determination was materially affected by unlawful procedure.

D. Determination was based on violation of any statutory or constitutional right.

E. Determination was arbitrary and capricious.

F. The penalty was excessive.

The supervising administrator, the Superintendent, or, when appropriate, the Board or the Board-appointed hearing officer may, at the conclusion of the appeal, uphold the discipline, modify the decision, or refer the matter back to the level from which it was appealed for rehearing and additional information. Such decision, along with specific direction as to the effective date of any discipline, shall be communicated to the certificated staff member within a reasonable amount of time following the appeal, not to exceed seven (7) working days.

The assigned hearing officer shall, by use of a mechanical device, make a record of the appeal hearing.

This policy, under A.R.S. 15-341, does not apply to dismissal of a certificated staff member except to the extent that the Board may find, subsequent to dismissal proceedings, that a lesser form of discipline as set forth in this policy should be imposed.

Not all administrative actions regarding a certificated staff member are considered "discipline," even though they may involve alleged or possible violations by the certificated staff member. This policy addresses only discipline and has no application to any of the following:

A. The certificated staff member evaluation procedure or the resulting evaluations as they pertain to the adequacy of the certificated staff member's classroom performance.

B. Letters or memorandums directed to a certificated staff member containing directives or instructions for future conduct.

C. Counseling of a certificated staff member concerning expectations of future conduct.

D. Nonrenewal of a contract of a certificated staff member employed by the District for less than the major portion of three (3) consecutive school years (noncontinuing certificated staff member).

**General Provisions for Suspension Without Pay or Dismissal Under A.R.S. 15-539**

*Step 1 - Notice:*

A. The Governing Board, except as otherwise provided by A.R.S. 15-539, shall upon receipt of a written statement of charges from the Superintendent that cause exists for the suspension of a certificated teacher without pay for a period longer than ten (10) school days or dismissal, shall give notice to the teacher of the Board's intention to suspend without pay or dismiss the teacher at the expiration of ten (10) days from the date of service of the notice.

1. If charges presented to the Board for dismissal of a certificated person allege immoral conduct, the charge or a resignation involving such charges shall be reported to the Department of Education.

2. Whenever the statement of charges by the Superintendent allege immoral or unprofessional conduct as the cause for dismissal, the Board may adopt a resolution to file a complaint with the State Department of Education. Pending disciplinary action by the State Board, the certificated teacher may be reassigned by the Superintendent or the Governing Board may place the teacher on administrative leave and give notice to the teacher of the administrative leave of absence pursuant to A.R.S. 15-540.

3. As used in this policy, immoral conduct means any conduct that is contrary to the moral standards of the community and that reflects an unfitness to perform the duties assigned to the certificated staff member.

B. The Governing Board, upon adoption of a written statement charging a certificated teacher with cause for suspension without pay or dismissal, may immediately place the teacher on administrative leave of absence and give the teacher notice of the administrative leave of absence.

C. Written notice of the administrative leave of absence shall be served on the teacher personally or by United States registered mail addressed to the teacher at the teacher's last known address.

***Step 2 – Hearing for Suspension Without
Pay or Dismissal:***

A.  The Governing Board shall decide whether to hold a hearing on the dismissal or suspension of a certificated teacher without pay for a period of time longer than ten (10) days as provided in A.R.S. 15-541.

> The Governing Board provides, *by policy*, that all hearings conducted pursuant to this section shall be conducted before a hearing officer.

B.  The Board shall designate a hearing officer to:

1.  hold the hearing,

2.  hear the evidence,

3.  prepare a record of the hearing, and

4.  issue a recommendation to the Board for action.

C.  If the parties cannot mutually agree on a hearing officer, a hearing officer shall be selected by the Governing Board from a list provided by the State Department of Education or the American Arbitration Association.

D.  A hearing held pursuant to A.R.S. 15-541 may not be conducted by any hearing officer having a personal interest which would conflict with the hearing officer's objectivity in the hearing.

E.  The hearing shall be held:

1.  not less than fifteen (15) days, nor

2.  not more than thirty (30) days.

3.  after the request is filed, unless all parties to the hearing mutually agree to a different hearing date.

F.  Notice of the time and place of the hearing shall be given to the teacher not less than three (3) days before the date of the hearing.

G.  The teacher may request that the hearing be conducted in public or private.

H.  The Governing Board shall provide any officer, appointee, or employee to be considered or discussed at a meeting with written notice of the executive session as is appropriate but not less than twenty-four (24) hours for the officer, appointee, or employee to determine whether the discussion or consideration should occur at a public meeting.

I.  At the hearing the teacher may appear in person and by counsel, if desired, and may present any testimony, evidence or statements, either oral or in writing, in the teacher's behalf.

J.  An official record of the hearing, including all testimony recorded manually or by mechanical device, and exhibits shall be prepared by the Governing Board or the hearing officer.

K.  The teacher who is the subject of the hearing may not request that the testimony be transcribed unless the teacher agrees in writing to pay the actual cost of the transcription.

L.  Within ten (10) days after a hearing conducted by a hearing officer, the hearing officer shall:

>    1. determine whether there existed good and just cause for the notice of dismissal or suspension; and

>    2. affirm or withdraw the notice of dismissal or suspension.

M. Within ten (10) days after a hearing conducted by a hearing officer, the hearing officer shall:

>    deliver a written recommendation to the Governing Board to the Governing Board that includes findings of fact and conclusions.

N.  Parties to the hearing have the right to object to the findings of the hearing officer and present oral and written arguments to the Governing Board.

O.  The Governing Board has an additional ten (10) days to determine whether good and just cause existed for the notice of dismissal or suspension and shall render its decision accordingly, either affirming or withdrawing the notice of suspension or dismissal.

>    Good and just cause does not include religious or political beliefs or affiliations unless they are in violation of the oath of the teacher.

## Additional Provisions and Conditions

During the pendency of a hearing, neither the certificated staff member nor the supervising administrator shall contact the Superintendent or a Board member to discuss the merits of the supervising administrator's recommendation or charges and proposed discipline except as provided by this policy.  No attempt shall be made during such period to discuss the merits of the charges with the person designated to act as hearing officer.

The Governing Board shall keep confidential the name of a student involved in a hearing for dismissal, discipline, or action on a teacher's certificate, with exceptions as noted in A.R.S. 15-551.

*Amendments.*  The District reserves the right to amend this policy in any way at any time.  Any amendment shall have prospective application only.

*Severability.*  If any provision of this policy is held to be invalid for any reason, such action shall not invalidate the remainder of this policy.  If any provision of this policy conflicts with any provisions in any other policies adopted by the District, the provisions of this policy shall prevail.

## Teachers Working Under a Short-Term Certification

A teacher who holds a teaching intern certificate, an emergency teaching certificate or another type of nonstandard certificate, that is valid for one (1) year or less, may be dismissed by the Board effective ten (10) days after delivery of the notice of dismissal to the teacher without complying with the requirements of A.R.S. conditions found in 15-537, 15-538, or 15-

541.  Notice of the Board's authority to dismiss pursuant to this shall be included in each teacher's contract.

Adopted:  November 13, 2018

LEGAL REF.:
A.R.S.
13-2911
15-153
15-203
15-341
15-342
15-350
15-503
15-507
15-508
15-514
15-536
15-538
15-538.01
15-538.02
15-539
15-540
15-541
15-542
15-543
15-549
15-551
41-770

CROSS REF.:
DKA - Payroll Procedures/Schedules
GCJ - Professional Staff Noncontinuing and Continuing Status
GCO - Evaluation of Professional Staff Members

# EXHIBIT 2

REGULATION

**EVALUATION OF PROFESSIONAL STAFF MEMBERS**

**Purpose**

The following statements list the purpose for the teacher evaluation system:

- The primary objectives of the teacher evaluation are to assess the quality of instruction and to bring about improvement.

- The evaluation system measures the effectiveness of the teacher in meeting the criteria established by the District, school, and individual teacher.

- The evaluation system provides information for administrative decision making concerning continuation, nonrenewal, and/or termination of contract.

**Definitions**

The following definitions apply in the Scottsdale Unified School District No. 48:

- *Probationary Teacher*:

  - A certificated teacher who has not been employed by the School District for the major portion of three (3) consecutive school years; or

  - A certificated teacher who is currently a continuing teacher as defined in A.R.S. 15-538.01 but who has been designated after an evaluation conducted according to the requirements pursuant to A.R.S. 15-537 in the lowest performance classification for the current school year shall become a probationary teacher as defined in A.R.S. 15-536 for the subsequent school year and shall remain a probationary teacher until that teacher's performance classification is designated in either of the two highest performance classifications.

- *Continuing Teacher* - A certificated teacher who has been employed by the School District for the major portion of three (3) consecutive school years and who has not been designated in the lowest performance classification for the previous school year or who has not regained continuing status after being designated as a probationary teacher pursuant to A.R.S. 15-538.01(C).

- *Major Portion of a School Year* [A.R.S. 15-501.05] - Major portion of a school year means full-time employment for fifty-one percent (51%) of the school days in which school is in session, except that a certificated teacher is not deemed to have completed the major portion of the third school year of three (3) consecutive years of employment until the end of the third school year.

**Personnel to be Evaluated**

All certificated instructional personnel are evaluated, including teachers, librarians, instructional specialists, and counselors. Nurses are also evaluated.

Teachers are classified as Probationary or Continuing. Probationary teachers are all certificated teachers who have not been employed by the School District for more than a major portion of three (3) consecutive school years and as per statute must be evaluated two (2) times per year. Continuing teachers are all certificated teachers who have been employed by the School District for more than a major portion of three (3) consecutive school years and as per statute must be evaluated one (1) time per year.

*Evaluators.* Qualified evaluators as identified by the Governing Board are as follows:

- All certificated administrators who have received training and demonstrated skill as required by the District and State to assure the following knowledge:

  - Knowledge of policies, laws, rules, related to evaluation.

  - Knowledge of effective evaluation process.

  - Knowledge of District evaluation system.

  - Inter-rater reliability on the teacher evaluation system. (Reliable and consistent evaluation)

- Pursuant to A.R.S. 15-537(B)(4), if the principal of a school is designated in the lowest performance classification, a teacher may request to have the District assign an alternate qualified evaluator.

*Steps in the process of evaluation:*

- Prior to September 30, personnel shall be informed about the evaluation system, the purposes, the criteria, and the respective roles of those involved.

- A Professional Growth Plan shall be written annually by the teacher, and a self-evaluation on the progress of the goals shall be included in the final evaluation report.

- Formal observations shall be conducted. A formal observation is one which is followed by specific written or oral feedback (which may be provided in an electronic format) to the teacher. Observations may be either announced or unannounced. The teacher has the option to schedule at least one (1) of these two (2) observations with the evaluator.

  - *Number of observations.* There will be a minimum of two (2) formal observations per evaluation. There shall be at least sixty (60) calendar days between the first and last observations.

  - *Duration of observations.* The duration of a formal observation shall be a complete and uninterrupted lesson by a qualified evaluator. A complete and uninterrupted lesson is established when:

    ⇒ A clear beginning can be identified (evaluator can identify an objective being proposed, implicitly or explicitly).

⇒ Content tied to the objective has been delivered.

⇒ Formal or informal assessment has occurred (check for understanding).

⇒ The observation is at least twenty (20) minutes in length.

■ Written or oral feedback shall follow each formal observation within ten (10) working days to assure each employee the opportunity to receive and react to observations, judgments, and recommendations. If the evaluator determines an area of concern or need following a formal observation, the evaluator must have a face-to-face conference with the teacher.

■ The requirement of a second classroom observation for a continuing teacher whose teaching performance based on the first classroom observation places the teacher in one (1) of the two (2) highest performance classifications for the current school year is waived, unless the teacher requests a second observation.

■ *Observations and Improvement Plans.* If after one (1) formal observation a teacher is found to be developing in two (2) areas using the District evaluation assessment tool, or a continuing teacher is found to be inadequate using the District evaluation assessment tool and not currently on an improvement plan, an improvement plan shall be developed. An improvement plan shall provide the teacher with a minimum of thirty (30) days to demonstrate improvement. A minimum of one (1) observation at least thirty (30) calendar days after the issuance of an improvement plan may be used to determine whether the teacher has corrected inadequacies and has demonstrated adequate classroom performance. An observation shall not be conducted within two (2) instructional days of any scheduled period in which school is not in session for one (1) week or more.

■ *Preliminary Notice of Inadequacy of Classroom Performance.* If after one (1) formal observation a teacher's classroom performance is inadequate, as defined in Governing Board Policy GCO, the teacher shall be placed on a remediation plan and shall be provided with a preliminary notice of inadequacy of classroom performance. If the teacher is a continuing teacher, they shall be placed on an improvement plan prior to being placed on a remediation plan with preliminary notice of inadequacy of classroom performance.

■ *Observations, Remediation Plans, and Preliminary Notice of Inadequacy of Classroom Performance.* A remediation plan shall provide the teacher with a minimum of forty-five (45) instructional days following a preliminary notice of inadequacy of classroom performance to demonstrate adequacy. At least one (1) formal observation following the issuance of a preliminary notice of inadequacy of classroom performance must be conducted to determine whether the teacher has corrected inadequacies and has demonstrated adequate classroom performance. If only one (1) formal observation is conducted, it must be conducted at the conclusion of the remediation plan. An observation shall not be conducted within two (2) instructional days of any scheduled period in which school is not in session for one (1) week or more.

***Evaluation program.*** The specific format for the teacher evaluation system will be developed in compliance with Policy GCO and this regulation under the leadership of the Superintendent.

**Administrators and Psychologists**

Continuous evaluation of all aspects of the total educational program, including student progress, personnel, curriculum, and facilities, will include a formal process of evaluating all certificated administrators and psychologists. The purpose of this evaluation shall be the improvement of the quality of the educational program in the District. The evaluation will be a cooperative procedure, with the evaluator and the evaluatee having full knowledge of the criteria, process, and results.

The following statements give more specific purposes for evaluation:

- Evaluations determine how well the objectives held by the school and District are being carried out. The success of the educational program is dependent upon many factors, which include the quality of classroom instruction, student evaluation, supervision, and administration.

- Evaluations provide the basis for motivation and for self-improvement, permitting administrative personnel to be aware of strengths and weaknesses in order to improve the operation of the District's programs.

The specific format for the evaluation system for certificated administrators and psychologists will be developed under the leadership of the Superintendent.

**Contract Renewal**

On or before May 15 the Board shall offer a contract for the next school year to each certificated administrator and psychologist whose contract is in its last year, unless on or before April 15 the Board, a member of the Board acting on behalf of the Board, or the Superintendent gives notice to the administrator or psychologist of the Board's intention not to offer a new contract.

LEGAL REF.:
A.R.S.
15-503
15-536
15-537
15-538
15-539
15-540
15-541
15-544
15-549

# EXHIBIT 3

**GBA-R ©**

REGULATION

**EQUAL EMPLOYMENT OPPORTUNITY**

**Compliance Officer**

The Superintendent shall appoint the compliance officer. Any person who feels unlawfully discriminated against or to have been the victim of unlawful discrimination by an agent or employee of the District or who knows of such discrimination against another person should file a complaint with the Superintendent's office. If the Superintendent is the one alleged to have unlawfully discriminated, the complaint shall be filed with the President of the Board.

**Complaint Procedure**

The District is committed to investigating each complaint and to taking appropriate action on all confirmed violations of policy. The compliance officer shall investigate and document complaints filed pursuant to this regulation as soon as reasonable. In investigating the complaint, the compliance officer will maintain confidentiality to the extent reasonably possible. The compliance officer shall also investigate incidents of policy violation that are raised by the Governing Board, even though no complaint has been made.

If after the initial investigation the compliance officer has reason to believe that a violation of policy has occurred, the compliance officer shall determine whether or not to hold an administrative hearing and/or to recommend bringing the matter before the Board.

If the person alleged to have violated policy is a teacher or an administrator, the due process provisions of the District's Policy GCQF shall apply, except that the supervising administrator may be assigned to conduct the hearing. In cases of serious misconduct, dismissal or suspension proceedings in accordance with A.R.S. 15-539 *et seq.*, may be initiated.

If the person alleged to have violated policy is a support staff employee, the compliance officer may follow due process and impose discipline under Policy GDQD if the evidence so warrants. The compliance officer also may recommend a suspension without pay, recommend dismissal, or impose other appropriate discipline.

If the person alleged to have violated policy is a student, the Superintendent may impose discipline in accordance with Policies JK and JKD.

If the compliance officer's investigation reveals no reasonable cause to believe policy has been violated, the Superintendent shall so inform the complaining party in writing.

# EXHIBIT 4

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | FEPA | 35A-2020-00626C |
| | EEOC | CRD-2020-0826 |

# ARIZONA ATTORNEY GENERAL'S OFFICE, CIVIL RIGHTS DIVISION AND EEOC

RECEIVED        *State or Local Agency, if any*

SEP 0 8 2020

CIVIL RIGHTS SECTION

| NAME *(Indicate Mr., Ms., Mrs.)* | | | TELEPHONE No. *(Include Area Code)* |
|---|---|---|---|
| Brooke Schneider | | | ▉ |
| STREET ADDRESS ▉ | CITY, STATE AND ZIP CODE ▉ | | DATE OF BIRTH ▉ |

| ATTORNEY NAME | LAW FIRM | TELEPHONE No. *(Include Area Code)* |
|---|---|---|
| Colleen Auer, Esq. | Auer Law Firm PLLC | 602-370-7965 |
| STREET ADDRESS 11445 East Via Linda, Ste., 2-529 | CITY, STATE AND ZIP CODE Scottsdale, Arizona 85259 | ATTORNEY EMAIL ADDRESS Cauernd14@gmail.com |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME. *(If more than one, list below.)*

| NAME Scottsdale Unified School District | NUMBER OF EMPLOYEES/MEMBERS CAT D | TELEPHONE No. *(Include Area Code)* 480-484-6100 |
|---|---|---|
| STREET ADDRESS 9500 East Jackrabbit Road | CITY, STATE AND ZIP CODE Scottsdale, Arizona 85250 | COUNTY Maricopa County |
| NAME Yavapai Elementary School | | TELEPHONE No. *(Include Area Code)* 480-484-3800 |
| STREET ADDRESS 701 North Miller Road | CITY, STATE AND ZIP CODE Scottsdale, Arizona 85257 | COUNTY Maricopa County |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| RACE        COLOR        SEX        RELIGION        NATIONAL ORIGIN        AGE | *EARLIEST (ADEA/EPA)*        *LATEST(ALL)* |
| RETALIATION        DISABILITY        GENETIC TEST RESULTS        OTHER (Specify) | 12/13/19        04/15/20 |
| | Continuing Action |

EXPLAIN THE PARTICULARS OF WHAT TOOK PLACE *(If additional space is needed, attach extra sheet(s):*

**I.    PERSONAL HARM:** I was subjected to different treatment, retaliated against and forced to resign.

**II.    RESPONDENT'S REASON FOR ADVERSE ACTION:** None.

**III.    DISCRIMINATION STATEMENT:** I believe Respondent discriminated against me because of my Sex, Female, and because I opposed a practice made unlawful under the Arizona Civil Rights Act, as amended, the Equal Pay Act of 1963, as amended, and Title VII of the Civil Rights Act of 1964, as amended. The particulars are:

A.    In or about July 2018, I was hired as a teacher for the District and am a certified K-6 teacher. My work performance has always been satisfactory or exceeded expectations.

B.    In or about October 18, 2019, I started teaching an elective Robotics class and became aware Scott Harvey, also a teacher of the elective Robotics class was paid for every session and my wages for the class were to be paid from either grant or tax credit and would take time to set up and generate the payment code. So, I taught the class for several weeks before the code was available for my use, and I could get paid for my teaching time. In or about December 2019, I reported the pay disparity to Principal/Supervisor Chuck Rantala and was told it could not be fixed. I then reported the pay disparity to the payroll department on December 13, 2019, and they instructed Rantala to resolve it which he ultimately did, in part, but not entirely. That afternoon, I began experiencing unprovoked, unjustified and/or legally non-compliant disciplinary actions by Rantala which led to my demotion to a probationary teacher subject to dismissal if I

| I WANT THIS CHARGE FILED WITH BOTH THE EEOC AND THE STATE OR LOCAL AGENCY, IF ANY. I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY COMPLAINT IN ACCORDANCE WITH THEIR PROCEDURES. | SIGNATURE OF COMPLAINANT AND DATE: *B. Schneider* 9/3/2020 |
|---|---|
| I SWEAR OR AFFIRM THAT I HAVE READ THE ABOVE CHARGE AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF. | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, Day, Year)* 09/03/2020 |
| Brooke Schneidery/DAJ.        REVISED 6/19. PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED | PATRICK R. DURHMAN Notary Public - State of Arizona MARICOPA COUNTY Commission # 567049 Expires June 19, 2023 |

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

35A-2020-00076c
CRD-2020-0826

# Arizona Attorney General's Office, Civil Rights Division and EEOC

CASE NAME: Brooke Schneider v. Scottsdale Unified School District

failed to satisfy a remedial plan fashioned by Rantala.

C. On or about December 20, 2019, I received my first performance evaluation from Rantala which reflected low scores. On or about January 27, 2020, I received a second low performance evaluation from Rantala and then he told me I would be given a Notice of Inadequacy and Remediation Plan.

D. On or about February 8, 2020, I reported to HR Director Amy Eveleth, that I was being retaliated against and threatened by a school administrator aud this needed to be handled. My concerns were not investigated by HR Director Eveleth nor anyone else at the District. Further acts of retaliation included being locked out of my computer and the pay-roll system, the placement of the Notice of Inadequacy and Remediation Plan in my official personnel file, notice of that adverse personnel action to the District's Governing Board, a District Investigation into the validity of my student test data, late payment of my final wages, a deduction of $2,000 from my final pay as "liquidated damages" to the District.

E. On or about March 16, 2020, I submitted my resignation.

F. I believe and therefore allege discrimination based on sex, Female and based on Retaliation most recently on April 15, 2020.

RECEIVED

SEP 08 2020

CIVIL RIGHTS SECTION

I WANT THIS CHARGE FILED WITH BOTH THE EEOC AND THE STATE OR LOCAL AGENCY, IF ANY. I WILL ADVISE THE AGENCIES IF I CHANGE MY ADDRESS OR TELEPHONE NUMBER AND I WILL COOPERATE FULLY WITH THEM IN THE PROCESSING OF MY COMPLAINT IN ACCORDANCE WITH THEIR PROCEDURES.

I SWEAR OR AFFIRM THAT I HAVE READ THE ABOVE CHARGE AND THAT IT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

SIGNATURE OF COMPLAINANT AND DATE:

B. Schneider 9/3/2020

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, Day, Year)
09/03/2020

Brooke Schneider/DAJ     REVISED 6/19. PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED



PATRICK R. DURHMAN
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 587049
Expires June 19, 2023

# EXHIBIT 5

# AUER LAW FIRM PLLC

June 23, 2021

Gladys Wagoner, Board Secretary
8500 E. Jackrabbit Road
Scottsdale, Arizona 85250

Lori Bird, General Counsel
Scottsdale Unified School District
8500 E. Jackrabbit Road
Scottsdale, Arizona 85250

   Re: <u>Notice of Claim Pursuant to A.R.S. §12-821.01</u>

To the authorized delegate for service of process on behalf of the District's Governing Board (the "Board") through June 30, 2021, and to the Board's General Counsel:

  This letter constitutes a Notice of Claim, pursuant to A.R.S. §12-821.01, against the Scottsdale Unified School District ("District") by Brooke Schneider ("Claimant"), whom the undersigned represents.

## I. The Claimant

  Claimant is a 2016 graduate of Northern Arizona University with a Bachelor of Science Degree in Elementary Education; a 2020 graduate, *Summa Cum Laude*, of Arizona State University with a Master of Education Degree in Curriculum and Instruction with an emphasis in Early Childhood Education; and, a current doctoral student at Arizona State University, pursuing a Doctor of Education Degree in Leadership and Innovation. Claimant is also an educator, certified in Elementary and Early Childhood Education and Structured English Immersion, K-12.

  From June 12, 2018, until her constructive discharge on March 16, 2020, Claimant was employed by the District under two, consecutive, one-year teaching contracts.

  Claimant's supervisors for the 2018-2019 school year describe Claimant's skills and performance for the District, as follows:

   …I have had the opportunity to work with Ms. Schneider as her immediate supervisor. Her dedication to her school community earned her the Teacher of the Year Award during the school year 2018-2019. She went above and beyond to facilitate learning for adults and for students as well. She was definitely a team

11445 E. VIA LINDA, STE 2-529, SCOTTSDALE, ARIZONA 85259
T (602) 370-7965 E CAUERND14@GMAIL.COM

PLAINTIFF_000001

player who was always ready to share and to learn from her team.  She also showed tremendous creativity by adding innovative and effective strategies that motivated her students in the classroom.  Her organizational skills gave her an edge when it comes to teaching, because she was always prepared to deliver the best possible lessons.

Ms. Schneider had an extraordinary classroom management system.  Her students developed a sense of community in her classroom.  She showed the utmost respect for her students, along with a great sense of humor that made her classroom a good learning environment for students to feel safe and appreciated.

Brook Schneider participated in school committees to develop and strengthen positive staff culture.  She was the only teacher to volunteer to be part of the PTO to help build a stronger community involving more families.

I recommend Brooke Schneider without any doubt that she will be a great doctoral student….

**Carlos Ardón**, *District Principal and Claimant's Supervisor 2018-2019 school year*, *March 2020, Letter of Recommendation for Claimant,* attached hereto as Exhibit 1.  Now Principal at Herrera Elementary School in the Phoenix Elementary School District #1, Carlos Ardón has since invited Claimant to accept a contract to teach Third Grade at Herrera Elementary School for the 2021-2022 school year.  *April 19, 2021, Letter of Contract Assurance from the Phoenix Elementary School District #1,* attached hereto as Exhibit 2.

I highly recommend Brooke Schneider as a candidate for your doctoral program.  As her supervisor, I have had the pleasure of working with her for the 2018-19 school year.

Brooke is a master teacher and fully comprehends the developmental needs of early childhood…

The students in Brooke's school come from a low socio-economic background.  Many students are in temporary housing with some living in their cars.  Brooke has studied trauma-informed practice and understands their needs…

Brooke has a strong work ethic and is committed not only to the students, but to the school as [a] whole.  Last year she was chosen as our Charros teacher of the year.  She earned this award due to her dedication and efforts in working for the whole of the school.  She often works with students not in her classroom and deeply believes that every teacher supports every student every day.

I know Brooke would be an excellent candidate for your program.  She has a profound dedication to students and an insatiable appetite for learning.  Her desire to improve and her dedication to her profession are like no other.

**Nan Wilkinson**, *District Assistant Principal and Claimant's Supervisor 2018-2019 school year*, *May 28, 2019 Letter of Recommendation for Claimant,* attached hereto as Exhibit 3.

PLAINTIFF_000002

Claimant's professional colleagues and professors echo these sentiments, as exemplified below:

…Having worked with Brooke in the classroom as a mentee, I can attest to her strong leadership qualities, vast knowledge of best educational practices, and most importantly her passion for teaching and implementing positive change in education.

During my time in her classroom, Brooke was an exceptional mentor teacher specifically in curriculum and instruction, at a school with a population of children in a low socio-economic bracket. Brooke allowed me to ask questions, and begin to implement strategies in a variety of areas including classroom management, data analysis and data-driven instruction, as well as creating individualized education plans, and differentiated instruction for all students. Brooke went above and beyond to demonstrate how she analyzed her benchmark and standardized test data, and used it to implement improvement strategies in her classroom….The aforementioned strategies are ones in which I still use in my classroom today.

One of my fondest memories in Brooke's classroom remains as when she won the Scottsdale Charros Teacher of the Year award. Brooke was recognized as one of the youngest teachers to receive this award in Scottsdale Unified School District's history. Brooke was recognized for her exceptional performance in the classroom according to administrative requirements, and her consistent involvement within the school community as the robotics coach, the math club and drama teacher, and a before and after school tutor….

I am continually thankful for the opportunity to observe Brooke's interaction with her co-workers, and administration. Her relationships with everyone on campus were positive and made me truly excited to be a teacher. Not only was Brooke able to effectively collaborate with her teammates, but she worked with the grades above and below her to plan effective vertical articulation. This is where I observed her leadership skills truly blossom. Using her knowledge of the curriculum, and best instructional practices, Brook was able to offer advice, and assist fellow educators on implementing strategies on student success in the classroom. It was inspiring to see Brooke, despite her mastery of teaching strategies, always approach her colleagues and administrators to collaborate on how she could grow and improve her craft….

…Brooke would absolutely be an asset to your company, as she is a strong leader, exceptionally knowledgeable, and consistently striving for growth and improvement in herself, her colleagues, her school, and most importantly her students and the educational system.

**Rachel Borney, Fifth Grade Teacher, Diamond Canyon School, A+ School of Excellence**, *March 30, 2021 Letter of Recommendation for Claimant*, attached hereto as Exhibit 4.

Ms. Brooke Schneider was a student of mine in the Master's Program at Arizona State University earning a Curriculum and Instruction (Early Childhood Education) degree. I have known her for over two years. I am writing a letter of

PLAINTIFF_000003

recommendation for this student. She turned her work in on time and earned strong A's and stood out towards the top 5-10% of the courses I taught.

Brooke has a heart for children and a heart for teaching and wants to foster children's love of learning. She has a strong interest in early childhood.

In summary, I recommend, without reservation, Ms. Brooke Schneider as a doctoral student in your program….

*Melanie Lehman, Ed.D.*, *Claimant's ASU Professor in the Master's Degree Program*, *February 27, 2020 Letter of Recommendation for Claimant,* attached hereto as Exhibit 5.

…I believe that Ms. Schneider's experiences, both prior to and including her involvement in our doctoral program, will enable her to step right into classrooms and schools around the country and make substantial differences in the lives of professional educators and their students. Additionally, her professionalism, knowledge of education and of the action research process, and collaborative skills make her an ideal candidate for the position you are looking to fill.

…I recommend her without hesitation….

*Craig Mertler, Ph.D.*, *Claimant's ASU Professor in the Doctoral Degree Program*, *March 27, 2021 Letter of Recommendation for Claimant*, attached hereto as Exhibit 6.

Claimant's classroom performance and results lend further credence to these accolades. By way of example only, and not limitation, during the 2019-2020 school year, Claimant's student benchmark test scores for Math and Reading (Exhibit 7 hereto) exceeded both the campus average, and the District average, as noted below:

- ➥ Assessment: 19-20 #1 Math Gr 01 Formative Benchmark
  - ⟩ Campus Average ► 73.6%
  - ⟩ District Average ► 77.46%
  - ⟩ Claimant's Average ► 80.00%
- ➥ Assessment: 19-20 #2 Math Gr 01 Formative Benchmark
  - ⟩ Campus Average ► 66.67%
  - ⟩ District Average ► 66.15%
  - ⟩ Claimant's Average ► 77.63%
- ➥ Assessment: First Grade MOY ELA 2019-20
  - ⟩ Campus Average ► 75.28%
  - ⟩ District Average ► 82.39%
  - ⟩ Claimant's Average ► 85.91%

PLAINTIFF_000004

In short, Claimant was one of the best and brightest teachers the District had in its employ. Yet, with no regard for 1) Claimant's legal rights, 2) the interests of the students, families, and communities the District serves, or 3) the District's "Core Purpose," "Core Values," and written policies, the District chose to: prematurely end Claimant's employment without Due Process; mar her professional record; tarnish her reputation; and, undermine her opportunities for future employment – all because Claimant asked to be paid the same amount as her male comparator for the same work teaching a Robotics class, and then reported the ensuing sex-based harassment and retaliation she suffered at the hands of her supervisor for that protected activity, to the District.

The District, and its co-conspirators, have much to answer for, as a result of these, and other, wrongful acts perpetrated against Claimant because of her protected activities, as detailed herein.

## II.   The Individual Claims

Claimant's first year teaching for the District was the 2018-2019 school year. She signed a one-year employment contract with the District to teach Fourth Grade at Yavapai Elementary School under Principal Carlos Ardón. During that school year, Claimant was classified as a "Highly Effective" teacher; she was nominated by Principal Ardón, and Assistant Principal, Nan Wilkinson, as Educator of the Year for the District; and, she was the youngest teacher in the District, at that time, to receive the "Scottsdale Charros" Educator of the Year award.

Claimant's second year teaching for the District was the 2019-2020 school year. Again, she signed a one-year employment contract with the District – this time to teach First Grade at Yavapai Elementary School under the newly-transferred, Principal Charles Rantala ("Rantala"). Roughly six and one-half months later, Claimant would be forced out of a hostile work environment with a stress and anxiety-induced serious medical condition, at the hands of Rantala, aided and abetted by the District and its co-conspirators. And, her once pristine personnel file would reflect all of the following:

- ☛   The District is a negative employment reference for Claimant
- ☛   The District has re-classified Claimant as a "Developing" teacher
- ☛   Four ("4") serious infractions now mar Claimant's professional record, as follows:

  1. **12-13-19:** Rantala's retaliatory and baseless Letter of Direction – issued to Claimant the same day that she complained to the District about unequal pay for equal work – which is comprised of false accusations of, *inter alia*, insubordination associated with her protected activity

PLAINTIFF_000005

which Rantala's own emails and other written evidence in the District's possession prove Rantala fabricated;

2. **12-20-19:** Rantala's 1st retaliatory, legally (and policy) non-compliant, poor performance evaluation of Claimant – issued just one week later – which omits Claimant's positive student benchmark test data in violation of state law (A.R.S. §15-537) and *District Policy GCO-RA*, and breaches the District's "Evaluation" covenants to Claimant in her employment contract;

3. **01-27-20:** Rantala's 2nd retaliatory, legally (and policy) non-compliant, poor performance evaluation – issued to Claimant well ahead of the sixty (60) calendar days between evaluations mandated by state law (A.R.S. §15-537(F)(1)) and *District Policy GCO-RA* – which, again, omits Claimant's positive student benchmark test data in violation of state law (A.R.S. §15-537) and *District Policy GCO-RA*, and breaches the District's "Evaluation" covenants to Claimant in her employment contract;

4. **02-18-20:** Rantala's retaliatory, legally (and policy) non-compliant, Preliminary Notice of Inadequacy & Remediation Plan – founded on Rantala's illegal (and contractually and policy non-compliant) performance evaluations – assessed to Claimant, *in absentia*, in violation of state-law service requirements (A.R.S. §15-539(E)), and without the same Due Process rights afforded to similarly-situated teachers.

Eight months into the 2019-2020 school year, the Board would be told that Claimant had: 1) been demoted to a "Developing" teacher; 2) resigned; and, 3) paid the District liquidated damages in order to be released from her 2019-2020 employment contract with the District. The Board would never learn the truth of the matter, from Claimant in her own defense, which is that;

➡ Like others before her, Claimant was constructively discharged by the District, Rantala, its then HR Director, Amy Eveleth, its then General Counsel, Michelle Marshall, its outside counsel, Jennifer MacLennan, and other as yet unknown co-conspirators (collectively, the "Responsible Parties") without the benefit of a pre-termination hearing, and because of her protected activity under the Equal Pay Act of 1963, 28 U.S.C. §206d(1) ("EPA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*, in violation of 42 U.S.C. §1983, the EPA, Title VII, the Arizona Employment Protection Act (A.R.S. §§23-1501 *et seq.*), and in breach of her 2019-2020 employment contract with the District as well as the implied covenant of good faith and fair dealing therein,

PLAINTIFF_000006

because, among other things, Claimant refused to return to a hostile work environment which the Responsible Parties had sanctioned, refused to investigate, failed to remediate, and actively aided, abetted, and perpetuated, following the District's receipt of Claimant's sex-based wage discrimination, retaliation, and hostile work environment complaints against Rantala on December 13, 2019, and February 8, 2020, respectively (collectively, the "Protected Activity");

- ☛ Instead of providing Claimant with the support, relief, and safe haven from Rantala's sexist wage and workplace discrimination and retaliation, as required by the EPA, Title VII, and A.R.S. §§23-340 *et seq.*, 23-1501 *et seq.*, and 41-1461 *et seq.*, the Responsible Parties enabled, facilitated, aided, and abetted Rantala's pattern and practice of sex-based wage and workplace discrimination and retaliation against female subordinates, like Claimant, who did not conform to gender stereotypes/roles for women, via 1) intentional wrongdoing, 2) pursuant to the District's surreptitious custom and practice of disposing of its personnel matters swiftly, under the table, out of the public eye, and without regard to the victim's employment rights, and 3) due to the failure to adequately supervise and train District employees and agents in the proper handling of such personnel matters;

- ☛ Indeed, the Responsible Parties, committed a full panoply of illegal, sex-based wage and workplace discrimination and retaliation against Claimant, because of her Protected Activity, for which the Responsible Parties are liable to Claimant. These violations include, but are not limited to, the following:

  - ⟩ In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, and A.R.S. §§23-340 *et* seq , 23-1501 *et seq.*, 41-1464(A), the Responsible Parties created a pervasively hostile work environment for individuals, like Claimant, who failed to conform to Rantala's gender stereotypes/roles for women, comprised of, *inter alia*: 1) unequal pay for equal work; 2) managing by threats and intimidation; 3) disrespecting and devaluing the victim's input and professional opinions; 4) micro-managing, excessively monitoring, and over-evaluating the victim's behavior and workplace performance; 5) manipulating, and manufacturing, information to undermine and humiliate the victim, and to set her up for failure; 6) passing the victim over for suitable work assignments and educational opportunities; 7) applying a heightened standard of performance and behavioral expectations to the victim, as compared to her male counterparts; 8) mis-attributing administrative and professional shortcomings

PLAINTIFF_000007

and errors to the victim; 9) impugning the victim's credibility, character, and competence; 10) lying to the victim about material, administrative and other workplace matters; 11) issuing legally, contractually, and policy non-compliant, poor performance evaluations to the victim; 12) demoting the victim to a lower teacher classification; 13) issuing baseless discipline to the victim, up to, and including, a Preliminary Notice of Inadequacy and Remediation Plan; 14) forcing the victim out of a hostile work environment and, ultimately, to resign and to pay liquidated damages to be released from her contract and thereby avoid a finding of contract abandonment and the resulting stigma and consequences to her professional career; and, 15) otherwise depriving the victim of her Constitutionally-protected liberty and property rights under color of state law.

➢ In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §§23-340 *et seq.*, 41-1463(B)(1), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, the Responsible Parties denied Claimant timely and equal pay for all of the hours she worked teaching an after-school Robotics class, for which she was paid late, and incompletely, as compared to her male comparator who was paid timely, and fully, for performing substantially equal work;

➢ In violation of the District's written policies, the EPA, Title VII, and A.R.S. §41-1464(A), Rantala, aided and abetted by the other Responsible Parties, issued retaliatory, false, and unfounded discipline to Claimant – i.e., a Letter of Direction – the same day that she reported receiving unequal pay for equal work for the Robotics class to the District's HR representative/payroll liaison;

➢ In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §41-1464(A), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, Rantala, aided and abetted by the other Responsible Parties, issued (i) retaliatory, (ii) false, and (iii) legally, contractually, and policy non-compliant, performance evaluations to Claimant – immediately following her report of unequal pay for equal work – which resulted in Claimant's demotion to a "Developing" teacher, and issuance of an unfounded Preliminary Notice of Inadequacy and Remediation Plan to Claimant threatening her continued employment with the District;

PLAINTIFF_000008

> In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §§41-1464(A), 41-1463(B)(1), the Responsible Parties sanctioned, refused to investigate, failed to remediate, and actively aided, abetted, and perpetuated, Rantala's sex-based wage and workplace harassment, discrimination, and retaliation against Claimant in response to Claimant's Protected Activity;

> In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §§41-1464(A), 41-1463(B)(1), the Responsible Parties forced Claimant out of the workplace on February 17, 2020, with a serious medical condition caused by the un-remediated sex-based wage and workplace harassment, discrimination, and retaliation inflicted on Claimant in response to her Protected Activity;

> In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §§23-271 *et seq*, 41-1464(A), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, the Responsible Parties failed and refused to pay Claimant 9.175 days of earned paid sick time accrued during the school year, payable while she was out of the workplace on medical leave from February 17, 2020 through the date of her constructive discharge on March 16, 2020, which remains unpaid to date;

> In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §41-1464(A), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, the Responsible Parties: 1) placed Rantala's retaliatory, illegal and policy non-compliant, Preliminary Notice of Inadequacy & Remediation Plan into Claimant's official personnel file for the District where it remains to this day; 2) designated Claimant as "ineligible for rehire" by the District; 3) changed the District's classification of Claimant from a "Highly Effective" teacher to a "Developing" teacher; and, 4) made the District a negative employment reference for Claimant;

> In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, and A.R.S. §41-1464(A), the Responsible Parties commenced a retaliatory personnel investigation against Claimant on March 4, 2020 – regarding the validity of her positive student benchmark test data which had been illegally omitted from Rantala's performance evaluations underlying the Preliminary

PLAINTIFF_000009

Notice of Inadequacy and Remediation Plan – and pursued that investigation, without allowing Claimant to participate in same, which they abruptly halted, and never completed, after Claimant's constructive discharge on March 16, 2020;

- In violation of the District's written policies, 42 U.S.C. §1983, Title VII, A.R.S. §41-1464(A), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, the Responsible Parties locked Claimant out of the District's computer system during her employment – which she needed access to in order to do her job – from March 4, 2020 until Claimant's constructive discharge on March 16, 2020;

- In violation of 42 U.S.C. §1983, Title VII, A.R.S. §§23-1501 *et seq.*, 41-1464(A), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, the Responsible Parties constructively discharged Claimant, depriving her of, *inter alia*, a Constitutionally-protected property right, when they required her to either: 1) immediately return to the un-remediated hostile work environment, which she had fled on February 17, 2020 because of a serious medical condition brought on by the abusive environment; 2) establish District-approved grounds for indefinite, unpaid FMLA leave, thereby forfeiting her right to work and to receive the compensation and benefits promised her under her employment contract; or 3) resign effective March 16, 2020, without any pre-termination hearing, and subject to payment of liquidated damages to the District, in order to be released from her contract and avoid a finding of contract abandonment and the resulting stigma and professional consequences of that edict, which is reported to the Board and the Arizona Department of Education; and,

- In violation of the District's written policies, 42 U.S.C. §1983, the EPA, Title VII, A.R.S. §§23-353(A), 41-1464(A), and in breach of Claimant's 2019-2020 employment contract as well as the implied covenant of good faith and fair dealing therein, the Responsible Parties failed to pay Claimant $3,643.28 in gross wages and benefits due her upon discharge as of April 14, 2020 – per an agreement to pay Claimant's full contractual wages and benefits through March 26, 2020 – which were paid late and only after Claimant challenged the amount of her final paycheck.

PLAINTIFF_000010

The evidence supporting these claims has been largely disclosed to the District in previous Rule 408 discussions, and, in EEOC proceedings (*Brooke Schneider vs. Scottsdale Unified School District* Charge Nos. EEOC 35A-2020-00626; CRD-2020-0826).  However, if the District believes that it requires additional facts and/or information to understand Claimant's claims against the District outlined hereinabove, and in Section III of this Notice of Claim, please contact the undersigned at 602-370-7965 or cauernd14@gmail.com to obtain that additional information.

### III.     The Class Claim

In addition to the individual claims against the District detailed in Section II above, Claimant will pursue individual and class-wide claims for injunctive and declaratory relief against the District (the "Class Claims") based on its violation of, *inter alia*, A.R.S. §§23-350 *et seq.*, in connection with its mid-year, e-PAR billing code process.  That process currently requires the creation of an e-PAR payroll code before teachers can bill for certain work performed outside of their annual teaching contract – *e.g.*, teaching before-and-after-school classes and other extracurricular school activities – which results in delayed billing, and untimely payment, of associated wages and benefits for those hours worked.

Claimant's standing to pursue these Class Claims is based on Claimant's intent – during the pendency of her doctoral program – to seek re-employment with the District as a substitute teacher for classes which will require her use of the District's mid-year, e-PAR billing code process.

### IV.     The Claim Amount

The Responsible Parties collectively, and individually, conducted themselves in a manner that violated Claimant's clearly established rights, causing Claimant substantial harm for which she is entitled to, at a minimum, the monetary damages detailed in Section V of this Notice of Claim, as well as her reasonable attorney's fees and costs pursuant to A.R.S. §12-341.01, 29 U.S.C. §216(b), 42 U.S.C. §2000e-5(k), and 42 U.S.C. §1988.

Claimant would also be entitled to recover punitive damages against the individual Responsible Parties because their individual conduct, as detailed herein, was malicious and/or in reckless disregard of Claimant's clearly established rights.  In addition Claimant would be entitled to equitable relief, attorney's fees and costs on the class claims described in Section III above.

### V.     The Minimum Monetary Damages Due Claimant

#### A.     Claimant's Make Whole Damages $15,036.55

1.     **Unpaid wages and benefits = $24,068.23** ($20,962.07 + 3,106.16 (10% interest per annum thru 9/8/2021, per breach of contract and A.A.C. R20-5-1213)

PLAINTIFF_000011

      **a.**   <u>**Under 2019/20 teaching contract = $18,630.38**</u> [9.175 earned sick days or (73.4 hrs x $29.90/hr earned unpaid sick days) + 2x (73.4 hrs x $29.90/hr earned unpaid sick days per A.A.C. R20-5-1213) + $2,000 Liq. Dmgs. paid to be released from contract + 42 unpaid days remaining in contract (336 hrs x $29.90/hr)]

      **b.**   <u>**For Robotics class = $450.00**</u> [5 hrs x $30/hr] x 3 (treble unpaid wages A.R.S. 23-355A)]

      **c.**   <u>**For 2 before & after school classes Claimant would have taught = $1,080.00**</u> [36 hrs x $30/hr]

      **d.**   <u>**For missed 403b contributions = $180.00**</u> [6wks x $15/wk]

      **e.**   <u>**For missed ASRS contributions = $621.69**</u> [(6wks ÷ 2) x ($1,711.23/2wks x 12.11%)]

**2.**   <u>**Less Mitigation Earnings = $9,031.68**</u> [42 days or (336 hrs x $26.88/hr)]

**3.**   <u>**Damages = $15,036.55**</u> ($24,068.23 - $9,031.68)

**B.**   <u>**Pecuniary and Non-Pecuniary Damages = $89,433.80**</u>

**1.**   <u>**Emotional Distress Damages = $25,000.00**</u> (anxiety; panic attacks, lack of sleep; nausea; headaches; depression; multiple therapist and physician consults; medication changes)

**2.**   <u>**Out-of-Pocket Medical & Mental Health = $16,440.00**</u> [$390 + [5yrs x (3000 + 180 + 30)]]

      **a.**   SUSD medical coverage ended 3/31/2020; Primrose coverage began 4/1/20. 2 PCP visits at $150.00/each & $90.00 dental visit uncovered = $390.00

      **b.**   Difference in annual medical deductible = $3,000

      **c.**   Difference in annual rx copays $180 ($15/mth x $12 mths)

      **d.**   Difference in annual vision copays $30

**3.**   <u>**Out-of-Pocket Job-Hunting Costs = $525.00**</u>

      **a.**   $100 (fuel costs for job interviews);

      **b.**   $25 (resume printing costs);

      **c.**   $400 (work apparel costs)

PLAINTIFF_000012

      **4.**     **Lost Life Insurance Coverage = $25,000.00**

      **5.**     **Difference in Wages = $22,468.80** [(186 days x 5yrs) = 930 days; (930 days x 8 hrs/day) = 7,440 hrs (7,440 hrs x $3.02/hr )]

  **C.**    **Attorney's Fees = $36,428.28**  [($45,068.09 fees x 20% across-the-board reduction) + $373.81 costs]

**TOTAL DEMAND = $140,898.63** ($104,470.35 damages + $36,428.28 attorney's fees and costs)

**VI.**    **The Settlement Demand**

    Claimant will settle the above-described claims against the District for:

➡   **$140,898.63** in monetary damages (inclusive of Claimant's reasonable attorney's fees and costs), all of which are detailed in Section V above; and,

➡   the following equitable relief:

> ⟡   Claimant's ***District personnel file shall be purged*** of all of the disciplinary infractions issued to Claimant by Rantala, aided and abetted by the other Responsible Parties – namely, 1) Rantala's December 13, 2019 Letter of Direction to Claimant, 2) Rantala's two performance evaluations of Claimant issued on December 20, 2019 and January 27, 2020, and 3) Rantala's Preliminary Notice of Inadequacy and Remediation Plan issued to Claimant on February 18, 2020;

> ⟡   Claimant's ***District personnel forms shall reflect*** that she was "Released From Employment" per contract;

> ⟡   Claimant's ***District teacher classification shall be returned*** to "Highly Effective;"

> ⟡   Claimant shall be ***Classified as "Eligible for Rehire"*** by the District;

> ⟡   Claimant's pay received from the District for the period February 18, 2020 thru March 26, 2020 shall be referred to ***as "Separation Pay" rather than as "Paid Administrative Leave"***;

> ⟡   District shall ***exclusively use a mutually-agreed-upon form of "Employment Reference"*** for Claimant;

> ⟡   District shall ***formally rescind any and all Notice(s) of Claimant's discipline, reclassification, demotion, and/or payment of liquidated damages*** delivered to the Board, Yavapai Elementary School Administrators, and other District staff members, by

PLAINTIFF_000013

distributing a mutually-agreed-upon form of "Retraction Notice" to said persons;

▷ District shall *__promptly arrange for an outside investigation__* of Claimant's: 1) December 13, 2019 report of unequal pay for equal work for the Robotics Class to the District's HR representative/payroll liaison; and, 2) February 8, 2020 complaint of a hostile work environment and retaliation by Rantala in response to her report of the sex-based wage disparity;

▷ District shall *__provide Claimant and the Board with copies__* of the outside investigator's Report and Findings following the above-stated outside investigation;

▷ District shall *__consider, and impose, as deemed appropriate, the discipline and penalties recommended by the outside investigator__* for any and all breaches of contract, violations of law, and/or violations of District policies found by the investigator, and shall *__consider, and implement, as deemed appropriate, the investigator's recommended remedial actions__* to prevent future recurrences of those breaches/violations identified;

▷ District shall *__include a copy of Claimant's 2019-2020 employment contract__* in her official personnel file with the District; and,

▷ District shall *__include a "Non-disparagement Clause" (as to Claimant)__* in any proposed Settlement Agreement to resolve Claimant's claims against the Responsible Parties detailed herein.

Pursuant to A.R.S. §12-821.01, the District has sixty (60) days to respond to this Notice of Claim before further legal action can be instituted under Arizona state law.

Sincerely,

Colleen M. Auer
AUER LAW FIRM PLLC
*Counsel for Claimant*

PLAINTIFF_000014

# EXHIBIT 1

PLAINTIFF_000015

To Whom It May Concern:

I would like to recommend Brooke Schneider as a candidate for the doctoral degree program. I have had the honor to work with Ms. Schneider during this school year 2018-2019. Ms. Schneider has been a dedicated educator who devotes her time to researching new ideas and growing educationally to help her students succeed academically and personally

I have had the opportunity to work with Ms. Schneider as her immediate supervisor. Her dedication to her school community earned her the Teacher of the Year Award during the school year 2018-2019. She went above and beyond to facilitate learning for adults and for students as well. She was definitely a team player who was always ready to share and to learn from her team. She also showed tremendous creativity by adding innovative and effective strategies that motivated her students in the classroom. Her organizational skills gave her an edge when it comes to teaching, because she was always prepared to deliver the best possible lessons.

Ms. Schneider had an extraordinary classroom management system. Her students developed a sense of community in her classroom. She showed the utmost respect for her students, along with a great sense of humor that made her classroom a good learning environment for students to feel safe and appreciated.

Brooke Schneider participated in school committees to develop and strengthen positive staff culture. She was the only teacher to volunteer to be part of the PTO to help build a stronger community involving more families.

I recommend Brooke Schneider without any doubt that she will be a great doctoral student. If I can be of any further assistance, do not hesitate to contact me at ███████████████ or ███████

Sincerely,

Carlos Ardón
Principal
Herrera School for the Fine Arts and Dual Language

PLAINTIFF_000016

# EXHIBIT 2

PLAINTIFF_000017



*Inspiring Every Child to Achieve*

# PHOENIX#1
Elementary School District

1817 N. 7th Street
Phoenix, AZ 85006
(602)257-3755
phxschools.org

## LETTER OF CONTRACT ASSURANCE

**ISSUED: April 19, 2021**

This is a letter of assurance, made and entered as of its day of execution hereinafter set forth, between Phoenix Elementary School District No. 1, through its Governing Board and

**Brooke Schneider**

**It shall confirm the salary amount $46,859.00 for SY 2021/2022**
*This salary placement includes $1,500.00 as provided by ASRS 15-977*

### Assignment: 3rd Grade Teacher at Herrera Elementary

**WITNESSETH:**

The Phoenix Elementary School District No. 1 agrees to offer employment to **Brooke Schneider** as a teacher for the 2021/2022 School Year, upon the satisfactory completion of a background and reference check, the presentation of proof of citizenship or appropriate visa, an Arizona Department of Public Safety Fingerprint Clearance Card and appropriate licensure to Human Resources prior to the start of the contract.

Salary placement will be as provided in the Governing Board policy.

We look forward to having you as a member of the Phoenix Elementary School District Staff, and we are certain your assignment will be rewarding and challenging.

My Signature affixed hereto acknowledges my understanding and obligation to work for Phoenix Elementary School District No. 1 for the 2021/2022 school year and become legally certified in the State of Arizona prior to the beginning of the contract, and my understanding that the Phoenix Elementary Governing Board will honor this agreement.

Sincerely yours,

Lauren Pagnotta
Human Resources Coordinator

_____     _____
Signature                          Date

*This letter of contract assurance expires 7 days for date of issue.*

_____     _____
Human Resources Representative          Date

PLAINTIFF_000018

# EXHIBIT 3

PLAINTIFF_000019

  Scottsdale *Unified* School District

Nancy Wilkinson, Assistant Principal
Sequoya Elementary School
11808 N 64th Street
Scottsdale, Arizona 85254

Telephone: 480-484-7500
FAX: 480-484-7501
Website: www.susd.org

May 28, 2019

To Whom it May Concern:

I highly recommend Brooke Schneider as a candidate for your doctoral program. As her supervisor, I have had the pleasure of working with her for the 2018-2019 school year.

Brooke is a master teacher and fully comprehends the developmental needs of early childhood. Her greatest strength is her compassion for students and her ability to work with trauma students. She understands the needs of students, can build relationships and creates a trusting environment. It is evident, when observing Brooke, she has a true love for her children and wants them to be successful academically, socially and emotionally.

The students in Brooke's school come from a low socio-economic background. Many students are in temporary housing with some living in their cars. Brooke has studied trauma-informed practice and understands their needs. For example, when working with students who reside in the shelter, she works diligently to build a trusting relationship. She knows she must have this before any learning can take place. She has a foundational grasp into the trauma brain and even teaches her children about the amygdala, emotional brain and learning brain. She is interested in brain research and has avidly studied how emotion plays a part in learning.

Brooke has a strong work ethic and is committed not only to the students, but to the school as whole. Last year she was chosen as our Charros teacher of the year. She earned this award due to her dedication and efforts in working for the whole of the school. She often works with students not in her classroom and deeply believes that every teacher supports every student every day.

I know Brooke would be an excellent candidate for your program. She has a profound dedication to students and an insatiable appetite for learning. Her desire to improve and her dedication to her profession are like no other.

Sincerely,

Nan Wilkinson, Assistant Principal
Sequoya Elementary School

# EXHIBIT 4

PLAINTIFF_000021

To Whom This May Concern,

As I write this letter for Miss Brooke Schneider, several excellent qualities come to mind. Having worked with Brooke in the classroom as a mentee, I can attest to her strong leadership qualities, vast knowledge of best educational practices, and most importantly her passion for teaching and implementing positive change in education.

During my time in her classroom, Brooke was an exceptional mentor teacher specifically in curriculum and instruction, at a school with a population of children in a low socio-economic bracket. Brooke allowed me to ask questions, and begin to implement strategies in a variety of areas including classroom management, data analysis and data-driven instruction, as well as creating individualized education plans, and differentiated instruction for all students. Brooke went above and beyond to demonstrate how she analyzed her benchmark and standardized test data, and used it to implement improvement strategies in her classroom. Despite being a mentee, Brooke consistently treated me as an equal, made me feel comfortable as I sought more knowledge, and allowed me to collaborate on instructional methods and intervention strategies. The aforementioned strategies are ones in which I still use in my classroom today.

One of my fondest memories in Brooke's classroom remains as when she won the Scottsdale Charros Teacher of the Year award. Brooke was recognized as one of the youngest teachers to receive this award in Scottsdale Unified School District's history. Brooke was recognized for her exceptional performance in the classroom according to administrative requirements, and her consistent involvement within the school community as the robotics coach, the math club and drama teacher, and a before and after school tutor. I even had the privilege of attending meetings with her for her involvement in site council, and the leadership team.

I am continually thankful for the opportunity to observe Brooke's interaction with her co-workers, and administration. Her relationships with everyone on campus were positive and made me truly excited to be a teacher. Not only was Brooke able to effectively collaborate with her teammates, but she worked with the grades above and below her to plan effective vertical articulation. This is where I observed her leadership skills truly blossom. Using her knowledge of the curriculum, and best instructional practices, Brooke was able to offer advice, and assist fellow educators on implementing strategies on student success in the classroom. It was inspiring to see Brooke, despite her mastery of teaching strategies, always approach her colleagues and administrators to collaborate on how she could grow and improve her craft. Observing and being a part of this instilled in me, an enthusiasm for sharing and gaining knowledge, and continuing to grow and develop my knowledge as a teacher.

My experience being mentored by Brooke was one of exceptional skill, leadership, passion, and growth. Brooke would absolutely be an asset to your company, as she is a strong leader, exceptionally knowledgeable, and consistently striving for growth and improvement in herself, her colleagues, her school, and most importantly her students and the educational system.


Sincerely,

Rachel Borney, Fifth Grade Teacher, Diamond Canyon School, A+ School of Excellence

PLAINTIFF_000022

# EXHIBIT 5

PLAINTIFF_000023



February 27, 2020

4701 West Thunderbird Road

Glendale, Arizona 85306

███████████████████

To Whom It Concern,

Ms. Brooke Schneider was a student of mine in the Master's Program at Arizona State University earning a Curriculum and Instruction (Early Childhood Education) degree. I have known her for over two years. I am writing a letter of recommendation for this student. She turned her work in on time and earned strong A's and stood out towards the top 5-10% of the courses I taught.

Brooke has a heart for children and a heart for teaching and wants to foster children's love of learning. She has a strong interest in early childhood.

In summary, I recommend, without reservation, Ms. Brooke Schneider as a doctoral student in your program. If you have any questions, please do not hesitate to email me.

Sincerely,

Melanie Lehman, Ed.D.

PLAINTIFF_000024

# EXHIBIT 6

PLAINTIFF_000025



March 27, 2021

Clark Consulting
Surprise, AZ 85388

To Whom It May Concern,

This purpose of this letter is to recommend Ms. Brooke Schneider for the position of Education Trainer/Coach. I have known Ms. Schneider for less than a year, having taught her in her first course in our EdD program in Educational Leadership and Innovation at ASU.

Based on my knowledge of Ms. Schneider's integrity and professionalism to which I was witness in my course, I give her the highest recommendation for this important consulting position with your firm. The course that I taught and referred to above focuses on the concept of action research and how it can be applied in schools and other educational settings as a means of improving educational practice at all levels. During her time as a student in my course, Ms. Schneider displayed the utmost attention to detail when it came to all aspects of the research process. Through her writing, she conveyed a meticulous degree of thoughtfulness when designing research to be conducted in a specific context-based setting. Her ideas were superb, as she possesses the ability to carefully consider various options as they pertain to methodological decisions. Further, Ms. Schneider willingly accepts constructive criticism, always looking for opportunities to learn and apply new techniques and skills. Furthermore, I believe that Ms. Schneider is gifted at articulating research findings in scholarly and thoughtful ways, yet never losing sight of her intended audience. In other words, she can produce scholarly manuscripts, but also has the skills to relate research findings to practitioners in a comprehensible manner.

I believe that Ms. Schneider's experiences, both prior to and including her involvement in our doctoral program, will enable her to step right into classrooms and schools around the country and make substantial differences in the lives of professional educators and their students. Additionally, her professionalism, knowledge of education and of the action research process, and collaborative skills make her an ideal candidate for the position you are looking to fill.

I believe that Ms. Schneider would be a superb candidate for this position. I recommend her without hesitation. Should you need further information, please feel free to contact me at

Sincerely,

*Craig A. Mertler*

Craig A. Mertler, Ph.D.
Associate Professor
EdD in Leadership & Innovation
Arizona State University

Division of Educational Leadership and Innovation
PO Box 37100, Phoenix, AZ 85069-7100
(602) 543-6300    Fax: (602) 543-2811
education.asu.edu

PLAINTIFF_000026

# EXHIBIT 7

PLAINTIFF_000027

# Test Results - Assessment : 19-20 #1 Math Gr 01 Formative Benchmark

| Average Raw Score | Average % Correct |
|---|---|
| 16 | 80% |

| Performance Level Summary | # | % | ☑ |
|---|---|---|---|
| Number of Students Tested: | 17 | 85.00 | |
| 2 - Partially Proficient | 1 | 5.88% | ☑ |
| 3 - Proficient | 7 | 41.18% | ☑ |
| 4 - Highly Proficient | 9 | 52.94% | ☑ |

⚙ ⣊ ✎ ✕

## By Performance Levels Chart



- 2 – Partially Proficient
- 3 – Proficient
- 4 – Highly Proficient

Create Group   Show: ☑ Demographics   ◯ Proficient / Not Proficient
☑ Chart   ◉ By Performance Levels

Search... 🔍

Showing 17 ▼ of 17 records

‹ 1 ›

| Student ID | Last Name | First Name | Level Tested | | Raw Score | % Correct | |
|---|---|---|---|---|---|---|---|
| | | District Average → | 15.49 | 77.46% | | | 33 |
| | | Campus Average → | 14.71 | 73.56% | | | 32 |
| | | Teacher Average → | 16 | 80% | | | 19 |
| 240539 | ▮ | Grade 1 | 14 | 70% | | Proficient | 19 |
| 241904 | ▮ | Grade 1 | 14 | 70% | | Proficient | 14 |
| 237638 | ▮ | Grade 1 | 14 | 70% | | Proficient | 13 |

PLAINTIFF_000028

## Test Results - Assessment : 19-20 #2 Math Gr 01 Formative Benchmark

| Average Raw Score | Average % Correct |
|---|---|
| 15.53 | 77.63% |

| Performance Level Summary | # | % | ☑ |
|---|---|---|---|
| Number of Students Tested: | 19 | 95.00 | |
| 1 - Minimally Proficient | 1 | 5.26% | ☑ |
| 2 - Partially Proficient | 1 | 5.26% | ☑ |
| 3 - Proficient | 6 | 31.58% | ☑ |
| 4 - Highly Proficient | 11 | 57.89% | ☑ |

⚙ ⋮⋮⋮ ✏ ✕

### By Performance Levels Chart



Proficient 31.58% (6)

■ 1 – Minimally Proficient
■ 2 – Partially Proficient
■ 3 – Proficient
■ 4 – Highly Proficient

Create Group  Show: ☑ Demographics   ○ Proficient / Not Proficient
☑ Chart   ⊙ By Performance Levels

Search... 🔍

Showing 19 ▼ of 19 records

‹ 1 ›

| Student ID | Last Name | First Name | Level Tested | | Raw Score | % Correct |
|---|---|---|---|---|---|---|
| | | District Average → | 13.23 | 66.15% | | 39 |
| | | Campus Average → | 13.33 | 66.67% | | 44 |
| | | Teacher Average → | 15.53 | 77.63% | | 25 |

PLAINTIFF_000029

| Average Raw Score | | Average % Correct | | |
|---|---|---|---|---|
| 111.68 | | 85.91% | | |
| **Performance Level Summary** | | **#** | **%** | ☑ |
| Number of Students Tested: | | 19 | 95.00 | |
| 2 - Partially Proficient (52.01 - 122) | | 14 | 73.68% | ☑ |
| 3 - Proficient (122.01 - 130) | | 5 | 26.32% | ☑ |

⚙  ⛢  ✎  ⛶        By Performance Levels Chart



- 2 - Partially Proficient (52.01 – 122)
- 3 - Proficient (122.01 – 130)

Create Group    **Show:** ☑ Demographics    ○ Proficient / Not Proficient
☑ Chart                ◉ By Performance Levels

Search...                    🔍

Showing 19 ▼ of 19 records

< 1 >

| | Student ID | Last Name | First Name | | | Level Tested | Raw Score |
|---|---|---|---|---|---|---|---|
| | | | District Average → | 107.11 | 82.39% | | |
| | | | Campus Average → | 97.87 | 75.28% | | |
| | | | Teacher Average → | 111.68 | 85.91% | | |
| | | | Filtered Students Average → | 111.68 | 85.91% | | |
| ☐ | 240539 | | Grade 1 | 98 | 75.38% | Partially Proficient | No |
| ☐ | 241904 | | Grade 1 | 110 | 84.62% | Partially Proficient | No |
| ☐ | 237638 | | Grade 1 | 88 | 67.69% | Partially Proficient | No |
| ☐ | 235688 | | Grade 1 | 87 | 66.92% | Partially Proficient | No |

PLAINTIFF_000030

# EXHIBIT 6

# RE: Robotics Clock in

## Chuck Rantala

Thu 10/31/2019 10:47 AM

Inbox

To: Brooke Schneider <bschneider@susd.org>;

Hi Brooke,

Yes, you'll need to clock in; but the code won't be ready until the ePar processes. Judy did the ePar Tuesday AM; but it can take up to 10 business days to route.

Thanks,

**Chuck Rantala**
**Hohokam & Yavapai Elementary Principal**
**Scottsdale Unified School District**
*Engage, Educate and Empower Every Student, Every Day*
Temporarily Located at Yavapai Elementary School
701 N. Miller Rd, Scottsdale, AZ 85257 | tel (480) 484-3800



Hohokam Website | Yavapai Website | Map



# EXHIBIT 7

**From:** Judy Edmondson
**To:** Brooke Schneider
**Subject:** Lego Robotics
**Date:** Friday, November 22, 2019 11:44:24 AM
**Attachments:** image001.png
image004.png
image005.png
image006.png
image007.png
image008.png
image009.png

Brooke,
Your start date for Lego Robotics was not until 11/20 when the ePar was approved and code assigned.  I cannot put the time slips in before that date.

Thank you,

**Judy Edmondson- Administrative Coordinator**
**Hohokam & Yavapai Elementary**
Scottsdale Unified School District
*Engage, Educate and Empower Every Student, Every Day*
Temporarily Located at Yavapai Elementary School
701 N. Miller Rd, Scottsdale, AZ 85257 | tel (480) 484-3805

Hohokam Website | Yavapai Website | Map



# EXHIBIT 8



**From:** Brooke Schneider
**Sent:** Tuesday, December 10, 2019 9:54 AM
**To:** Teresa Belmonte
**Subject:** Re: message

Teresa,

Thank you so much! I really appreciate it!

-Brooke

**From:** Teresa Belmonte
**Sent:** Tuesday, December 10, 2019 9:51:19 AM
**To:** Brooke Schneider
**Subject:** RE: message

Ok, let me get this corrected for you. I'm going to reach out to the school to change the effective date to cover the dates you worked. Sorry for the confusion on this, Brooke!

Teresa



**Teresa Belmonte | HR Staffing Coordinator**
**Scottsdale Unified School District**
7575 E. Main St., Scottsdale, AZ 85251
tel (480) 484-6199 | fax (480) 484-6287
**Monday through Friday, 7:30am to 4pm – by appt. only**
"Your success is our success, from Hire to Retire"

Website | Map | SUSD Magazine



*CONFIDENTIALITY NOTICE (HIPAA Compliance): The information contained in this e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.*

*Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, and have received this communication in error, please contact the sender by reply e-mail and destroy/delete all copies of the original message. Thank you.*

**From:** Brooke Schneider
**Sent:** Tuesday, December 10, 2019 9:02 AM
**To:** Teresa Belmonte <tbelmonte@susd.org>
**Subject:** Re: message

Teresa,

They were before that date.

-Brooke

---

**From:** Teresa Belmonte
**Sent:** Tuesday, December 10, 2019 7:30:41 AM
**To:** Brooke Schneider
**Subject:** RE: message

Where those dates on or after 11/20/19?



**Teresa Belmonte | HR Staffing Coordinator**
**Scottsdale Unified School District**
7575 E. Main St., Scottsdale, AZ 85251
tel (480) 484-6199 | fax (480) 484-6287
**Monday through Friday, 7:30am to 4pm – by appt. only**
"Your success is our success, from Hire to Retire"

Website | Map | SUSD Magazine



*CONFIDENTIALITY NOTICE (HIPAA Compliance): The information contained in this e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, and have received this communication in error, please contact the sender by reply e-mail and destroy/delete all copies of the original message. Thank you.*

**From:** Brooke Schneider
**Sent:** Monday, December 9, 2019 4:22 PM
**To:** Teresa Belmonte <tbelmonte@susd.org>
**Subject:** Re: message

Teresa,

I was not clocking in on those days because I had no code to clock in with yet. I recorded my hours on paper to keep track and transferred them to time clock adjustment sheets. Judy said she was unable to process them as they were days before I had a code.

-Brooke

**From:** Teresa Belmonte
**Sent:** Monday, December 9, 2019 3:29:19 PM
**To:** Brooke Schneider
**Subject:** RE: message

Hi Brooke,

This is a time clock supplemental. Have you been using the time clock? If so, great! You can check with Judy to see what days you're missing. Then you can fill out a Payroll Exception form to send to Payroll to correct the missed hours. Please let me know if you need help once you've talked to Judy.

Thanks!
Teresa



**Teresa Belmonte | HR Staffing Coordinator**
**Scottsdale Unified School District**
7575 E. Main St., Scottsdale, AZ 85251
tel (480) 484-6199 | fax (480) 484-6287
**Monday through Friday, 7:30am to 4pm – by appt. only**
"Your success is our success, from Hire to Retire"

Website | Map | SUSD Magazine



*CONFIDENTIALITY NOTICE (HIPAA Compliance): The information contained in this e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, and have received this communication in error, please contact the sender by reply e-mail and destroy/delete all copies of the original message. Thank you.*

**From:** Brooke Schneider
**Sent:** Monday, December 9, 2019 3:26 PM
**To:** Teresa Belmonte <tbelmonte@susd.org>
**Subject:** Re: message

Dear Teresa,

I wanted to inquire about my pay for robotics. It was last minute that I was asked to take over the program. I was aware that I may not get paid for two or three sessions because of a delay to get the code and I agreed However, there was a mix up with our school secretary and it was not properly communicated in a timely fashion to HR. As

a result I have now worked eight hours unpaid. I wanted to know if it would be possible to receive backpay for those hours. I recorded them on the time slips. Thank you so much.

Sincerely,
Brooke Schneider

---

**From:** Teresa Belmonte
**Sent:** Monday, December 9, 2019 2:47:01 PM
**To:** Brooke Schneider
**Subject:** message

Hi Brooke,

I had a message that you called for me while I was out sick. What can I help you with?



**Teresa Belmonte | HR Staffing Coordinator**
Scottsdale Unified School District
7575 E. Main St., Scottsdale, AZ 85251
tel (480) 484-6199 | fax (480) 484-6287
Monday through Friday, 7:30am to 4pm – by appt. only
"Your success is our success, from <u>H</u>ire to <u>R</u>etire"

<u>Website</u> | <u>Map</u> | <u>SUSD Magazine</u>



*CONFIDENTIALITY NOTICE (HIPAA Compliance): The information contained in this e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, and have received this communication in error, please contact the sender by reply e-mail and destroy/delete all copies of the original message. Thank you.*

# EXHIBIT 9

███████

| | |
|---|---|
| **From:** | Judy Edmondson <judy.edmondson@susd.org> |
| **Sent:** | Tuesday, December 1, 2020 10:38 AM |
| **To:** | Chuck Rantala |
| **Subject:** | FW: message |



**Judy Edmondson**
**Hohokam & Yavapai Elementary**
**Scottsdale Unified School District**
*Engage, Educate and Empower Every Student, Every Day*
Temporarily Located at Yavapai Elementary School
701 N. Miller Rd, Scottsdale, AZ 85257 | tel (480) 484-3805



Hohokam Website | Yavapai Website | Map

**From:** Teresa Belmonte <tbelmonte@susd.org>
**Sent:** Tuesday, December 10, 2019 9:53 AM
**To:** Judy Edmondson <judy.edmondson@susd.org>
**Subject:** FW: message

I was going to call you but I didn't know if you're at a new number. Brooke is stating that she worked prior to 11/20/19. We have to pay her for time worked. Please submit a Pay Change epar to change the effective date to the first day she worked this supplemental. If there's an issue with her working prior to the start date you indicated, have Chuck handle it.

Thanks!
Teresa



**Teresa Belmonte | HR Staffing Coordinator**
**Scottsdale Unified School District**
7575 E. Main St., Scottsdale, AZ 85251
tel (480) 484-6199 | fax (480) 484-6287
**Monday through Friday, 7:30am to 4pm – by appt. only**
"Your success is our success, from Hire to Retire"



Website | Map | SUSD Magazine

*CONFIDENTIALITY NOTICE (HIPAA Compliance): The information contained in this e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, and have received this communication in error, please contact the sender by reply e-mail and destroy/delete all copies of the original message. Thank you.*

# EXHIBIT 10



Scottsdale *Unified* School District

*Engage, Educate and Empower Every Student, Every Day*

Education Center
7575 E. Main Street
Scottsdale, Arizona 85251-4522

Telephone: 480-484-6172
FAX: 480-484-6287
Web site: www.susd.org

## CERTIFIED CORRECTIVE ACTION MEMORANDUM

DATE:     12/13/19

TO:       Brooke Schneider

FROM:     Chuck Rantala

RE:       Please check one:     ☒ Letter of Direction (non-disciplinary)
                                ☐ Letter or Reprimand (disciplinary per Policy GCQF)

**Issue(s) or behaviors to be addressed:**
Ms. Schneider began work with FLL Robotics prior to her ePar clearing Human Resources. Additionally, Ms. Schneider did not follow proper procedures when logging minors for a student. And she withheld a student from a field trip without proper communication to parents and administration; or administration approval.

**Prior discussion or warning regarding issue(s) or behavior(s) with specific dates:**
SUSD Governing Board policy
E-mail dated 10/31/19
MTSS-B process Hohokam_Yavapai

**Specific policy/regulation/procedure/employment handbook violation(s):**
SUSD Governing Board policy GCQF-Discipline, Suspension, and Dismissal of Professional Staff Members

- Engaging in acts of insubordination

GBEB-R Staff Conduct

- Failure to comply with lawful direction of District officials

SUSD Governing Board policy GBEA-Staff Ethics

- Makes the well-being of students the fundamental value of all decision making and actions.
- Supports the principle of due process and protects the civil and human rights of all individuals.

**Required corrective action by the employee with specific dates:**
Effective immediately, Ms. Schneider will follow all SUSD Governing Board policies as well as campus policies and procedures. She will also follow all directions from her supervisor.

Revised. July 2019

Failure to follow corrective action as specified in this memo may lead to additional corrective or disciplinary action up to and including a recommendation for termination as delineated in board policy and Arizona Revised Statutes.

Employee signature indicates receipt of a copy of this memorandum but does not necessarily indicate employee agreement.

(Signature of Employee)

Date of Signature: _ 12/13/19

Employee intent to write a response

☐ No

☒ Yes – must submit within ten (10) working days

C:     Employee
        Human Resources if Letter of Reprimand (Employee Personnel File)
        Supervisor/Site Administrator

# EXHIBIT 11

IN RESPONSE TO: CERTIFIED CORRECTIVE ACTION MEMORANDUM

DATE RECEIVED: 12/13/2019

DATE OF RESPONSE:

TO: Chuck Rantala

FROM: Brooke Schneider

Dear Mr. Chuck Rantala,

This letter is written in response to a certified corrective action memorandum drafted by the school administrator, Mr. Chuck Rantala and presented to SUSD teacher, Miss Brooke Schneider on Friday, the thirteenth of December in the year two-thousand nineteen. Said memorandum was presented to myself, Miss Brooke Schneider in a meeting with just several hours of warning and no description of what the meeting was regarding, except "to follow up on some items", per an email sent by principal, Mr. Chuck Rantala to Miss Brooke Schneider on Friday, the thirteenth of December at 9:57am. By providing just over five hours, during a working school day, I was not given an appropriate amount of time to notify my Scottsdale Education Association representative and ask that she be present for said meeting. As a result, upon arrival at the meeting, where no third party was present, I felt frightened, intimidated, and very puzzled by the accusations against me in the certified corrective action memorandum that was presented to me.

The first accusation that was "addressed" within the memorandum was, "Ms. Schneider began work with FLL Robotics prior to her ePar clearing with Human Resources". In response to this accusation, I would like to present several emails regarding the mixed messages and inconsistent information amongst myself, the school principal, Mr, Chuck Rantala, and the SUSD representative, Teresa Belmonte. First, I would like to refer to an email sent to principal, Mr. Chuck Rantala on the fourteenth of October at 6:52am from SUSD employee, Mr. Scott Harvey. Following a verbal request by principal, Mr. Chuck Rantala, Mr. Scott Harvey sent an email stating the estimated number of hours in which I would be working for FLL Robotics. Within this email thread, principal, Mr. Chuck Rantala responded by asking what Miss Brooke Schneider's start date for the program would be. Mr. Scott Harvey responded by stating, "The start date for Brooke is 10/28/19". Principal, Mr. Chuck Rantala concluded the email thread by responding "Great, thank you", per an email on the twenty-eighth of October at 11:26 am. At this time, I had been granted permission to begin working on Monday the twenty-eighth of October by principal, Mr. Chuck Rantala via the email referred to above, in which I did. After several days, I, Miss Brooke Schneider made several email inquiries to principal, Mr. Chuck Rantala

regarding the robotics payment procedure as it was not clearly stated to me at any time. The first inquiry regarding FLL Robotics payment procedures was written by Miss Brooke Schneider to principal, Mr. Chuck Rantala on Monday, the twenty-eighth of October at 10:00 pm. I have yet to receive a response to this inquiry. The second inquiry was written on Thursday, the thirty-first of October at 10:01 am. I, Miss Brooke Schneider received a response on Thursday, the thirty-first of October at 10:47 am which read, "Hi Brooke, Yes, you'll need to clock in; but the code won't be ready until the ePar processes. Judy did the ePar Tuesday AM; but it can take up to 10 business days to route".

After waiting several days, I, Miss Brooke Schneider walked into the Yavapai Elementary School front office and had verbally engaged with administrative assistant to principal, Mr. Chuck Rantala and "official liaison", Judy Edmonson as agreed to by Mr. Chuck Rantala during the meeting with Miss Brooke Schneider on Friday, the thirteenth of December. The conversation went as follows: "Hi Judy. Any news on the robotics ePar code yet?" Judy responded with, "What robotics code? For Ashley?". I responded by explaining that I was to coach the Yavapai FLL Robotics team and that I had discussed with principal, Mr. Chuck Rantala, several days prior via email, as well as, when the funding was unanimously approved by our site council on Monday, the twenty-eighth of October. Judy stated that she would speak with Chuck and get things moving forward. However, in contrast to this verbal exchange, principal, Mr. Chuck Rantala stated to Brooke Schneider, via email on Thursday, the thirty-first of October at 10:47am, " Judy did the ePar Tuesday AM; but it can take up to 10 business days to route". However, upon speaking to principal liaison, Mrs. Judy Edmonson, I was informed that the ePar code had in fact, not been submitted to the district in a timely fashion as principal, Mr. Chuck Rantala had previously stated in his email to Miss Brooke Schneider prior to this verbal exchange.

After working six additional hours over two weeks time, I had yet to receive an ePar code. I felt confused and was unsure of how to move forward. To ensure I was following the policies of SUSD Human Resources, I reached out to Human Resources district representative, Ms. Teresa Belmonte. Within this email thread, I, Miss Brooke Schneider was honest and transparent about the events that had transpired regarding the FLL Robotics and ePar code procedure issue. In an email to SUSD Human Resources representative, Ms. Teresa Belmonte on Monday, the ninth of December at 3:25 pm, I, Miss Brooke Schneider stated, "I wanted to inquire about my pay for robotics. It was last minute that I was asked to take over the program. I was aware that I may not get paid for two or three sessions because of a delay to get the code and I agreed. However, there was a mix up with our school secretary and it was not properly communicated in a timely fashion to HR. As a result I have now worked eight hours unpaid. I wanted to know if it would be possible to receive back pay for those hours. I recorded them on the time slips. Thank you so much". SUSD Human Resources representative, Teresa Belmonte responded the same day at

3:29 pm, "This is a time clock supplemental. Have you been using the time clock? If so, great! You can check with Judy to see what days you're missing. Then you can fill out a Payroll Exception form to send to Payroll to correct the missed hours. Please let me know if you need help once you've talked to Judy". I, Miss Brooke Schneider, responded with, "I was not clocking in on those days because I had no code to clock in with yet. I recorded my hours on paper to keep track and transferred them to time clock adjustment sheets. Judy said she was unable to process them as they were days before I had a code". SUSD Human Resources representative, Teresa Belmonte responded, "Were those dates on or after 11/20/19?", in which I, Miss Brooke Schneider responded, "They were before that date". Teresa sent her final response in the email thread with, "Ok, let me get this corrected for you. I'm going to reach out to the school to change the effective date to cover the dates you worked. Sorry for the confusion on this, Brooke!" As per the above email thread, I, Miss Brooke Schneider was in contact with SUSD Human Resources and was following proper procedure and policy throughout the time in which this payment issue was being resolved. At no time did I, Miss Brooke Schneider engage in any acts of insubordination, intentional or unintentional to school administrators or district administrators. SUSD Human Resources was incredibly helpful and responded to my inquiries in a timely and thoughtful manner and the problem was resolved. In the certified corrective action memorandum, issued to I, Miss Brooke Schneider, I am accused of "engaging in acts of insubordination". This accusation is false and appears to be done in retaliation to I, Miss Brooke Schneider attempting to receive clarification and seek assistance from the SUSD Human Resources department. Principal, Mr. Chuck Rantala agreed to said start date via email on the twenty-eighth of October, 2019 at 11:26 am. However, principal Mr. Chuck Rantala is accusing I, Miss Brooke Schneider of working before the agreed upon start date, which is entirely false. The ePar code was not submitted to SUSD Human Resources in a timely manner by principal, Mr. Chuck Rantala via administrative assistant/principal liaison, Mrs. Judy Edmonson. As a result, it appears I was used as a scapegoat in order to cover up for mistakes made by administration regarding this FLL Robotics payment procedural issue. I, Miss Brooke Schneider, in no way "engaged in acts of insubordination" in any way whatsoever.

The second issue being addressed in the certified corrective action memorandum issued to I, Miss Brooke Schneider on Friday, the thirteenth of December states, "Ms. Schneider did not follow proper procedures when logging minors for a student". Per Yavapai/Hohokam MTSS-B procedures, minor behaviors in accordance with the "R.O.C.K.S." behavior matrix distributed by, interim assistant principal, Ms. Andrea Wymore prior to the start of the academic school year, minor behaviors (found in R.O.C.K.S behavior matrix) must be submitted into the Google Docs, MTSS-B Minor behavior database. However, in no place in the MTSS-B documents does it state when the minor behavior reports must be entered. I, Miss Brooke Schneider recorded all minor behaviors on a written behavior record that I kept up-to-date and confidential with only myself, the teacher, and school administration to be given access to said written behavior record. I

consistently recorded minor behaviors on this written document and have entered all behaviors in the Google Docs MTSS-B database. I presented this written behavior record the following day, when requested by assistant principal, Mrs. Kelley Perry in a meeting on Monday, the ninth of December at 4:30 pm. I requested that the behavior record be copied, given to principal, Mr. Chuck Rantala and returned to me in a timely manner. However, I have yet to receive my written report as of today, Sunday the fifth of January in the year of two-thousand and twenty. I am formally requesting that the written behavior record created by I, Miss Brooke Schneider be returned to me in order for me to provide my students with the behavior support and interventions needed as per the Yavapai/Hohokam MTSS-B policies and procedures. Per the certified corrective action memorandum presented to I, Miss Brooke Schneider on Friday, the thirteenth of December by principal, Mr. Chuck Rantala, it is stated that I, Miss Brooke Schneider did not follow proper procedures for logging minor behaviors for a student. However, in accordance with the MTSS-B documents provided to me by previous assistant principal, Ms. Andrea Wymore, as well as current assistant principal, Mrs. Kelley Perry, "minor behaviors must be recorded on the MTSS-B Google Docs database". However, there is no specification on the time period in which a teacher must have minor behaviors entered into the database. I, Miss Brooke Schneider kept written record of all minor behaviors, which was provided to the school administration, Mrs. Kelley Perry on Tuesday, the tenth of December. Additionally, I submitted all minor behaviors onto the MTSS-B Google Docs database. Upon meeting with assistant principal, Mrs. Kelley Perry on Monday, the ninth of December, I was informed that minor behaviors must be submitted into the MTSS-B Google Docs database within twenty-four hours of the behavior occurring. Since being informed of this policy, I, Miss Brooke Schneider have been in compliance with this policy. Per the certified corrective action memorandum it is stated that, I, Miss Brooke Schneider was given "prior discussion or warning regarding issue(s) or behavior(s) with specific dates via MTSS-B process Hohokam/Yavapai". However, the documentation provided by the school administration to teachers did not specify the time allotment in which teachers were required to submit minor behaviors into the MTSS-B Google Docs database. Additionally, I never received any sort of verbal or written instruction by school administration in regards to a specific time frame in which minor behaviors need to be submitted prior to meeting with the assistant principal, Mrs. Kelley Perry on Monday, the ninth of December. This accusation is entirely false and was due to error and miscommunication by school administration to the staff at Yavapai Elementary School.

The final accusation made against I, Miss Brooke Schneider via the certified corrective action memorandum, presented to I, Miss Brooke Schneider by principal, Mr. Chuck Rantala on Friday, the thirteenth of December was as follows: "And she withheld a student from a field trip without proper communication to parents and administrator; or administration approval". The student in question was deemed unable to follow the simple directions and safety procedures by teachers and school personnel in order to stay safe in a public setting. After exhausting multiple

interventions on multiple occasions provided through MTSS-B Hohokam/Yavapai "flow chart" of appropriate behavior interventions, the child was unable to follow simple directions provided by teachers and other school personnel. Per SUSD Governing Board policy GBEA-Staff Ethics, an SUSD employee, "Makes the well-being of students the fundamental value of all decision making and actions". After discussing with parent and grandparent of said student on two separate occasions in the days prior to the field trip to the Arizona Science Center on Thursday, the fifth of December, it was agreed that said student would be required to stay on the Yavapai Elementary School Campus with another teacher instead of attending said field trip if behavior did not improve. This choice was made after exhausting interventions and consulting with said child's parents With concern for said student's safety and well-being, the decision was made to keep said student on campus for the duration of the field trip. In the process of coming to this decision, I, Miss Brooke Schneider researched and attended the field trip venue, prior to the field trip date. Such hazards as buses and cars near pedestrian walkways and vast public spaces where students can be easily distracted and/or lost if instructions of teacher and school personnel are not followed promptly and consistently were all factors that contributed to the decision by, I, Miss Brooke Schneider along with parent of said student to provide the student a safe alternative to the field trip to the Arizona Science Center. Said student was provided with ample activities and exercises to ensure the student would not be excluded from instruction and grade level appropriate practice in order to reach Arizona Common Core Standards for first grade. As an educator and professional, I made the decision to provide said student with an alternative to the field trip experience in order to stay in compliance with SUSD Governing Board policy GBEA-Staff Ethics, an SUSD employee, "Makes the well-being of students the fundamental value of all decision making and actions". By doing extensive research on the venue, providing school provided intervention and reteaching of lessons to student, and working alongside the family, the student was provided due process and his civil and human rights were protected by providing him the opportunity to engage in an alternative field trip experience in order to keep him safe and to be provided with the most conducive environment to his safety, physical well-being, and emotional well-being.

I, Miss Brooke Schneider followed SUSD Governing Board policies GBEA Staff Ethics throughout this process leading up to the first grade field trip to the Arizona Science Center on Thursday, the fifth of December. Said student was given an alternative to the field trip experience in order to keep said student and their classmates safe. By allowing the student to attend the field trip, I would have been in violation of SUSD Governing Board policy GBEA-Staff Ethics, an SUSD employee, "Makes the well-being of students the fundamental value of all decision making and actions". Per the certified corrective action memorandum, principal, Mr. Chuck Rantala claims that I, Miss Brooke Schneider did not provide proper communication to school administration. I, Miss Brooke Schneider have not at any time under this school administration been given any direction neither verbal or written regarding expectations on how to go about

keeping students safe during field trips. Therefore, I referred to the SUSD Governing Board policy GBEA-Staff Ethics, an SUSD employee, "Makes the well-being of students the fundamental value of all decision making and actions", in order to make my well informed, professional decision in compliance with the above SUSD Governing Board Policy.

In conclusion, the accusations made by principal, Mr. Chuck Rantala are in their entirety false and appear to be fabricated in retaliation to I, Miss Brooke Schneider seeking assistance from the SUSD Human Resources Department regarding payment procedures for FLL Robotics. Coincidentally, this certified corrective action memorandum was issued to I, Miss Brooke Schneider within seventy-two hours of I, Miss Brooke Schneider seeking assistance from SUSD Human Resources via email on Tuesday, the tenth of December. I, Miss Brooke Schneider feel incredibly uncomfortable, intimidated, and violated by the actions of principal, Mr. Chuck Rantala. As an educator and professional, I care deeply about my students, colleagues, administrators, and school as a whole. I am a professional that values rules, policies, procedures, expectations, as well as state and federal laws in order to keep my students safe and to provide them the best education possible. In no way do the accusations via the certificated corrective action memorandum presented to me, by principal, Mr. Chuck Rantala hold any truth and do not represent I, Miss Brooke Schneider as a teacher or professional. I motion that this certified corrective action memorandum be removed from my personnel file as it is entirely inaccurate.

Sincerely,
Miss Brooke Schneider

# EXHIBIT 12

# GCO
# EVALUATION OF PROFESSIONAL STAFF MEMBERS

The process of evaluation for staff members shall be designed to improve the quality of instruction and strengthen the abilities of the staff.

Certain elements in an effective evaluation process shall be emphasized:

- Evaluation shall be a cooperative endeavor between evaluator and evaluatee.

- Open communication shall be considered essential.

- The agreed-upon purpose of evaluation shall be to work toward common goals for the improvement of education. This shall include attention to student and staff success, which shall include all certificated staff members.

- Evaluation shall be ongoing and flexible, and sensitive to need for revision.

- The result of evaluation(s) shall be courses of action for the improvement of instruction. These courses of action shall be set in motion by specific recommendations mutually reviewed by the evaluator and the evaluatee.

- Evaluation shall be considered one aspect of effective management, rather than a discrete entity.

- Effective evaluation depends on accurate information; therefore, input from all appropriate sources shall be used.

- Evaluation(s) shall be based on, but not limited to the following:

- Student learning as the primary focus of the teacher's professional time.

- Job expectations and performance within the District.

- Instruments for assessment.

- Personal observation.

**Evaluation of Classroom Teachers and Other Certificated Non-administrative Staff Members**

1

The District evaluation instrument will utilize the required elements of the model framework for a teacher and principal evaluation instrument adopted by the State Board of Education on or before December 31, 2012 that includes, quantitative data on student academic progress that accounts for between thirty three percent (33%) and fifty percent (50%) of the evaluation outcomes. The model framework shall include four (4) performance classifications, designated as highly effective, effective, developing, and ineffective adopted by the State Board of Education pursuant to A.R.S. 15-203. The model framework includes guidelines for school districts and charter schools to use in their evaluation instruments.

Definitions for the above performance classifications adopted by the State Board of Education shall be adopted by the School District in a public meeting by school year 2013-2014. The performance classifications are to be applied to the evaluation instruments in a manner designed to improve principal and teacher performance. At least annually, the School District Governing Board shall discuss at a public meeting its aggregate performance classifications of principals and teachers.

In accordance with state law, the District shall involve its certificated teachers in the development and periodic evaluation of the teacher performance evaluation system. The following elements will be a part of the evaluation system:

• A copy of the evaluation system shall be given to each teacher in the District.

• The Board shall receive recommendations from the Superintendent for qualified evaluators prior to naming evaluators.

• The best practices for professional development and evaluator training adopted by the State Board of Education.

• The Board will designate qualified evaluators by name or position at a Board meeting each year.

**Inadequacy of Classroom Performance**

A teacher's classroom performance is inadequate if the teacher is designated in the lowest performance classification rating of *ineffective* pursuant to A.R.S. 15-203 in one (1) or more of the components/indicator statements set forth in the District's teacher evaluation system. A teacher's classroom performance is also inadequate if the teacher is designated in the second lowest performance classification rating of *developing* pursuant to A.R.S. 15-203 in three (3) or more of the components/indicator statements set forth in the District's teacher evaluation system.

If the District receives approval to budget for a career ladder program, more than one (1) evaluation system may be developed as authorized in A.R.S. 15-539. If more than one (1) level is established, the same level of performance for minimum adequacy shall be required of all teachers who have completed the same number of years of teaching in the District.

Prior approval by the Board is not required for each notice of inadequacy. The Assistant Superintendent for Human Resources or the Assistant Superintendent for Human Resources' designee is authorized to issue notices of inadequacy of classroom performance, subject to approval by the Superintendent. When a notice is issued without prior Board approval, the Board shall be notified within ten (10) days of such issuance.

## Evaluation of Administrators
## and Psychologists

The District shall establish and maintain a system for the evaluation of the performance of principals, other school administrators, and psychologists. The District will seek advice from District administrators and psychologists in the development of this performance evaluation system.

The Board shall make available the evaluation and performance classification pursuant to A.R.S. 15-203 of each principal in the School District to school districts and charter schools that are inquiring about the performance of the principal for hiring purposes.

Adopted: August 13, 2013

LEGAL REF.:
A.R.S.
15-203
15-502
15-503
15-536
15-537
15-537.01
15-538
15-538.01
15-539 *et seq.*
15-544
15-549
15-918.02
15-977
A.A.C.
R7-2-605

CROSS REF:
GCB - Professional Staff Contracts and Compensation
GCF - Professional Staff Hiring
GCJ - Professional Staff Noncontinuing and Continuing Status
GCK - Professional Staff Assignments and Transfers
GCMF - Professional Staff Duties and Responsibilities
GCQF - Discipline, Suspension, and Dismissal of Professional Staff Members
GDO - Evaluation of Support Staff Members

# EXHIBIT 13

From: Brooke Schneider <bschneider@susd.org<mailto:bschneider@susd.org>>
Sent: Saturday, February 8, 2020 5:26 PM
To: Amy Eveleth <aeveleth@susd.org<mailto:aeveleth@susd.org>>
Subject: Meeting Request

Dear Ms. Eveleth,


I need to request a meeting regarding events that have transpired over the past several months. I am concerned for my safety and well being at my work site. I am being retaliated against and threatened by a school administrator and need to ensure it is handled as soon as possible. I was afraid to contact human resources earlier, as I was being intimidated by this administrator. However, I no longer feel safe at work and am in desperate need of assistance.


Sincerely,

Brooke Schneider

First Grade Teacher

Yavapai Elementary School

# EXHIBIT 14

From: Amy Eveleth
Sent: Tuesday, February 11, 2020 3:49:02 PM
To: Brooke Schneider
Subject: RE: Meeting Request


Good morning Brooke,


My apologies for the late response, I was out of the office yesterday and am just now catching up on email.


My understanding is that your most recent formal observation indicated you are developing in 4 standards which necessitates a remediation plan. A remediation plan is not punitive nor is it retaliatory. It is a tool designed to provide teachers with valuable feedback which includes targeted strategies, actions, resources and support designed to help teachers enhance and improve their practice. There is a scheduled meeting in regard to this on Thursday, February 13, at 3:30. I will be present at this meeting to deliver the Preliminary Notice of Inadequacy to you and answer any questions you may have.


Mr. Rantala is a district certified qualified evaluator. If you feel that the evaluation procedure used is at variance from the Board-adopted procedure, as outlined in Governing Board Policy GCO and its regulation GCO-R (attached), your first step would be to schedule a meeting with your evaluator/supervisor to discuss what aspect(s) of the evaluation policy/procedure you believe was/were not followed as outlined. You are welcome to have an advocate present at this meeting with your supervisor. For additional information, please refer to the 19-20 Certified Employee Handbook located on the iDrive.


Aside from this, you have made some very strong accusations in your email below. If you truly feel you are being threatened by an administrator and do not feel safe at work, then immediate action is necessary and a thorough investigation must be initiated, the first step being a meeting with you. Please let me know your availability tomorrow, Wednesday, February 12, Thursday, February 13 and Friday February 14 and I will try to accommodate your schedule.


Respectfully,


Amy M. Eveleth

# EXHIBIT 15



**SCOTTSDALE UNIFIED SCHOOL DISTRICT**

**Special Meeting of the Governing Board**

**April 7, 2020**

**5:00 PM**

**Mohave District Annex**

8500 E. Jackrabbit Road
Scottsdale, AZ 85250
480-484-6100
**www.susd.org**

## BOARD MEMBERS

**2020 Governing Board**

**Allyson Beckham, President**
**Patty Beckman, Vice President**
**Jann-Michael Greenburg**
**Sandy Kravetz**
**Barbara Perleberg**


**Superintendent**
**Dr. John Kriekard**


## CORE PURPOSE
**Ensuring all individual learners reach their full potential**


## CORE VALUES

- **Humble**
- **Responsive**
- **Growth-Minded**
- **Student-Focused**


## THEMATIC GOAL
**Enhancing a Culture of Learning**

**GOVERNING BOARD MEETING**
**SCOTTSDALE UNIFIED SCHOOL DISTRICT NO. 48**
**Mohave District Annex, 8500 E. Jackrabbit Road, Scottsdale, AZ 85250**

# Table of Contents
**Special Board Meeting  April 7, 2020 5:00 PM**

*Ensuring all individual learners reach their full potential*

**Due to the COVID-19 (A.K.A. "Coronavirus") emergency, Center for Disease Control guidelines, and pursuant to guidance from the Arizona Attorney General regarding compliance with the Open Meeting Law during this national emergency (see opinion at:** *https://www.azag.gov/sites/default/files/2020-03/Covid-OML_202003131526.pdf*)**:**

**THIS MEETING WILL BE CONDUCTED ONLINE AND BY TELEPHONE ONLY.**

**MEMBERS OF THE PUBLIC WILL NOT BE PERMITTED TO ATTEND THIS MEETING IN PERSON, but will be able to view the public portions of this meeting online, at the usual livestreamed site through** *youtube*

   I.  Call to Order/Roll Call

  II.  Pledge of Allegiance

 III.  Approval of Agenda

 IV.  Superintendent's Comments

  V.  INFORMATION/DISCUSSION ITEM

     A.  Navajo Elementary School Fire Restoration Update      5

 VI.  CONSENT AGENDA - Board Action Required

     A.  Personnel Action Items, 2/28/2020 - 3/24/2020      6

     B.  Approval of Purchase of Cherokee Elementary School Cabling      11

     C.  Authorize Expenditures for Elementary/Middle School Stage Curtains, Stage Rigging   12
        and Stage Lighting with Clearwing Systems Integration

     D.  Authorization of Expenditure – Navajo ES New Bus Lane, Parking Lot Expansion and   14
        Playground Improvements Project with Caliente Construction, Inc.

     E.  Authorization of Expenditure – Navajo ES Playground Shade Structure Replacement   16
        and Installation with Shade N Net of Arizona, Inc.

     F.  Authorization of Expenditures – Sequoya ES New Parking Lot/Student Drop off/Pick   18
        up and Arcadia HS Parking Lot Renovation with Sun Valley Builders

 VII.  ACTION ITEMS - Board Action Required

    A. Tentative Approval of 2020-21 Capital Outlay Budgets    20

    B. Approval of Quarterly Expectations/Priorities for the Superintendent for the Fourth    21
       Quarter of 2019-2020

    C. Approve Waiver of Mid-Year Review for 2019-2020 for General Counsel    22

VIII. Adjournment

Please Note: The Board may change the order of items listed in the Agenda prior to the meeting or during the meeting. ALSO, THE BOARD MAY VOTE TO CONVENE IN EXECUTIVE SESSION ON ANY ITEM THAT IS LISTED ON THIS AGENDA FOR DISCUSSION/CONSULTATION WITH LEGAL COUNSEL TO OBTAIN LEGAL ADVICE, PURSUANT TO A.R.S. §38-431.03(A)(3).

*Persons with a disability may request a reasonable accommodation, such as a sign language interpreter, by contacting Melissa Tornquist at 480-484-6113. Requests should be made as early as possible to enable the District to arrange for the requested accommodation and at least one (1) working day prior to the Governing Board meeting.*

Information/Discussion Item:

### Navajo Elementary School Fire Restoration Update

**Submitted by:**                                                          **Funding:**
Dennis Roehler, Director of Building Services                              N/A

## BACKGROUND:

Mr. Roehler will update the Governing Board on the Navajo Elementary School's Fire Restoration and next steps.

## IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT
Positive governance leads to improved organizational health.

This aligns to District Goal:
      1   Academic Achievement
      2   Fiscal Stability
      3   External Communication
  X  4   Organizational Health
      5  School Safety

**Consent Item:**
        **Personnel Action Items, 2/28/2020 - 3/24/2020**

| **Submitted by:** | **Funding:** |
|---|---|
| Jed Bowman, Ph.D., Assistant Superintendent of Human Resources | Various |

## RECOMMENDATION:

It is recommended that the Governing Board approve Personnel Actions which include:
**10** New Employments, **2** Transfers, 0 Classified Substitutes and Temporary Workers,
**4** Employee Contract/Agreement Revisions, **60** Employee Compensation Actions and **42** Separations.

## BACKGROUND:

**NEW EMPLOYMENTS: (LA=Limited Appointment, TC=Terminating Contract):**

| NAME | UNIT/ASSIGNMENT | FUNDING | EFFECTIVE |
|---|---|---|---|
| **Administrative/Administrative Support/Support-Exempt - Department:** | | | |
| N/A | | | |
| **Administrative/Administrative Support/Support-Exempt - School:** | | | |
| N/A | | | |
| **Certified - Department:** | | | |
| N/A | | | |
| **Certified - School:** | | | |
| Wasem, Brandon | Arcadia/Assistant Drama | M&O (001) | 2/25/2020 |
| **Classified - Department:** | | | |
| Digos II, Jason | Security/Security Officer | M&O (001) | 3/16/2020 |
| Greenleaf, Teresa | Comm Ed/Childcare Provider | Com Ed (520) | 3/16/2020 |
| Hernandes, Viviane | Nut Srvcs/Senior Nut Srcs Worker | NS (510) | 3/4/2020 |
| Means, Alexandra | Payroll/Payroll Coordinator | M&O (001) | 3/26/2020 |
| Micketti, Gabrielle | Special Ed/Inst Support Paraeducator Float | M&O (001) | 3/4/2020 |
| Peritore, Desiree | Transportation/Bus Driver Training | M&O (001) | 3/16/2020 |
| Reyes, Gissell | Nut Srvcs/Nut Srcs Worker | M&O (001) | 4/9/2020 |
| Wilson, Steven | Transportation/Bus Driver Training | M&O (001) | 3/16/2020 |
| **Classified - School:** | | | |
| Gioffre, Michele | Desert Canyon ES/LA Inst Support Assistant | GIFT (530) | 3/4/2020 |

## LEAVES OF ABSENCE:

| NAME | UNIT/ASSIGNMENT | | EFFECTIVE |
|------|-----------------|---|-----------|
| **Administrative/Administrative Support/Support-Exempt:** | | | |
| N/A | | | |
| | | | |
| **Certified:** | | | |
| N/A | | | |
| **Classified:** | | | |
| N/A | | | |

## TRANSFERS:

| NAME | UNIT/ASSIGNMENT | TRANSFER TO | FUNDING | EFFECTIVE | VACANCY DATE |
|------|-----------------|-------------|---------|-----------|--------------|
| **Administrative/Administrative Support/Support-Exempt - Department:** | | | | | |
| N/A | | | | | |
| **Administrative/Administrative Support/Support-Exempt - School:** | | | | | |
| N/A | | | | | |
| **Certified - Department:** | | | | | |
| N/A | | | | | |
| **Certified - School:** | | | | | |
| N/A | | | | | |
| **Classified - Department:** | | | | | |
| Milford, Lori | Fac&Bldg Srvcs/Fac Srvcs | Fac&Bldg Srvcs/Fac Coord | M&O (001) | 2/24/2020 | 2/3/2020 |
| **Classified - School:** | | | | | |
| Kostes, France | Chaparral/Adm Supp Ass | Ingleside/Adm Supp Tech Registr | M | 3/23/2020 | 02/07/20 |

## It is recommended that the Governing Board approve the following as:
## CLASSIFIED SUBSTITUTES and TEMPORARY WORKERS:

| NAME | UNIT/ASSIGNMENT | EFFECTIVE |
|------|-----------------|-----------|
| N/A | | |

## EMPLOYEE CONTRACT/AGREEMENT REVISIONS

| NAME | UNIT/ASSIGNMENT | FUNDING | REASON | EFFECTIVE |
|------|-----------------|---------|--------|-----------|
| **Administrative/Administrative Support/Support-Exempt:** | | | | |
| Cepress, Sheila | Deseg/Program Coord Native American | M&O (001) | Increased FTE | 3/16/2020 |
| **Certified:** | | | | |
| Ranweiler, John | DMHS/Teacher Social Studies | M&O (001) | Pay Correction | 7/26/2019 |
| **Classified:** | | | | |
| Weiss, Karen | Cocopah/Crossing Guard | M&O (001) | Increased FTE | 3/16/2020 |
| Young, Gene | Cheyenne/Crossing Guard | M&O (001) | Additional Position | 3/4/2020 |

# EMPLOYEE COMPENSATION ACTIONS

| NAME | UNIT/ASSIGNMENT | FUNDING | REASON | EFFECTIVE |
|------|-----------------|---------|--------|-----------|
| **Certified:** | | | | |
| Achtzehn, Dana | DMHS/Asst Coach | Tax Cr (526) | Stipend | 3/2/2020 |
| Alvarez, Lucy | Business&Finance/Unitown Sponsor | Tax Cr (526) | Stipend | 2/12/2020 |
| Anderson, Kathryn | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Blanchet, Andrea | Ingleside/Newspaper&Yearbook | M&O (001) | Stipend | 3/16/2020 |
| Bordonaro, Patricia | Saguaro/JV Softball | M&O (001) | Stipend | 2/9/2020 |
| Bouslog, Brittany | HR/National Board Certification | M&O (001) | Stipend | 12/7/2019 |
| Brennan, Bart | DMHS/Playoff Stipend | M&O (001) | Pay Correction | 2/24/2020 |
| Butler, Tricia | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Chanko, David | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Collier, Sean | Saguaro/Additional Hours | Tax Cr (526) | Stipend | 8/5/2019 |
| Dommin, Sarah | Cherokee/Before/After School Programs | Tax Cr (526) | Stipend | 3/26/2020 |
| Elliott, Benjamin | Desert Canyon MS/Track and Field | Tax Cr (526) | Pay Correction | 3/16/2020 |
| Gregan, Molly | Comm Ed/Testing | Com Ed (520) | Pay Correction | 11/1/2019 |
| Griggs, Gary | Coronado/Unitown Sponsor | Tax Cr (526) | Stipend | 2/12/2020 |
| Gustkey, Claren | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Hansen, Stephanie | Special Ed/Tutor Before/During/After School | M&O (001) | Pay Correction | 12/20/2019 |
| Henschen, Jennifer | Tavan/Tutor Before/During/After School | M&O (001) | Stipend | 1/21/2020 |
| Holland, Jenni | Cherokee/Before/After School Programs | Tax Cr (526) | Stipend | 2/20/2020 |
| Jones, Jason | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Kallis, Karen | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Kempton, Aryana | Pueblo/Tutor Before/During/After School | Tax Cr (526) | Pay Correction | 3/2/2020 |
| Krauss, Cynthia | Special Ed/Tutor Before/During/After School | M&O (001) | Pay Correction | 12/20/2019 |
| Krauss, Cynthia | Coronado/Coronado Initiative Fall | M&O (001) | Stipend | 8/5/2019 |
| Krist, Kerri | Pueblo/Tutor Before/During/After School | Tax Cr (526) | Stipend | 3/2/2020 |
| Malysa, Richelle | Cherokee/Before/After School Programs | Tax Cr (526) | Stipend | 3/25/2020 |
| Maneri, Angelena | Ingleside/Newspaper&Yearbook | M&O (001) | Stipend | 3/16/2020 |
| Martin, Margrit | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| McCandlish, Lisa | Indian Ed/Summer School Teacher | Ind Ed (200) | Stipend | 6/8/2020 |
| Muto, Michael | DMHS/Playoff Stipend | M&O (001) | Pay Correction | 2/24/2020 |
| Patterson, Anna | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Perea, Ashley | Indian Ed/Summer School Teacher | Ind Ed (200) | Stipend | 6/8/2020 |
| Pescatore, James | Desert Canyon MS/Track and Field | Tax Cr (526) | Pay Correction | 3/16/2020 |
| Ray, Jordan | Business&Finance/Unitown Sponsor | Tax Cr (526) | Stipend | 2/12/2020 |
| Repp, Kathleen | Indian Ed/Tutor Before/During/After School | Ind Ed (200) | Pay Correction | 2/26/2020 |
| Richmond, Linda | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Sampson, Jennifer | Cherokee/Before/After School Programs | Tax Cr (526) | Stipend | 3/25/2020 |
| Sanchez, Alicia | DMHS/Playoff Stipend | M&O (001) | Pay Correction | 2/24/2020 |
| Sawkiw, Alyson | Tavan/Tutor Before/During/After School | M&O (001) | Stipend | 1/23/2020 |
| Schneider, Brooke | Indian Ed/Tutor Before/During/After School | Ind Ed (200) | Pay Correction | 3/4/2020 |
| Seiden, Enid | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Stelmack, Katherine | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Stephan, Ian | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Tavassoli, Savi | Chaparral/Teacher Math ETP | M&O (001) | Stipend | 2/20/2020 |
| Tutnick, Gay Lin | Saguaro/Additional Work Hours | Tax Cr (526) | Stipend | 8/5/2019 |
| Wendt, Kimberley | Student Services/Homebound | M&O (001) | Pay Correction | 3/3/2020 |
| Wilson, Brandy | Navajo/Tutor Before/During/After School | M&O (001) | Pay Correction | 9/16/2019 |

**Classified:**

| Name | Unit/Assignment | | Reason | Effective |
|------|-----------------|---|--------|-----------|
| Cano, Stephanie | Nut Srvcs/Sr Nut Srvces Worker | NS (510) | Leave Coverage | 3/2/2020 |
| Cearley, Scott | IT/Additional Hours | M&O (001) | Stipend | 3/9/2020 |
| Gildersleeve, Julie | Pueblo/Additional Hours | M&O (001) | Pay Correction | 3/4/2020 |
| Greteman, Monika | Pueblo/Additional Hours | M&O (001) | Pay Correction | 3/6/2020 |
| Gutierrez, Amy | Pueblo/Additional Work Hours | M&O (001) | Pay Correction | 3/6/2020 |
| Guyan, Jason | Fac&Bldg Srvcs/Fac Srvces Worker | M&O (001) | Leave Coverage | 2/5/2020 |
| Mehta, Mehul | IT/Additional Hours | M&O (001) | Stipend | 3/12/2020 |
| Milford, Edward | IT/Additional Work Hours | M&O (001) | Stipend | 3/9/2020 |
| Mullen, Jill | Navajo/Before/After School Programs | M&O (001) | Pay Correction | 10/17/2019 |
| Rupnik, Paula | Pueblo/Adm Supp Coordinator | M&O (001) | Pay Correction | 3/6/2020 |
| Sabbagh, Nagui | Saguaro/Additional Hours | Tax Cr (526) | Stipend | 3/7/2020 |
| Shah, Divyesh | IT/Additional Hours | M&O (001) | Stipend | 3/9/2020 |
| Spade, Karen | IT/Additional Hours | M&O (001) | Stipend | 3/18/2020 |
| Thorne, Gregory | Navajo/Before/After School Programs | M&O (001) | Pay Correction | 9/16/2019 |

# SEPARATIONS:

| NAME | UNIT/ASSIGNMENT | REASON | EFFECTIVE | DAMAGES |
|------|-----------------|--------|-----------|---------|
| **Administrative/Administrative Support/Support-Exempt:** | | | | |
| Chestnut, Steven | Student Srvcs/Exec Director | Retirement | 6/30/2020 | N/A |
| Como, Sondra | Governing Board/Exec Adm Coordinator | Retirement | 6/30/2020 | N/A |
| Cruz-Freeman, Alexis | Pima ES/Principal | Resignation | 6/30/2020 | N/A |
| Tiras, Evan | Desert Canyon ES/Asst Principal | Resignation | 6/15/2020 | N/A |
| **Certified** | | | | |
| Allen, Wendy | Coronado/Teacher Librarian | Retirement | 5/27/2020 | N/A |
| Anderson, Katherine | DMHS/Teacher Art | Retirement | 5/27/2020 | N/A |
| Buchanan, Carmen | Arcadia/Teacher Special Ed | Resignation | 5/27/2020 | N/A |
| Burch, Emma | Coronado/Teacher Lang Arts | Resignation | 5/27/2020 | N/A |
| Chanko, David | Chaparral/Teacher Math | Resignation | 5/27/2020 | N/A |
| Donnelly, Daniel | Chaparral/Teacher Math | Resignation | 5/27/2020 | N/A |
| Greene, Stacey | Ingleside/Teacher Gifted | Retirement | 5/27/2020 | N/A |
| Hazeltine, Alisa | Pima/Teacher 03 | Retirement | 5/27/2020 | N/A |
| Hernandez-Florez, Rosario | Mohave/Teacher Spanish | Retirement | 5/27/2020 | N/A |
| Holmes, James K | Tonalea/Teacher Art | Non-Renewal | 5/27/2020 | N/A |
| Kozimor, Tyler | Copper Ridge/Teacher Science | Resignation | 5/27/2020 | N/A |
| Manluccia, Anthony | Cocopah/Teacher Band | Resignation | 5/27/2020 | N/A |
| Navarro, Janet | Pima/Teacher 02 | Retirement | 5/27/2020 | N/A |
| Nietz, Derek | Saguaro/Teacher Science | Retirement | 5/27/2020 | N/A |
| Oates, Jacquelyn | Kiva/Teacher Special Ed | Resignation | 5/27/2020 | N/A |
| Ottino, Charles | DMHS/Teacher Math | Resignation | 5/27/2020 | N/A |
| Rembold, Jordan | Tonalea/Teacher Math | Resignation | 5/27/2020 | N/A |
| Schneider, Brooke | Yavapai/Teacher 01 | Resignation | 3/16/2020 | N/A |
| Schultz, Jade | Copper Ridge/Teacher Special Ed | Resignation | 5/27/2020 | N/A |
| Siems, Kathryn | Hohokam/Teacher 02 | Retirement | 5/27/2020 | N/A |
| Spahr, Sueann | Chaparral/Teacher Art | Retirement | 5/27/2020 | N/A |
| Tobey, Leisa | Cherokee/Teacher 04 | Resignation | 5/27/2020 | N/A |
| Williams, Marilyn | Tavan/Teacher Gifted | Retirement | 5/27/2020 | N/A |

**Classified:**

| | | | |
|---|---|---|---|
| Bourjos, Janet | DMHS/Inst Supp Paraeducator | Retirement | 4/8/2020 |
| Cataldo, Pamela | Cochise/Inst Supp Paraeducator | Retirement | 5/21/2020 |
| Chatterjee, Joyeeta | Comm Ed/Childcare Provider | Resignation | 3/20/2020 |
| Ferger-Kauffman, Ranae | MDA Communications/Office Manager | Retirement | 6/30/2020 |
| Ferrell-Townsel, Keyonta | Security/Lead Security Officer | Resignation | 3/3/2020 |
| Heinrichs, Jolene | Fac&Bldg Srvcs/Fac Srvcs Worker | Resignation | 4/3/2020 |
| Kohler, Leslie | Laguna/Inst Supp Paraeducator | Job Abandonment | 2/27/2020 |
| Kortina, Joy | Pima/Nurse (LPN) | Resignation | 3/6/2020 |
| Loftus, Mary | DMHS/Guidance Coordinator | Retirement | 5/22/2020 |
| Magallon, Eddie | Fac&Bldg Srvcs/Fac Srvcs Worker | Resignation | 2/7/2020 |
| McCullough, Laneya | Cochise/Inst Supp Paraeducator | Resignation | 3/6/2020 |
| Nebgen, Donald | Fac&Bldg Srvcs/Fac Srvcs Splst Locksmith | Retirement | 3/27/2020 |
| Reyes, Gissell | Nut Srvcs/Nut Srvcs Worker | Resignation | 4/9/2020 |
| Standridge, John | Fac&Bldg Srvcs/Fac Srvcs Worker | Resignation | 3/13/2020 |
| Westlake, Dave | Transportation/Bus Driver | Retirement | 5/21/2020 |

**IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT**

Hiring and retention of a qualified and diverse workforce leads to increased student achievement.

This aligns to District Goal:

____X__1      Academic Achievement
_____2      Fiscal Stability
_____3      External Communication
____X__4      Organizational Health
_____5      School Safety

Consent Item:

## Approval of Purchase of Cherokee Elementary School Cabling

<u>**Submitted by:**</u>                                                                <u>**Funding:**</u>
Debi Spaulding, Chief Systems Officer                                  Bond

## <u>RECOMMENDATION:</u>

It is recommended that the Governing Board approve the purchase and installation of cabling for the voice and data network for Cherokee Elementary School to Enterprise Networks Solutions in accordance with the State Contract #ADSPO16-137344 – Network, Equipment and Services.

## <u>BACKGROUND:</u>

The purpose for this purchase is to provide network infrastructure for the new construction of Cherokee Elementary School.  The total cost of this proposal is $126,876.

For the Cherokee rebuild project, SUSD has opted to provide the IT Systems including the network cabling for the new buildings.  A total of 471 Category 6 data cables will be installed in for the new campus buildings. This horizontal cabling includes connectivity for the following:
> (64) Wireless Access Points which require 2 data cables each
> (43) Interactive Flat Panel data cables
> (300) network jacks for voice and data locations
> (1) 2 post data rack for MDF
> (1) 4 post data rack for MDF
> (3) 2 post data rack for IDFs
> (12) strands of .50 micron, OM4 fiber optic cable, with innerduct, between MDF and IDFs

The Governing Board has previously approved the use of the NASBO cooperative contracts. The administration has determined the use of these contracts represents best value to the District.

### Budget Details
Funding for this project is from FY20 budget. The funding will be from the following source:  Bond

## <u>IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT</u>
Positive Network Security leads to increased academic achievement, improved organizational health and improved school safety.

This aligns to District Goal:
| | | |
|---|---|---|
| _____ | 1 | Academic Achievement |
| _____ | 2 | Fiscal Stability |
| X | 3 | External Communication |
| _____ | 4 | Organizational Health |
| X | 5 | School Safety |

**Consent Item:**

> **Authorize Expenditures for Elementary/Middle School Stage Curtains, Stage Rigging and Stage Lighting with Clearwing Systems Integration**

**Submitted by:**                                                                   **Funding:**
Dennis Roehler, Director of Facilities                                  630 - Bond

## RECOMMENDATION:

It is recommended that the Governing Board approve the award of the Elementary/Middle School House Improvements to Clearwing Systems Integration using the Omnia Contract R160902 in the amount of **$270,140.83**.

## BACKGROUND:

The scope of work for these projects was developed in collaboration with Michelle Irvine, SUSD's Fine Arts Coordinator. There are nine (9) separate elementary school projects for this item. All prices address curtains and rigging and seven (7) include upgrades to lighting.

The table below identifies the 2016 Bond Budget for each campus as well as Clearwing's actual project cost at each campus.

| Campus | Budget | Project Cost |
|---|---|---|
| Anasazi ES | $ 50,000.00 | $ 22,733.76 |
| Cheyenne | $ 50,000.00 | $ 29,464.69 |
| Cochise ES | $ 50,000.00 | $ 24,566.59 |
| DCES | $ 50,000.00 | $ 8,104.35 |
| Laguna ES | $ 50,000.00 | $ 42,320.19 |
| Redfield ES | $ 50,000.00 | $ 51,492.00 |
| Sequoya ES | $ 50,000.00 | $ 37,544.34 |
| Tavan | $ 50,000.00 | $ 24,365.11 |
| Tonalea K8 | $ 50,000.00 | $ 29,549.80 |
| **Grand Total** | **$ 450,000.00** | **$ 270,140.83** |

## JUSTIFICATION:

Lifecycle Projects have reached the end of their useful life.  In the case of these projects, all equipment was inspected for safety and overall performance. All equipment shall meet current fire code for flame retardancy and safety.

IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT

This aligns to District Goal:

| | | |
|---|---|---|
| _____ | 1 | Academic Achievement |
| __xx__ | 2 | Fiscal Stability |
| _____ | 3 | External Communication |
| __xx__ | 4 | Organizational Health |
| __xx__ | 5 | School Safety |

Consent Item:

### Authorization of Expenditure – Navajo ES New Bus Lane, Parking Lot Expansion and Playground Improvements Project with Caliente Construction, Inc.

**Submitted by:**                                      **Funding:**
Dennis Roehler, Director of Building Services          Bond - 630

## RECOMMENDATION:

It is recommended that the Governing Board authorize the expenditure of 2016 Bond Funds with Caliente Construction, Inc. using their Maricopa County Cooperative Contract 190063 for the Navajo Elementary School New Bus Lane, Parking Lot Expansion and Playground Improvements Project in the amount of **$1,047,356.00**

## BACKGROUND:

The 2016 Bond set aside for Navajo ES was originally **$16,645,816.00**. After the devastating fire on August 22, 2018 the SUSD Governing Board authorized the restoration of Navajo ES in lieu of rebuilding the campus.

2016 Bond, Navajo ES Restoration expenditures to date **$4,339,947.49**. This is not a final expenditure amount as we have playground shade canopies and play equipment expenditures forthcoming. There are additional costs yet to be accounted for, we believe they are incidental and should not materially affect the final total expenditure amount.

In consultation with Mr. Patzlaff, Navajo's Principal and in consideration of student safety, staff parking capacity, and drop off / pick up queuing expansion, we believe this project will bring tremendous value to the Navajo campus and its community. It is anticipated that the final total Scottsdale USD 2016 Bond expenditures for Navajo ES shall not exceed **$5,800,000.00.**

Caliente Construction, Inc. is prepared to start this project immediately upon receipt of a Purchase Order.

## JUSTIFICATION:

School Rebuild Projects Navajo's restoration left some gaps that would have been addressed had the school been rebuilt. Student safety at Bus Drop Off which is currently on Camelback. This project creates a bus pull out to get the drop off/pick up off Camelback Rd. This in turn addresses the Pre-K and Kinder playgrounds that are currently, directly adjacent to Camelback Rd., moving them to a more central location on the campus away from a main thoroughfare. Lastly, parent queuing for student drop off and pick up is being extended to pull traffic off Camelback Rd. to improve drop off and pick up times.

As a biproduct of the extended parent queuing additional parking spaces shall be added which will accommodate future needs should the D building be repurposed at a later date.

## IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT

This aligns to District Goal:

  __xx__  1   Academic Achievement
  _____  2   Fiscal Stability
  _____  3   External Communication
  __xx__  4   Organizational Health
  __xx__  5   School Safety

**Consent Item:**

### Authorization of Expenditure – Navajo ES Playground Shade Structure Replacement and Installation with Shade N Net of Arizona, Inc.

**Submitted by:**                                                      **Funding:**
Dennis Roehler, Director of Building Services                          630

## RECOMMENDATION:

It is recommended that the Governing Board authorize the expenditure of 2016 Bond funds for the replacement and installation of the playground shade structures with Shade N Net of Arizona, Inc. in the amount of **$122,270.68** using their Mohave Contract Number #16D – Shade - 0401.

## BACKGROUND:

The 2016 Bond set aside for Navajo ES was originally **$16,645,816.00**. After the devastating fire on August 22, 2018 the SUSD Governing Board authorized the restoration of Navajo ES in lieu of rebuilding the campus.

2016 Bond, Navajo ES Restoration expenditures to date **$4,339,947.49**.  This is not a final expenditure amount as we have a play equipment expenditure forthcoming. There are additional costs yet to be accounted for, we believe they are incidental and should not materially affect the final total expenditure amount.

In consultation with Mr. Patzlaff, Navajo's Principal and in consideration of student safety **(moving pre-K and Kinder playgrounds away from their current location on Camelback)**, staff parking capacity, and drop off / pick up queuing expansion, we believe this project will bring tremendous value to the Navajo campus and its community. It is anticipated that the final total Scottsdale USD 2016 Bond expenditures for Navajo ES shall not exceed **$5,800,000.00.**

Shade N Net of Arizona, Inc. has provided a quote to remove and replace the shade structure at Navajo Elementary School and is prepared to start fabrication immediately in order to complete installation well in advance of the new school year that starts in August of 2020.

**JUSTIFICATION:** School Rebuild Projects, Navajo's restoration left some gaps that would have been addressed had the school been rebuilt. Student safety at Bus Drop Off which is currently on Camelback. This project creates a bus pull out to get the drop off/pick up off Camelback Rd.  This in turn addresses the Pre-K and Kinder playgrounds that are currently, directly adjacent to Camelback Rd., moving them to a more central location on the campus away from a main thoroughfare. With the relocation of playground equipment, it is necessary to relocate the shade canopies as well.

## IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT

Maintain district facilities and provide safe, healthy environment in line with federal standards

This aligns to District Goal:
   <u>  x  </u>1   Academic Achievement
   <u>  x  </u>2   Fiscal Stability
   <u>     </u>3   External Communication
   <u>  x  </u>4   Organizational Health
   <u>  x  </u>5   School Safety

Consent Item:

### Authorization of Expenditures – Sequoya ES New Parking Lot / Student drop off/pick up and Arcadia HS Parking Lot Renovation with Sun Valley Builders

**Submitted by:**                                              **Funding:**
Dennis Roehler, Director of Building Services          Bond - 630

## RECOMMENDATION:

It is recommended that the Governing Board authorize the expenditure of 2016 Bond Funds with Sun Valley Builders using their Buckeye Elementary School District S.A.V.E. contract #17-003 on the following projects:

Sequoya ES New Parking Lot and Student Drop off / Pick up queuing in the amount of **$842,170.00**
Arcadia HS Parking Lot Renovation in the amount of $**720,319.00**

## BACKGROUND:

In collaboration with the Purchasing Dept. we solicited bids from multiple vendors. The Sequoya project received two qualified contractor submissions, and the Arcadia HS project also received two qualified contractor submissions. Both projects are within their established budgets. It is anticipated that both projects shall be completed before school resumes in August of 2020.

## JUSTIFICATION:

Lifecycle Projects have reached the end of their useful life. In the case of Sequoya's parking lot project as the scope of work was being developed it was noted that the parent queuing for student drop off / pick up is extremely challenging. With Sequoya's 500 plus students, upwards of 50% of whom are open enrolled, the number of vehicles dropping off students is significant. Observation of the morning and afternoon parent queuing led to consideration of expanding the queuing lane and available parking. The existing parent queuing design was a stop gap measure put in place several years ago and has become obsolete as more parents choose to drive their students to the Sequoya campus. In the case of Arcadia HS this parking lot's asphalt has reached its useful life and due to current student enrollment it is critical that the student parking be maximized.

## IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT

This aligns to District Goal:
  _xx_   1   Academic Achievement
  _____   2   Fiscal Stability
  _____   3   External Communication
  _xx_   4   Organizational Health
  _xx_   5   School Safety

**Action:**

**Tentative Approval of 2020-21 Capital Outlay Budgets**

**Submitted by:**                                      **Funding:**

Jeff Gadd, Chief Financial Officer                      610,611,620,630,500

**Recommendation**:

It is recommended that the Governing Board Tentatively Approve the 2020-2021 Capital Outlay Budgets.

**BACKGROUND:**

Jeff Gadd, Chief Financial Officer, will present a discussion and review of the proposed 2020-2021 Capital Outlay Budget. Due to changes that have resulted from the 2020/2021 "Skinny" Budget approved by the Legislature the following categories have been reduced.

Partially Restored DAA Budget (currently approved by State Legislature for 2020/2021):
Technology - $4,243,000
Maintenance - $900,000
Vehicles - $230,000
Textbook - $1,500,000

Total - $6,873,000 (categorical spending total after reduction)

Previously Proposed DAA Budget (fully restored):
Technology - $4,743,000
Maintenance - $1,200,000
Vehicles - $430,000
Textbook - $2,200,000

Total - $8,573,000 (categorical spending total previously proposed)

Partially Restored DAA Budget is a reduction of approximately $1,700,000 million or 50% of the recession-era cuts to DAA Statewide.

**IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT**
Positive governance leads to increased fiscal stability and organizational health.
This aligns to District Goal:
_____1    Academic Achievement
\_\_X\_\_2    Fiscal Stability
_____3    External Communication
\_\_X\_\_4    Organizational Health
_____5    School Safety

**Action Item:**

> ### Approval of Quarterly Expectations/Priorities for the Superintendent for the Fourth Quarter of 2019-2020

**Submitted by:**                                              **Funding:**
Dr. John Kriekard, Superintendent                             N/A

## RECOMMENDATION:

It is recommended the Governing Board approve quarterly expectations/priorities for the Superintendent for the fourth quarter of 2019-2020 school year.

## BACKGROUND:

Dr. Kriekard will report on the quarterly expectations/priorities for the third quarter of 2019-2020 school year:

1. Staffing for all schools
2. Budget meetings and strategies
3. Background data collected for facility meetings
4. Enhanced ASU/CSI/Charros partnerships
5. Completion of Certified Handbook
6. Discussion of Internal Auditor to take place in January 2020

The Board will also discuss what expectations/priorities it would like Dr. Kriekard to address for the fourth quarter of 2019-2020 school year.  Suggestions are:

1. Thematic Goal (Playbook) Update
2. Transition with new Superintendent
3. Successful completion of the school year with online learning

## IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT

Positive governance leads to improved organizational health.

This aligns to District Goal:
| | |
|---|---|
| _____ 1 | Academic Achievement |
| _____ 2 | Fiscal Stability |
| _____ 3 | External Communication |
| __X__ 4 | Organizational Health |
| _____ 5 | School Safety |

**Action Item:**

### Approve Waiver of Mid-Year Review for 2019-2020 for General Counsel and Discussion of Policy BDG and General Counsel Evaluation Process

**Submitted by:**                                                    **Funding:**
Dr. John Kriekard, Superintendent                                    N/A


**RECOMMENDATION:**

It is recommended the Governing Board approve waiving the portion of Policy BDG, School Attorney, that calls for an informal, mid-year review of the General Counsel's performance, for the 2019-20 school year.

In addition, the Governing Board may discuss Policy BDG, School Attorney, including the General Counsel evaluation tool and evaluation process.


**BACKGROUND:**

Policy BDG, School Attorney, states that the evaluation process for the General Counsel "shall" include an informal, mid-year review. In the current school year, the Governing Board planned to conduct that review during an executive session on March 17, 2020. However, due to time constraints, the Board postponed that agenda item. In addition to time constraints, the entire District is working to support the public health and educate students during the national and state crisis presented by the COVID-19 virus, which has included direction from public health authorities that people should work remotely and engage in social distancing as much as possible, to help prevent or suppress the spread of the virus.

Governing Board members each have received updates on the General Counsel's performance, and will have an opportunity to conduct a final performance evaluation prior to the end of the school year.


**IMPACT ON STUDENTS AND DISTRICT GOAL ALIGNMENT**
Positive governance leads to improved organizational health.

This aligns to District Goal:
        _____1   Academic Achievement
        _____2   Fiscal Stability
        _____3   External Communication
X_____4   Organizational Health
X_____5   School Safety

# EXHIBIT 16

# ACA
# GENERAL HARASSMENT

The Governing Board is committed to provide a learning environment that is free from harassment in any form. All individuals associated with this District, including but not necessarily limited to, the Governing Board, the administration, and all other employees, students, and members of the public while on campus, are expected to conduct themselves at all times so as to provide a working and educational atmosphere free from harassment.

Definition

Harassment occurs when an individual is subjected to treatment or a school environment that is hostile or intimidating because of, but not limited to, the individual's race, religion, color, national origin, age, physical ability, or gender. Harassment can occur at any time during a school day, including conduct while going to or from school, or during school-related activities.

Harassment includes, but is not limited to:

- *Verbal.* Derogatory comments or jokes, slurs, insults, epithets, or threatening words spoken to another person.

- *Physical.* Unwanted physical touching, contact, assault, deliberate impeding or blocking of movements, or any intimidating interference with normal work or movement.

- *Visual.* Derogatory, demeaning, or inflammatory posters, cartoons, calendars, written words, letters, notes, invitations, drawings, gestures, or objects.

## Retaliation Is Prohibited

The District will neither allow nor tolerate retaliation in any form by any employee, student, or others against any complaining employee, student, or corroborating witness. Retaliation that contravenes this policy could result in discipline up to and including termination or expulsion.

## Education/Training

The District is committed to:

- Providing continual information and training for its administrators and staff members through regular meetings, ensuring that they understand the policy and its importance.

- Making all faculty members, staff members, students, and parents aware of this policy and the commitment of the District toward its strict enforcement.

• Remaining watchful for conditions that create or may lead to a hostile or offensive school environment.

• Establishing programs and practices designed to create a school and working environment free from discrimination and harassment.

Adopted: date of manual adoption

LEGAL REF.: A.R.S.
41-1461 *et seq.*
20 U.S.C. 1681, Education Amendments of 1972, Title IX
20 U.S.C. 1703, Equal Employment Opportunity Act of 1972
42 U.S.C. 2000, Civil Rights Act of 1964 as amended, Title VII

CROSS REF.:
AC - Nondiscrimination/Equal Opportunity
GBA - Equal Employment Opportunity
GCQF - Discipline, Suspension, and Dismissal of Professional Staff Members
GDQD - Discipline, Suspension, and Dismissal of Support Staff Members
IHBA - Special Instructional Programs and Accommodations for
Disabled Students
JB - Equal Educational Opportunities
JII - Student Concerns, Complaints and Grievances
JK - Student Discipline
JKD - Student Suspension
KED - Public Concerns/Complaints about Facilities or Services
KFA - Public Conduct on School Property

# EXHIBIT 17

# AC ©
# NON - DISCRIMINATION /
# EQUAL OPPORTUNITY

The Governing Board is committed to creating an environment where celebrating cultural diversity stimulates the awareness of others by recognizing our similarities, acknowledging our differences, and developing global respect for the values of others.

The Board is committed to a policy of nondiscrimination in relation to race, color, religion, sex, age, national origin, and disability. This policy will prevail in all matters concerning staff members, students, the public, educational programs and services, and individuals with whom the Board does business.

Adopted: date of manual adoption

LEGAL REF.:
A.R.S.
23-341
41-1463
20 U.S.C. 1400 *et seq.*, Individuals with Disabilities Education Act
20 U.S.C. 1681, Education Amendments of 1972, Title IX
20 U.S.C. 1703, Equal Employment Opportunity Act of 1972
29 U.S.C. 794, Rehabilitation Act of 1973, (Section 504)
42 U.S.C. 2000, Civil Rights Act of 1964, Titles VI and VII
42 U.S.C. 12101 *et seq.,* Americans with Disabilities Act
Arizona Constitution, Ordinance Art. XX, Par. Seventh

CROSS REF.:
ACA - Sexual Harassment
GBA - Equal Employment Opportunity
GCQF - Discipline, Suspension, and Dismissal of Professional Staff Members
GDQD - Discipline, Suspension, and Dismissal of Support Staff Members
IHBA - Special Instructional Programs and Accommodations for
          Disabled Students
JB - Equal Educational Opportunities
JII - Student Concerns, Complaints and Grievances
JK - Student Discipline
JKD - Student Suspension
KED - Public Concerns/Complaints about Facilities or Services

# EXHIBIT 18

# Scottsdale Unified School District #48

2019-2020

## Certified Teacher Contract

SCHNEIDER, BROOKE ROSE

Issued By: Scottsdale Unified School District #48 on 3/8/2019

This contract is made and entered into as of its day of execution hereinafter set forth between Scottsdale Unified School District No. 48 of Maricopa County, Arizona acting through its Governing Board (hereinafter referred to as "District") and the below named employee (hereinafter referred to as "Teacher"). District and Teacher agree as follows:

---

### Position Information

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Position: | Teacher 04 | Start Date: | 07/31/2019 | End Date: | 05/27/2020 | Amount: | $43,400.00 |
| | | Days: | 186 | | | | |
| Department: | Elementary Classroom | FTE: | 1.0000 | | | | |
| | | Type: | Certified Teacher Contract | | | | |
| | | Salary Sch: | Certified Salary Schedule BA+0 Step 8 | | | | |

---

Total Amount: $43,400.00

1. **Duties.** Teacher agrees to teach such grade(s) or subject(s) and to perform such other professional duties as may be assigned by the Governing Board or its administrators. Teacher agrees to faithfully perform all duties assigned in accordance with law, Governing Board policies and administrative regulations now in effect and as may be modified from time to time during the contract term.

2. **Term.** Unless otherwise notified, Teacher will commence the first day of work on date listed above and for the number of contract days listed above. The contract year for Teacher shall be in accordance with the official calendar adopted by the Governing Board. If, however, an emergency or other circumstance as determined and declared by the Governing Board or its authorized designee delays the opening or requires the closing of the schools, the period of time covered by the employment contract shall be extended so as to maintain open schools for the number of days required by the employment contract without additional compensation to Teacher.

3. **Conditions.** Teacher's employment is conditioned upon the possession at all times of a valid Arizona teacher's certificate for the position being offered and upon the satisfactory completion of any and all background checks and fingerprint clearances that may be required. Teacher agrees to be appropriately certified in all assigned core academic subjects or as otherwise required by law and to hold all requisite endorsements by the commencement date of this contract. Teacher's employment may be terminated if these conditions are not satisfied.

4. **Maintaining Job Requirements.** Teacher understands and agrees that Teacher is not entitled to compensation for any period during which such fingerprint clearance, certificate(s) and/or endorsement(s) and/or approved area(s) is/are not maintained and in effect; and in addition to any other remedies to which the District may be entitled, District shall not be obliged to pay or compensate Teacher for work performed during such period and District may deduct any of that paid to Teacher attributable to such period from any other monies owed to Teacher by District. In the sole discretion of the District, Teacher may be paid at a substitute teacher rate for a maximum number of days as permitted by law.

5. **Evaluation.** Teacher shall be evaluated through the use of an evaluation system and instrument adopted and approved pursuant to A.R.S. §§15-203.A.38 and 15-537. Teacher acknowledges and agrees that the District's evaluation system and instrument may be amended during the term of this contract. Teacher further agrees that the form of evaluation system and instrument in effect as of the date of the first formal observation of the Teacher shall be the system and instrument that is used to evaluate the Teacher for the remainder of the school year, except and to the extent that a modified system or instrument is required by law.

6. **Salary.**

a. **Base Salary.** In consideration for the performance of the above services, the Governing Board agrees to pay the Teacher as Base Salary the sum as listed above for the term of this contract, except as may be modified herein.

b. **Additional Revenue.** If additional revenues become available to the District through legislative appropriation, state sales tax revenues, or other legal enactment and if those revenues are appropriated, authorized, and/or permitted to be used for teachers' salaries during the 2019-2020 school year, Teacher shall be given a raise in salary, if so approved by the Governing Board in its sole discretion. Any such salary increase shall be apportioned to employees in a manner that will be determined by the Governing Board, unless the authorizing enactment specifies the method by which the increase is to be distributed.

accepted Signed On:3/8/2019 2:39:27 PM

## Certified Teacher Contract

SCHNEIDER, BROOKE ROSE

Issued By: Scottsdale Unified School District #48 on 3/8/2019

c. Proposition 301 Performance Pay. In addition to the Base Salary set forth above, Teacher also shall receive Performance Pay if Teacher qualifies for such pay pursuant to the Governing Board's Performance Pay plan. The qualifying requirements for Performance Pay, and the amount and timing of any Performance payments, shall be as specified in the Performance Pay plan and state law. Payment of Performance Pay shall be contingent on receipt by the Governing Board of Proposition 301 monies used to fund Performance Pay payments.

7. Fringe Benefits. In addition to the amounts set forth above, Teacher shall also receive those direct economic fringe benefits set forth in Governing Board policy. "Direct economic fringe benefits" means only leave and insurance benefits. The Governing Board reserves the right to modify, repeal or enact Governing Board policies during the term of this contract that do not affect the Teacher's direct economic fringe benefits, except that the Governing Board expressly reserves the right to modify the health insurance plan(s) offered to employees during the term of this contract, including but not limited to changing the insurer, required co-payments and/or deductibles, benefits covered, and other terms of the insurance policy coverage. To the extent appropriate for the occasion and as part of the compensation, the District may provide incidental food and beverages at mandatory staff meetings, including in-services and staff development activities/trainings, in order to foster good working relations and encourage and reward staff participation.

8. General Salary Reduction.

a. General Salary Reduction. Teacher acknowledges that at any time after execution of this contract, the Base Salary specified above may be reduced in accordance with a general salary reduction by an amount not to exceed ten percent (10%) of Teacher's Base Salary if any of the following occurs: 1) the Arizona Legislature or any other funding source does not appropriate or make funds available to the District, or reduces, delays, or requires repayment of funding; or 2) the District's Base Support Level, Revenue Control Limit, or General Budget Limit authorized at the beginning of the 2019-2020 fiscal year is less or becomes less than that authorized for the 2018-2019 school year; or 3) the District fails to receive during the 2019-2020 fiscal year, funds in the amount initially budgeted for such year due to a transition to current year funding or for any other reason. In addition to this notice, Teacher shall be given not less than ten (10) calendar days' notice prior to a reduction in Teacher's Base Salary pursuant to this paragraph.

9. Salary Amount. The Base Salary set forth above is intended to reflect Teacher's 2019-2020 salary. If the stated sum does not accurately correspond to the 2019-2020 salary placement, the accurate corresponding salary shall govern. Teacher has an affirmative duty to promptly notify the District of any inaccurate amount within thirty (30) days of receipt of this contract. Teacher's signature on this contract constitutes Teacher's prior written authorization, pursuant to A.R.S. § 23-352, for the Governing Board to withhold from Teacher's pay any compensation paid in excess of the accurate salary amount. No retroactive correction to the Base Salary shall be made after June 30, 2020.

10. School Closure. This contract is conditioned upon the school or other work location to which Teacher is assigned remaining open and in full operation for the entire term of this contract. In the event that, pursuant to court order, lack of appropriated or available funds or for any other reason beyond the control of the District, either the assigned school or other work location is not open in operation for the full contract term or school operations are suspended or reduced below the anticipated level, there may be a pro rata reduction of compensation under this contract corresponding to the portion of the contract term that suspended or reduced school District operations require suspension or reduction of the services of Teacher.

11. Resignation. Pursuant to A.R.S. § 15-545, any Teacher resignation without prior Governing Board approval shall be deemed to be an unprofessional act. Teacher recognizes that the District will incur expenses of securing a replacement and possibly costs for a substitute in the event that the Teacher does not fulfill his/her obligations under the contract. In the event that the Teacher fails to report to his/her assignment or resigns from employment with the District, effective prior to the end of the term of this contract, Teacher agrees to pay the District the amount listed below as liquidated damages, and not as a penalty. The Governing Board may waive this payment if the Teacher's non-performance results from circumstances beyond his/her control or from an agreement for a resignation in lieu of dismissal. The District may withhold all or any part of these liquidated damages from any amount payable to the Teacher after receipt of the resignation or a failure to report for duty, and may take any action, including filing suit, to collect the liquidated damages. Teacher shall reimburse the District for any collection fees, attorney fees, court costs or other reasonable expenses incurred by the District to collect the amount owed as liquidated damages.

After June 1st -----> $500
June 15th - August 1st -----> $1,000
After August 1st -----> $2,000

12. Governing Law. This contract shall be governed by the laws of the United States and the State of Arizona, together with District policies, rules, and regulations now in force or as they may be modified. Teacher agrees that the Arizona State and Federal courts shall exercise exclusive jurisdiction over any and all matters arising out of this contract.

13. Arrest. Pursuant to A.R.S. § 15-550, if Teacher is arrested for or charged with any nonappealable offense listed in A.R.S. § 41-1758.03(B), Teacher shall immediately report the arrest or charge to Teacher's supervisor. Failure to do so shall result in immediate dismissal.

14. Dismissal. Pursuant to A.R.S. § 15-538.02, the Governing Board may dismiss a Teacher who holds a teaching intern certificate, an emergency teaching certificate or another type of nonstandard certificate that is valid for one (1) year or less that without complying with the requirements of A.R.S. §§ 15-537, 15-538, or 15-541. Such dismissal shall be effective ten (10) working days after delivery of the notice of dismissal to the Teacher.

15. Retired Teachers. If Teacher has returned to work after retirement and is currently receiving benefits from the Arizona State Retirement System, Teacher acknowledges that employment is not subject to renewal, teacher is not entitled to a hearing or other protections under A.R.S. §15-538 through 15-543, and specifically agrees to the terms of A.R.S. §38-766.01, incorporated by reference.

16. Acceptance. Teacher's acceptance of this contract shall be by signing it and returning it to the District's Human Resources Office within

accepted Signed On 3/8/2019 2:39:27 PM

# Scottsdale Unified School District #48

2019-2020

## Certified Teacher Contract

SCHNEIDER, BROOKE ROSE

Issued By: Scottsdale Unified School District #48 on 3/8/2019

FIFTEEN (15) business days from the date of receipt or the Governing Board's offer of employment is revoked. By law, contract is deemed received when personally delivered, delivered to teacher's school mail, email or the District's portal, or two (2) days from mailing. If this contract is returned and includes terms in addition to the terms of this Contract offered by the Board or is not returned within the (fifteen) 15 business days, under accordance with the provisions of A.R.S. §15-536 and/or A.R.S. §15-538.01, this contract shall be null and void.

3/8/2019

| | |
|---|---|
| Employee Signature      Date | Patty Beckman      Date |
| | President of the Governing Board |

# Scottsdale Unified School District #48

**2019-2020**

## Notice of Salary Adjustment for Horizontal Movement

SCHNEIDER, BROOKE ROSE

Issued By: Scottsdale Unified School District #48 on 7/29/2019

Please be advised that your salary has been adjusted to reflect the increases for Horizontal Movement approved for the 2019-2020 school year.

**Position Information**

Amount: $44,492.00

| | |
|---|---|
| FTE: | 1.0000 |
| Type: | Notice of Salary Adjustment for Horizontal Movement |
| Salary Sch: | Certified Salary Schedule BA+12 Step 8 |

Total Amount: $44,492.00

Please accept/reject this notice upon review.

This Signature is to be used solely for official District business that has been approved by the Governing Board.